1

1           UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3

CAUSE OF ACTION INSTITUTE,            :
4                                      :
              Plaintiff,               :
5                                      :   CA NO. 16-2354
v.                                     :
6                                      :
INTERNAL REVENUE SERVICE,             :
7                                      :
              Defendant.               :
8    -------------------------------------------------------

9

10           TRANSCRIPT OF MOTIONS HEARING

11     BEFORE THE HONORABLE KETANJI BROWN JACKSON

12           UNITED STATES DISTRICT JUDGE

13            Thursday, August 24, 2017

14   APPEARANCES:

15     For the Plaintiff:  Ryan Patrick Mulvey, Esq.
                           Lee A. Steven, Esq.
16                         CAUSE OF ACTION INSTITUTE
                           1875 Eye Street, NW
17                         Suite 800
                           Washington, DC 20006
18
       For the Defendant:  Kieran O'Neill Carter, Esq.
19                         Ryan O'Connor McMonagle, Esq.
                           DEPARTMENT OF JUSTICE, TAX
20                         DIVISION
                           Civil Trial Section, Eastern
21                         Region
                           P.O. Box 227
22                         Washington, DC 20044

23

24   Proceedings reported by machine shorthand, transcript

25   produced by computer-aided transcription.

2

1                        P R O C E E D I N G S

2            DEPUTY CLERK:  Your Honor, this is Civil

3   Action 17-2354, Cause of Action Institute v. Internal

4   Revenue Service.  Will the parties please approach the

5   podium and state your appearances and the appearance of

6   other individuals at your table for the record, please.

7            MS. CARTER:  Good morning, Your Honor.  May it

8   please the Court, Kieran Carter on behalf of the

9   Internal Revenue Service.  I'm accompanied by my client,

10   Ryan McMonagle.

11            THE COURT:  Good morning.

12            MR. MULVEY:  Good morning, Your Honor.  May it

13   please the Court, my name is Ryan Mulvey, and I

14   represent Cause of Action Institute, and I'm joined by

15   cocounsel Lee Steven.

16            THE COURT:  Good morning to you as well.  The

17   Court has scheduled this hearing in order to give the

18   parties in this matter the opportunity to provide

19   argument and hopefully insight into the pending

20   dispositive motion, which is the IRS's motion to dismiss

21   the plaintiff's FOIA action.

22            I have reviewed your briefs, and I'm familiar

23   with your arguments.  I do want to hear them, though, so

24   you certainly can provide as much background information

25   as you deem necessary in order to illuminate the issues.

3

1    I don't impose time limits with respect to my arguments,

2    but I do ask questions because the point is for the

3    Court to have its questions answered so that it can rule

4    on the pending motion.  And I will try to focus you in

5    on some of the issues that are most concerning to me

6    about the arguments that have been made on both sides.

7         But let me just say I also do something

8    slightly unconventional with respect to the procedure.

9    Even though it is the defendant's motion to dismiss, I

10   like to start with the plaintiff to ask Plaintiff's

11   counsel to provide an overview of the claims in the case

12   so that we understand where we are.  And then the

13   movant, the defendant's counsel can respond, explaining

14   the defendant's perspective generally about the case and

15   also why it is the claims we've just heard about should

16   be dismissed from the defendant's perspective.  The

17   plaintiff will have an opportunity to respond, and then

18   we can go back and forth entertaining replies.  All

19   right?

20        So Mr. Mulvey, I assume you'll be arguing on

21   behalf of Cause of Action Institute.

22        MR. MULVEY:  Good morning again, Your Honor.

23        THE COURT:  Good morning.

24        MR. MULVEY:  As we're all aware, this is an

25   action under the Freedom of Information Act for records

4

1    from the Internal Revenue Service.  Your Honor, the

2    IRS's position on the treatment of Joint Committee on

3    Taxation-related records in this case, in our opinion,

4    is novel.  It conflicts with well-established case law

5    and, frankly, is dangerous insofar as its practical

6    effect would be to sweep a broad array of records in the

7    agency's possession out of reach of public disclosure,

8    thereby undermining the spirit of the FOIA.

9              THE COURT:  All right.  Well, I will certainly

10   give you the opportunity to make your argument regarding

11   why their arguments are wrong.  Let me just have you

12   focus in on your request.  You made a FOIA request.

13             MR. MULVEY:  Certainly.

14             THE COURT:  It has a bunch of different parts.

15   It appears to have been cleverly crafted to at least

16   prompt the IRS to make the response that it made insofar

17   as, as far as I can tell, the response seems to be

18   very -- or the request seems to be very specifically

19   tailored to certain aspects of this.  So maybe you can

20   just back up and tell me what you are asking for and

21   why.

22             MR. MULVEY:  Sure.  In December 2015, the IRS

23   Office of Chief Counsel came out with a notice for

24   proposed revisions to the chief counsel's directives

25   manual and the Internal Revenue manual concerning the

1   Joint Committee on Taxation records and IRS records

2   concerning its interactions with the JCT.  That notice

3   and its contents have since been included and

4   incorporated into the IRM and the CCDM, which is as we

5   understand a subsection of the IRM.

6          Our two FOIA requests, as you've suggested,

7   were strategically designed to test the new guidance

8   from the IRS because on our view, as I've stated, we

9   believe the IRS's position is overbroad and goes beyond

10  what the established case law would permit concerning

11  the treatment of congressional --

12         THE COURT:  All right.  Well, as an initial

13  matter, let me just confirm, I hear you saying that this

14  was guidance that came from the IRS and not from

15  Congress related to its intentions with respect to the

16  records at issue; correct?  I mean, the guidance that

17  you're talking about in 2015 is not necessarily from, at

18  least, from the plaintiff's perspective, I would assume,

19  reflective of Congress's intent related to the

20  documents.

21         MR. MULVEY:  The chief counsel notice does

22  include the wording of the JCT legend.  Our

23  understanding is that legend comes from the JCT or at

24  least is designed together by the JCT and the IRS.

25         But the JCT policy manual and anything more

1    specific such as what the IRS has entered into the

2    record here wasn't publicly available.  So --

3         THE COURT:  Are you disputing that this policy

4    existed prior to the 2015 announcement?

5         MR. MULVEY:  Well, the current policy at least

6    is no, it doesn't come any earlier than I believe it was

7    2013 when *United We Stand v. IRS* was decided by the D.C.

8    Circuit.  Our understanding is JCT practice and IRS

9    policy was updated in light of that.  But we would also

10   suggest based on how the IRS has processed previous FOIA

11   requests that we had submitted, it's also a little more

12   recent than the D.C. Circuit case.

13        THE COURT:  All right.  So you say no earlier

14   than 2013 is pretty much what your understanding is.

15        MR. MULVEY:  I think that's probably true,

16   Your Honor.

17        THE COURT:  All right.  So in terms of the

18   requests that you made --

19        MR. MULVEY:  Your Honor, if I may.

20        THE COURT:  Yes.

21        MR. MULVEY:  2004 was *United We Stand*, I

22   apologize.

23        THE COURT:  Excuse me.  So no earlier than

24   2004.  So we're not talking about decades of policy from

25   your perspective.

```
1          MR. MULVEY:  Yes.

2          THE COURT:  Okay.  The actual request that

3    you -- there are two requests, right?

4          MR. MULVEY:  That's correct, Your Honor.  They

5    were submitted concurrently, but they are separate

6    requests.

7          THE COURT:  Both to the IRS?

8          MR. MULVEY:  Both to the IRS.

9          THE COURT:  And they appear to have a number

10   of subparts, and maybe you can just describe them so

11   we're all clear as to what it is we're talking about.

12         MR. MULVEY:  Sure.  So as you mentioned, there

13   are two requests.  One, which is FOIA request F 16180,

14   score 0047, seeks one item, which is all communications

15   between the IRS and the JCT, and there's a list of

16   search terms.  There's an exclusion for records

17   concerning 26 U.S.C. 6045, 6405 and 8222, Subsection 2.

18         THE COURT:  And so the genesis of that was or

19   what is it that you're looking for getting at?  All

20   communications, letters, records?

21         MR. MULVEY:  All communications.

22         THE COURT:  All right.

23         MR. MULVEY:  So it's not restricted to one

24   medium.  And the search terms there cover a wide range

25   of topics, some which pertain to the JCT's statutory
```

1    responsibilities and its oversight of the IRS and others

2    which, in Plaintiff's view, cover different things like

3    the Paperwork Production Act, the Privacy Act, the

4    Federal Records Act, other items that we believe the IRS

5    or the JCT might have communicated about.

6            THE COURT:  All right.  And how did the agency

7    respond to your request?  And in particular, did it

8    indicate that it had actually conducted a search for

9    responsive records pursuant to that FOIA request?

10           MR. MULVEY:  The agency acknowledged receipt

11   of the request, and its determination both, its initial

12   determination and on appeal, on administrative appeal,

13   it determined that all records that would be responsive

14   are congressional; therefore a search doesn't need to be

15   conducted.  And no search, as far as we are aware, has

16   been conducted, either in that request or the second.

17           And in the alternative, the IRS argued at the

18   administrative stage, at least, that the request, both

19   requests, in fact, were imperfect and therefore not even

20   valid FOIA requests.  In the papers, though, our view

21   would be that the IRS has waived that argument at this

22   point since we raised it in our opposition and the IRS

23   didn't reply.

24           THE COURT:  Didn't put it in their motion to

25   dismiss?

1          MR. MULVEY:  Neither in the motion to dismiss,

2     nor in the reply.

3          THE COURT:  All right.

4          But again, just sort of homing in on their

5     response to your request, from your perspective their

6     argument appeared to be that categorically any and all

7     communications between the IRS and the JCT count as

8     congressional records, and therefore we don't even need

9     to look for these documents.

10          MR. MULVEY:  Indeed, Your Honor, that's how we

11     understand the defendant's position in this case.

12          THE COURT:  All right.  What you call the

13     second request, which is I call the first request, so

14     maybe we shouldn't worry about numbering them.

15          MR. MULVEY:  Right.  The other --

16          THE COURT:  Go ahead.

17          MR. MULVEY:  Sorry.  The other request is

18     F 16180, score 0049.  And that seeks five different

19     categories of records.  If you'd like, I can go through

20     each of the items.

21          THE COURT:  Maybe.  Just kind of homing in on

22     what you think distinguishes them or what you're getting

23     at with respect to each one.

24          MR. MULVEY:  Sure.  I think that there are a

25     few that are particularly important to highlight.  Item

1    No. 1 seeks all records transmitted between the IRS and

2    the JCT or all communications concerning such

3    transmissions which do not contain "alleging,"

4    "restricting their use" or "dissemination."  And that

5    legend that we're referring to is the JCT legend, which

6    is published in the CCDM and the IRM.

7              THE COURT:  So you are, I suppose, assuming

8    that such items or documents exist, that there are

9    records and communications that don't have a legend on

10   them?

11             MR. MULVEY:  That's right.  We don't know

12   whether there are such records or not.

13             THE COURT:  All right.

14             MR. MULVEY:  Item No. 2 is communications

15   between the IRS's FOIA office, PGLD, or any other IRS

16   function or component with the JCT concerning an IRS

17   decision to disclose or withhold records that might have

18   been subject to JCT oversight inquiry.

19             THE COURT:  You added words that I'm not sure

20   actually are in the request.  So let me understand

21   exactly what you're looking for.

22             You want communications concerning the

23   agency's decision-making process about whether to

24   disclose?

25             MR. MULVEY:  Right.  So the JCT is not subject

1    to the FOIA, so we couldn't -- it would have to be IRS

2    determinations since the IRS is the government agency.

3              THE COURT:  But if that's the case, then why

4    would communications with the JCT matter?  Wouldn't you

5    just be looking for internal IRS communications

6    regarding whether or not to disclose records related to

7    the JCT?

8              MR. MULVEY:  So internal communications I

9    think would fall within the scope of the request.  But

10   we know based on the IRM and the 2015 notice there's a

11   provision -- I could even read it to you verbatim if

12   you'd like or at least point you to the provision --

13   which requires that when the IRS receives a FOIA request

14   which implicates JCT-related records that it's supposed

15   to communicate with the JCT about that.

16              And we know that happened in this case because

17   as part of Mr. Barthold, who is the chief of staff for

18   the JCT, he attached copies -- it looked like facsimile

19   copies but we don't know -- of Cause of Action's two

20   requests.

21              THE COURT:  Was that the accidental

22   disclosure?  No, I'm sorry.

23              MR. MULVEY:  We don't consider it an

24   accidental disclosure.  That would be the 6103(p)

25   reports.

1          THE COURT:  Okay.  So I'm sorry.  I'm not

2    familiar with exactly the point that you just made,

3    which is he, who disclosed what now?

4          MR. MULVEY:  Okay.  In Mr. Barthold's

5    declaration.

6          THE COURT:  Yes.

7          MR. MULVEY:  There is an attachment which is

8    his letter, I believe it was from August 2016, to the

9    IRS concerning Cause of Action's FOIA request.

10          THE COURT:  I see.

11          MR. MULVEY:  Attached to that letter are

12    copies of Cause of Action's FOIA request.

13          THE COURT:  I see.  And so you think the

14    letter to the JCT that he attached is a document

15    responsive to this No. 2 or Subsection 2 of this

16    request?

17          MR. MULVEY:  Well, I think there's two points

18    to consider there, Your Honor.

19          First, yes, we would consider it responsive.

20    We defined the frame for our request as to the present,

21    and we defined "the present" to mean the date on which a

22    search is conducted.  Because no search has been

23    conducted, the agency, I'm not sure, has what it might

24    consider a potential cutoff date.  That might be

25    something the parties need to discuss with Your Honor

1    down the line.

2           But at the very least, Mr. Barthold's August

3    letter and the attachments are examples of the types of

4    things that would be responsive to Item 2.  I'm sure

5    that Cause of Action is not the first FOIA requester to

6    seek JCT-related records.  Therefore, it stands to

7    reason that similar records would exist for other FOIA

8    requests and would fall within even what the IRS might

9    agree is the proper time scope for a request No. 1.

10          THE COURT:  All right.  We'll get further into

11   this, but thank you.  Number 3.

12          MR. MULVEY:  Number 3 is records, all records

13   generated or maintained by the IRS in the normal course

14   of its operations that were subsequently provided to the

15   JCT in response to a general oversight inquiry.

16          THE COURT:  How do you define "general

17   oversight inquiry"?  What is it that you're talking

18   about when you say that?

19          MR. MULVEY:  So, Your Honor, I think the best

20   way is to contrast with something like the letter we

21   were just discussing.  Mr. Barthold's letter, which I

22   would note does not contain a legend, was sent with

23   respect to the IRS's obligations to deal with Cause of

24   Action's FOIA request, those obligations falling under

25   the FOIA.

1          We would distinguish records like that from

2     records concerning legitimate JCT inquiries that fall

3     within their statutory responsibilities which are

4     described in depth at the beginning of the IRS's factual

5     background in this case.

6          THE COURT:  All right.

7          MR. MULVEY:  And I would note that No. 3 is

8     particularly important to us because we would dispute

9     the IRS's position that records that preexist a JCT

10    inquiry, that is records that are either created by the

11    agency or even obtained by the agency but are not

12    created by it or by the JCT, likely cannot become

13    congressional records merely because the JCT wills it.

14          THE COURT:  Well, they are provided to the

15    JCT, albeit not created by the IRS for the purpose of

16    responding.  They are, I suppose, compiled and provided

17    to the JCT in response to an inquiry.

18          MR. MULVEY:  Well, that's certainly true,

19    Your Honor, but Mr. Barthold and Mr. Landes's

20    description as well, that's one of the other

21    declarants --

22          THE COURT:  Yes.

23          MR. MULVEY:  Their description of what the

24    policy is and what the actual wording of the legend is

25    and the JCT policy manual are different.  The JCT legend

1   speaks of JCT's correspondence.  That was the sort of

2   thing that the *United We Stand* court determined was

3   covered by the legend and couldn't be disclosed.  And

4   then it says, "Records created in response to, including

5   any replies," and elsewhere in Mr. Barthold's

6   description replies are otherwise described as "the

7   reply letter."

8           We don't believe -- well, rather, we don't

9   contest that a document that is created for the purpose

10  of responding, that is, a record whose creation is

11  dependent upon the receipt of by the IRS a JCT inquiry,

12  can be a congressional record.  Rather, we're looking at

13  other sorts of things that the IRS has in its files that

14  it pulls and sends to the JCT.

15          THE COURT:  Yes.  And we'll get into this.  I

16  mean, obviously the IRS's assertion is that such a

17  compilation creates a new record for the purpose of this

18  analysis, and therefore there really isn't a distinction

19  between "created" and "compiled."

20          MR. MULVEY:  Sure.  And if you want to get

21  into that later, Your Honor --

22          THE COURT:  Yes.

23          MR. MULVEY:  -- I think we actually have some

24  thoughts on that.

25          THE COURT:  All right.  We'll come back to it.

1   What about No. 4?

2          MR. MULVEY:  Number 4 is all records generated

3   or maintained by the IRS in the normal course of

4   operations that were subsequently provided to the JCT as

5   part of IRS general oversight responsibilities but which

6   were not provided in response to a JCT inquiry.  And

7   here, Your Honor, we have the 6103(p)(3) (B) and (C)

8   reports.

9          THE COURT:  Which are not otherwise made

10  available to the public.

11         MR. MULVEY:  Well, they have been in the past.

12  The IRS has released them to us before.

13         THE COURT:  Pursuant to FOIA requests?

14         MR. MULVEY:  Yes, Your Honor.  In my

15  declaration, which is offered in support of our

16  opposition to the pending motion, describes and contains

17  those Section 6103(p) reports.

18         THE COURT:  All right.

19         MR. MULVEY:  And then the final item,

20  Your Honor, is all records created by or originating at

21  the JCT which were provided to the IRS and are

22  maintained by the IRS in any agency system including the

23  but not limited to eTRAK communications and

24  correspondence tracking system which eTRAK, Your Honor,

25  which I'm sure you know based on the information, the

1    factual background provided by the IRS.

2          THE COURT:  Yes.

3          MR. MULVEY:  I won't describe it then.

4          THE COURT:  But do maybe say a little bit

5    about why you think a record that has been incorporated

6    into the eTRAK communications system somehow gets

7    outside of the purview of a congressional record as

8    described in the legend or otherwise.

9          MR. MULVEY:  The fact that it's an eTRAK by

10   itself doesn't, it doesn't accomplish that, Your Honor.

11   I think Item 5 we understood and still understand to be

12   more of a catch-all category for any or records that

13   might not have been specifically indicated as being a

14   congressional record.

15          Since the congressional -- the modified

16   control test in the congressional records context looks

17   to Congress's intent and also the IRS's ability to

18   dispose of a record as it sees fit.  So where intent

19   might be lacking, such as the absence of a legend, yet

20   the IRS has otherwise used the JCT received record or

21   JCT-related record for other purposes, then it would be

22   responsive to Item No. 5.

23          But I think we would concede that Item No. 5

24   is somewhat duplicative of the other items, hence our

25   characterization of it in the opposition brief as a

1    catch-all.

2            THE COURT:  All right.  Thank you.  That was

3    helpful.  You'll have a chance to come back again once

4    I've heard from Ms. Carter.

5            MR. MULVEY:  Thank you, Your Honor.

6            MS. CARTER:  Good morning, Your Honor.

7            THE COURT:  Good morning.

8            MS. CARTER:  The threshold argument in this

9    case is whether the documents underlying Cause of

10   Action's requests are agency records or congressional

11   records.  The Joint Committee on Taxation, or JCT for

12   short, has manifested its intent to control both its

13   correspondence to the IRS and all records created in

14   response.

15           THE COURT:  All right.  So I hate to stop you

16   so early, but I'm going to because you set it up

17   perfectly.  You say the threshold issue is whether these

18   documents are agency records or congressional records

19   for the purpose of release under the FOIA.

20           One very obvious, I think, question is why and

21   under what circumstances do you think that that question

22   raises an issue of subject matter jurisdiction?  You

23   have filed this as a 12(b)(1), and I know that there's

24   some, the words "jurisdiction" appear in the statute,

25   but I have found case law in the D.C. Circuit and

1   elsewhere that indicates that that's a merits question

2   and logically it appears to be under the FOIA.

3          So maybe you can help me because I think this

4   matters a lot as to how I approach this case as to

5   whether or not this really is about subject matter

6   jurisdiction or not.

7          MS. CARTER:  Your Honor, in the Supreme Court

8   case of *Department of Justice v. Tax Analysts*, the Court

9   ceded that FOIA structure and legislative history make

10  clear that agency control over requested materials is a

11  prerequisite to triggering any duties under the FOIA.

12         THE COURT:  Yes.  Any duties.  But, you know,

13  jurisdiction has different meanings and components, and

14  other circuits and including the D.C. Circuit have

15  analyzed the relevant FOIA provisions as talking about

16  the court's jurisdiction to provide the remedies that

17  are being requested as opposed to subject matter

18  jurisdiction.

19         MS. CARTER:  Your Honor, I would submit that

20  if a record is not an agency record, there is no subject

21  matter jurisdiction under the FOIA, because the FOIA

22  only applies to agency records.  It would be like

23  bringing a -- in a way it's similar to a 12(b)(6) motion

24  saying that if you don't have a cause of action, you

25  don't have a claim at all.

1          THE COURT:  Yes, it is a 12(b)(6).  My point

2     is that the issue is a merits issue and not a subject

3     matter.  So let me direct your attention, and you may

4     not have looked at it from this perspective, but there's

5     a D.C. Circuit case, *Citizens for Responsibility and*

6     *Ethics in Washington v. The Office of Administration*,

7     which is the 566 F.3d 219, it's a 2009 D.C. Circuit case

8     in which the issue was whether for the purpose of a FOIA

9     request the entity to whom that request was submitted

10    was an agency, because under the statute if you're not

11    an agency, you don't have to respond to a FOIA request.

12          And the D.C. Circuit held that although -- and

13    I'm quoting -- although the District Court dismissed the

14    complaint for failure to state a claim, CREW argues that

15    "the District Court erred by also dismissing the

16    complaint for lack of subject matter jurisdiction

17    pursuant to 12(b)(1).  We agree."

18          And it goes on to analyze those as two

19    separate things and to say that "because we conclude

20    that the Office of Administration is not an agency

21    covered by the FOIA, we find sufficient grounds to

22    affirm the District Court's dismissal of the complaint

23    for failure to state a claim."

24          It was error under those circumstances to

25    treat the District Court's or to dismiss on the basis of

1    lack of subject matter jurisdiction.

2          The Second Circuit has a very similar analysis

3    where it talks about the Supreme Court case that you

4    discuss and points out in a case called *Maine State*

5    *Legal Services v. National Security Council*,

6    811 F.3d 542, and this is a 2016 Second Circuit case,

7    that they're talking about the National Security Council

8    in a FOIA case.  The NSC argued before the District

9    Court that "A Court has subject matter jurisdiction to

10   hear and decide FOIA claims only if the party from whom

11   the disclosure is indeed an agency.  We disagree.

12   Absent agency, a Court properly dismisses a FOIA claim

13   on the merits, not for lack of subject matter

14   jurisdiction."

15         And it has a lovely discussion about the

16   difference and why it's important to dismiss on the

17   proper basis.  And let me tell you why I think it

18   matters in this case.  Because if this is a 12(b)(6)

19   motion, which is what I think it is, maybe -- I want to

20   hear from you on that -- they're not supposed to look at

21   all of your affidavits and all of the extrinsic

22   evidence.  I need to test this just on the basis of the

23   complaint to the extent it's a motion to dismiss and not

24   a motion for summary judgment.

25         So all of your arguments, the affidavits of

22

1   the people all go out the window if we're not in the

2   right motion-to-dismiss position.  Maybe you can help me

3   in figuring out what I'm supposed to do.

4          MS. CARTER:  Well, Your Honor, I do recognize

5   that especially in the D.C. Circuit in FOIA cases there

6   has been generally, not always, but a tendency to look

7   at FOIA cases and dismiss at the dispositive motion, at

8   the early stages under 12(b)(6) rather than 12(b)(1).

9   Certainly that's true in exhaustion cases where the

10   question is whether the, whether a requester exhausted

11   their administrative remedies before filing a FOIA

12   request.  And the D.C. Circuit has held that it's a

13   jurisprudential matter, not a jurisdictional question.

14          However, I respectfully disagree with the

15   Court as to what you may look at, even if this is a

16   12(b)(6) motion.  I don't have the case cite ready for

17   you, but the D.C. Circuit has said that the Court may

18   look at external evidence when deciding a 12(b)(6)

19   motion if that evidence is related to the, related to

20   the allegations of the complaint.  And here --

21          THE COURT:  Doesn't that have to be evidence

22   that's attached to the complaint or incorporated into

23   the complaint?

24          MS. CARTER:  I don't think so, Your Honor.  I

25   think -- so oftentimes you have FOIA litigation in

1    District Court where they've referred to the FOIA

2    request but they don't attach it as an exhibit to the

3    complaint.

4         THE COURT:  Yes, but it's incorporated by

5    reference because they're talking about the FOIA

6    request.  They're saying you didn't respond adequately

7    to my request.  So even though it's not physically

8    attached, it's part of the plaintiff's claim.

9         What is not a part of the plaintiff's claim, I

10   think, is all the stuff that your people bring in in

11   their affidavits related to why and under what

12   circumstances the agency considers something to be a

13   congressional record.

14        MS. CARTER:  I think it can be incorporated in

15   because of the discussions that Cause of Action actually

16   incorporates in their complaint.  In their complaint and

17   in all of the letters they attach to their complaint

18   they actually include their discussions with the IRS.

19   They include their letters back and forth to the IRS.

20   They include those --

21        THE COURT:  But don't they -- but you have to

22   accept the complaint as true under a 12(b)(6) standard.

23   Even if you're right that they incorporate some of the

24   discussions, don't they contest many of the basic claims

25   or statements that are being made by the people in your

24

1    affidavits?

2          MS. CARTER:  They contest the legal

3    conclusions we've made, but actually as far as I know

4    they haven't contested any of the factual statements

5    that we make, the factual statements being that the

6    Joint Committee on Taxation has, does attach this legend

7    to its correspondence and that -- or the factual

8    contention that the IRS has agreed to relinquish control

9    of these documents.

10         THE COURT:  All right.  Well, that's helpful

11   to hear your position.  It sounds as though you say even

12   if this is a 12(b)(6).  We can still get to and use the

13   affidavits.  Am I adequately characterizing your

14   response?

15         MS. CARTER:  Yes, Your Honor.  I would say

16   that we can proceed under 12(b)(1) as well, Your Honor.

17   And the reason why is because the statutory basis for

18   this action is the FOIA.  And if the FOIA simply -- and

19   if the -- and if the FOIA does not apply because these

20   are congressional records, I think that this can be a

21   jurisdictional matter.

22         THE COURT:  I will commend to you the Second

23   Circuit's opinion, which I think reflects what the D.C.

24   Circuit said in the case that I previously cited, and

25   especially the part in which they say, "In looking at

1    the FOIA based on its text we construe

2    Section 552(a)(4)(b), which is the relevant FOIA

3    provision, to reference remedial power, not subject

4    matter jurisdiction.  The highlighted language does not

5    speak to the Court's ability to adjudicate a claim, but

6    only the remedies that the Court may award."

7         So they consider the statutory provision and

8    the extent to which it talks about jurisdiction not to

9    be addressing whether I have the power to evaluate this

10   in a subject matter jurisdiction sense but whether I

11   have the power to award the remedies.  And so therefore

12   it is not okay, according to the Second Circuit and I

13   say also the D.C. Circuit, to treat it as a 12(b)(1).

14        But even so, with respect to the 12(b)(6)

15   argument that gets us to the affidavits, maybe you can

16   help me also to understand the extent to which this, the

17   analysis that you want the Court to make, can be done

18   outside of the context of identifying particular

19   documents.

20        And by that I mean -- well, let me start off

21   by asking you the same question I asked your

22   counterpart, which is in response to the FOIA requests

23   that came in, that we've been discussing, did the agency

24   conduct a search?  Did you search for the records that

25   were being requested?

1          MS. CARTER:  No, Your Honor, we didn't.  And I

2     would refer the Court back to the *Tax Analyst* opinion,

3     which says that a prerequisite to triggering any duties

4     under the FOIA is that the agency has control over the

5     requested documents.

6          THE COURT:  Okay.

7          MS. CARTER:  And so it's our position that as

8     we don't, as the IRS does not have control over any of

9     these documents, we are not obligated to do a search.

10         THE COURT:  Here is my problem with that as a

11    categorical matter:  As I understand the legal tests

12    that are applied, whether or not the agency has control

13    over the documents is a fact-specific inquiry that

14    relates to Congress's intent with respect to the

15    particular documents.

16         So what's hard for me is to look at all of

17    these different requests that they have strategically

18    laid out regarding different kinds of documents, some of

19    which originate with Congress, some of which originate

20    with the IRS, but all of which are in the IRS's

21    possession at the time of the request and say as a

22    categorical matter without even looking at the

23    particular documents in the categories that they've laid

24    out, you don't have to search.  These are all

25    congressional records, because the test is not as broad

1    as that.  The test is not anything the agency indicates

2    came from Congress or relates to something about

3    Congress counts as a congressional record.  The test

4    requires me to look at Congress's intent with respect to

5    the particular document.

6         So what I'm confused about is the agency's

7    insistence that it can say off the top without even

8    identifying the particular records that these are all

9    congressional records and we don't even have to go any

10   further.

11        MS. CARTER:  Well, Your Honor, I would

12   respectfully disagree that the test is that you have to

13   look at the specific document.  The test is whether

14   Congress has manifested its intent to control certain

15   documents and whether the agency has agreed --

16        THE COURT:  Right.  What documents is what I'm

17   asking you.

18        MS. CARTER:  So in this case the facts before

19   Your Honor are that the IRS has, the Joint Committee on

20   Taxation has endeavored to apply a legend to all of its

21   official correspondence to the IRS.

22        THE COURT:  But there's also record evidence

23   that not every document has the legend.  In fact, we saw

24   a letter just a second ago that didn't have it on there.

25   So what do I do with that?

1            MS. CARTER:  First of all, with respect to

2    that letter, I'm not aware if that's the entire, if

3    that's the entirety of the communication or not.  It

4    could have been an attachment to an email and the email

5    had the legend on it or something.  But beyond that, the

6    IRS has provided evidence of the Joint Committee's

7    intent to manifest its control over all documents in a

8    generalized way, which I do believe applies to all the

9    documents --

10            THE COURT:  We don't have a statute, do we?

11    You don't have a statute by Congress that says every

12    communication with the IRS in any form originating with

13    us or with the agency is a congressional record.  We

14    don't have a statute, right?  Am I right about that?

15            MS. CARTER:  That's correct.

16            THE COURT:  Okay.  So we have a legend that

17    may or may not appear on certain documents.  If you are

18    correct, why do we even need a legend?  If Congress's

19    intent is that every communication that originates with

20    it or the IRS about any subject counts, then what was

21    the purpose of the legend?

22            MS. CARTER:  Your Honor, in this case we are

23    only talking about the Joint Committee on Taxation and

24    its communications with the IRS.  We're not talking

25    about Congress in general.  It's certainly not

1    Congress's intent.

2         THE COURT:  Fine.

3         MS. CARTER:  This relationship and these facts

4    are special, because in this relationship all of these

5    communications are confidential.  The Joint Committee on

6    Taxation --

7         THE COURT:  So why do we need a legend that

8    says that?  If that is true categorically, then a legend

9    is neither here nor there; right?

10        MS. CARTER:  Your Honor, the legend is one of

11   many manifestations of intent.

12        THE COURT:  Why do they -- but why do they

13   need to manifest it by creating a legend and endeavoring

14   to put it on every document if, regardless, all of the

15   communications are confidential and should not be

16   considered agency records?

17        MS. CARTER:  They don't need to include the

18   legend.  Our position is that the, that they did not

19   need to include the legend on everything, but that they

20   have in an effort to be extra careful to once again in

21   many ways communicate their desire to have these, to

22   have these documents remain under congressional control.

23        They have done multiple things to assert their

24   control over these documents, and the rule is that

25   they've asserted, they've manifested an intention to

1   control these documents.  And yes, the Joint Committee

2   on Taxation can manifest an intention to assert control

3   over all of its documents.  It has --  there's nothing

4   that says it can't.

5          THE COURT:  So let's be more specific, because

6   I guess I'm still confused when you just say "its

7   documents."

8          MS. CARTER:  Okay.

9          THE COURT:  So we have different categories of

10  documents that we're talking about.

11         MS. CARTER:  Yes.

12         THE COURT:  And I understand the agency's

13  position to be that all of the categories of documents

14  that are touched upon by the FOIA request are

15  congressional records and don't have to be disclosed and

16  that's why you didn't search, right?

17         MS. CARTER:  Yes.

18         THE COURT:  The whole kit and caboodle.

19         MS. CARTER:  Right.

20         THE COURT:  But some of the documents that

21  we're talking about are not documents that originated

22  with Congress.  So how is it that you assume that

23  nevertheless those documents should be deemed

24  congressional records for the purpose of this FOIA

25  request?

 1          MS. CARTER:  There are a number of things.

 2     The first is that when a legend is applied, the legend

 3     that has been used for the entire time frame --

 4          THE COURT:  I'm sorry.  Is a legend applied to

 5     documents that are in the IRS's possession?  I thought

 6     the legend only went on the ones that started from

 7     Congress and went to the IRS.

 8          MS. CARTER:  So the legend that's been applied

 9     to JCT correspondence to the IRS says that, has the

10     language that this correspondence and any replies

11     thereto, any documents created in response to that are

12     considered congressional documents.

13          So already within the scope of documents that

14     are absolutely congressional records that Cause of

15     Action has now said that they are not contesting are

16     congressional records are those correspondence from JCT

17     to the IRS that includes legend and any responses by the

18     IRS back to JCT.

19          So --

20          THE COURT:  No, I'm sorry.  Let me just be

21     more precise, because that's not what I heard him say,

22     nor is it consistent exactly with what the legend says,

23     which is any documents created by the IRS in connection

24     with the response to this joint committee document,

25     including any replies by the committee.  So we have

1    documents that are created by the IRS in response are

2    covered, but they have strategically crafted a FOIA

3    request to get at documents that they say were not

4    created by the IRS in response to -- so what do we do

5    with those categories of documents?

6         MS. CARTER:  Your Honor, it's our position

7    that any documents compiled in response by the IRS in

8    order to be responsive to a joint committee request fall

9    under the concept of created.  The compilation is a

10   creation.

11        THE COURT:  But that's not what the legend

12   says.  That's your position.  My question is what is

13   Congress's position, and to the extent you're relying on

14   the legend to cover those categories of documents, don't

15   we have to look at what it says about what counts?

16        MS. CARTER:  Your Honor, we're relying on the

17   D.C. Circuit case of *United We Stand*, which held that a

18   compilation of documents or anything that is not

19   necessarily encompassed by the actual language of the

20   legend but that would reveal the nature of the

21   underlying JCT inquiry is interpreted to be a

22   congressional record and it has been interpreted that

23   the JCT intended to manifest its intent over those

24   documents as well.

25        THE COURT:  I'm so glad you raised that case,

1    and the point being that it says the compilations that

2    reveal the nature of the inquiry.  So I'm back to my

3    original question, which is don't I have to know exactly

4    what kinds of documents we're talking about in order to

5    assess whether the compilation that you say was compiled

6    and put together and sent to the JCT in response to

7    their inquiry would reveal the nature of the inquiry?

8          MS. CARTER:  Your Honor, by the language of

9    Cause of Action's FOIA request, any documents that would

10   be responsive to the FOIA request would also reveal the

11   nature of the Joint Committee on Taxation inquiry.  They

12   have asked for the correspondence between the IRS and

13   the joint committee.  That correspondence is going to be

14   related to joint committee inquiry.  That's the whole

15   point of it.

16         THE COURT:  Let's be fair.  They've asked for

17   correspondence and records that were, that were

18   transmitted -- with respect to what I'm talking about,

19   these are records that were created by the agency in the

20   ordinary course, having nothing to do with the JCT.

21   Then when the JCT asks them for the records or some,

22   makes some other inquiry in response to that inquiry,

23   they go to their files, they pull out things that were

24   otherwise created and they send them.

25         MS. CARTER:  Correct.

34

1          THE COURT:  Maybe the letter that says, In

2     response to your inquiry about X, here are the following

3     documents, it's withheld because revealing that letter

4     would necessarily reveal the nature of the inquiry that

5     has been put forward.

6          But it is not apparent to me that shipping

7     over or releasing all of the records that had previously

8     been created by the agency independent of any

9     congressional inquiry necessarily reveals the nature of

10    the inquiry that has been made.  I mean, these were

11    records that were created regardless.  Who knows why or

12    under what circumstance they are responsive without the

13    particular correspondence that says, We're the JCT and

14    we're looking for certain records because we're making

15    this kind of inquiry.  Without that, how does the public

16    know what the nature of the inquiry is?

17         MS. CARTER:  You have to look at the context

18    in which the records are used.

19         THE COURT:  Precisely, which is why I don't

20    understand how we can do this as a categorical matter.

21         MS. CARTER:  Certainly if I requested, if I

22    sent a FOIA request to the IRS asking for my 2016 tax

23    return, that's an agency record and the IRS would have

24    to give me that 2016 tax return.

25         If I asked the IRS and submitted a FOIA

1  request to them asking for all documents related to

2  inquiries about whether -- all documents about whether

3  the JCT asked about taxpayers who claimed charitable

4  deductions and my tax return has a charitable deduction

5  on it, because I'm asking for that same record in the

6  context of a JCT inquiry, because I'm asking for what

7  JCT asked about --

8         THE COURT:  Yes, but you understand that the

9  question and the hypothetical that you just posited

10  includes the nature of the inquiry in it.  Unlike their

11  records.  They just say, Give me everything that the IRS

12  transmitted to the JCT from 2009 to present in response

13  to an inquiry.  They don't say in response to an inquiry

14  about X.

15         And so what I'm trying to understand is how as

16  a categorical matter.  There may very well be some

17  documents that when you release them as a result of this

18  will show what the nature of the original JCT inquiry

19  is.  But I have to know, I have to look at them

20  separately in order to figure that out.  Because there

21  may very well be some documents that have been

22  transmitted in response to an inquiry that don't make

23  clear what the inquiry is about.

24         MS. CARTER:  I would submit that I think where

25  our disagreement lies is in whether the fact that a

1    document was responsive to an inquiry at all makes it,

2    reveals something about the nature --

3            THE COURT:  Yeah, that is our disagreement,

4    because the D.C. Circuit says the nature of the inquiry

5    is the issue.  That when you reveal the nature of the

6    inquiry, that's when you're treading on ground that we

7    understand not to be okay.

8            MS. CARTER:  And that's only when there has

9    not been a specific manifestation of intent, Your Honor.

10   That's only -- *United We Stand* said that if there had

11   been a specific manifestation of intent, for example,

12   when the legend was appended to the correspondence from

13   the JCT to the IRS, that is a congressional record.  And

14   even though the legend clearly did not specifically

15   incorporate the response back, when the legend doesn't

16   specifically incorporate that response, only then you

17   can still call it the congressional record.  Even though

18   there hasn't been a direct manifestation of intent, it's

19   sort of like an indirect manifestation of intent, that's

20   enough to be a congressional record.

21           Here most if not all of the documents fall

22   under a specific manifestation of intent.  So we don't

23   even need to get to the question of whether additional

24   documents are -- we have the legend appended to most

25   documents, and then the legend which incorporates the

1    other documents --

2              THE COURT:  I'm sorry.  How do you know this?

3    You haven't searched for the documents.  You keep

4    talking about the legend being appended, and what I

5    don't understand is are we talking about 100 percent,

6    50 percent, 75 percent?  And if it's less than

7    100 percent, doesn't that undercut your argument that

8    Congress isn't making assessments about what it intends

9    to exercise control over or not?

10             MS. CARTER:  It absolutely does not.

11             THE COURT:  How can you both rely on the

12   legend and then disclaim it?

13             MS. CARTER:  The legend is one of many

14   manifestations of intent.  We also have the Joint

15   Committee on Taxation's training of new hires to put the

16   legend on everything.  Its declaration from Mr. Barthold

17   saying that they endeavor to put the legend on

18   everything because it is their intent to control all its

19   correspondence and all replies thereto.

20             They have their policy manual which says,

21   which says that it's their intent to control all the

22   documents, and that has been communicated to the IRS.

23   And the IRS importantly has assented to this complete

24   relinquishment of control and has agreed to their

25   expressions of control.

1          THE COURT:  I understand, but the question for

2    my purposes and the thing that is most troubling to me

3    about the argument that you are making is that I don't

4    understand how it is consistent with a body of case law

5    that indicates that there's some factual analysis that

6    I'm supposed to be doing with regard to congressional

7    intent at a more granular level than what it is that you

8    are suggesting.  That there are particular documents at

9    issue that Congress can, the JCT can and may decide that

10   some of them are okay to be treated as congressional or

11   as agency records and some of them aren't.

12          And I just, what's hard for me is that the

13   agency did not even endeavor in this situation to look

14   at what are clear distinctions that are being drawn in

15   this FOIA request regarding different types of documents

16   and say These we think we need to pull and determine

17   whether they have the legend on them or not and what the

18   implications are of that.  These we need to pull and

19   determine -- like let's talk about number two, the sub 2

20   of what I call the first request.  Right.

21          These are the communications between the FOIA

22   office and the JCT about whether or not to disclose.

23   That's not to me obviously a congressional record,

24   right.  Because this is, the IRS's responsibility is to

25   determine whether or not to disclose -- they're the

1    decision makers, says the plaintiff.  They have to

2    consult with the JCT.  But when you go back to your

3    original threshold question, are these congressional

4    records, it's obvious to me that those communications

5    are.  And what's troubling is that it doesn't appear to

6    me that the agency has made any attempt to try to really

7    home in on this and figure out to what extent are those

8    kinds of communications covered or not by the

9    congressional records analysis.

10         So why do you think that the IRS's

11   communications with the JCT about whether or not to

12   disclose a record is a congressional record?  That's not

13   an inquiry, it's not an investigation, it's not a

14   response to the investigation.  It doesn't appear to fit

15   anywhere into the legend.  It seems like a totally

16   different animal.  So how is it that that gets to be

17   congressional record for the purpose of FOIA?

18         MS. CARTER:  Because the IRS -- sorry.  The

19   Joint Committee on Taxation has repeatedly said that all

20   of its communications with the IRS, it intends for all

21   of those communications to be congressional records, and

22   it has relayed that intent to the IRS in many different

23   fashions.  And the IRS has acknowledged and assented to

24   that consent.

25         If you look back at the purpose of this

1   manifestation of intent rule, why didn't they just, why

2   didn't the Court come up with a rule that simply said

3   that if the Congress intended it to be, they said they

4   had to manifest the intent.  And the reason they have to

5   manifest the intent is that the agency is aware of that

6   intent and can act based on that awareness.  And nothing

7   in the case law, Your Honor, says that that intent has

8   to be specific to a document or a subset of documents.

9   Nothing in the case law says that a committee can't make

10  an expression of intent to control all documents.

11          THE COURT:  But it hasn't done that.  Even you

12  say they haven't.  You tell me that the manifestation of

13  intent or at least one aspect of it, perhaps a major

14  aspect of it is the legend.  The legend doesn't say all

15  communications of any sort with the IRS.

16          MS. CARTER:  The Joint Committee on Taxation

17  as a rule has manifested its intent to control all of

18  its records.  The declaration of Mr. Barthold says they

19  have manifested an intent to control all of its records.

20  Its training manual --

21          THE COURT:  I'm sorry.  His declaration I'm

22  not sure governs what -- I mean, it's his opinion,

23  right?  It's a conclusory opinion about whether or not

24  the committee has --

25          MS. CARTER:  It's a statement of the

41

1    committee, what the committee has done.  The committee's

2    position is that all records are a congressional record.

3            THE COURT:  But not going forward.  It is --

4    in the context of this litigation he apparently has gone

5    back, right?  The plaintiffs point this out.

6            MS. CARTER:  I'm not talking about the letter.

7    I'm talking about all of the evidence that the IRS has

8    put forward in this motion to show that Congress has

9    manifested its intent to control all of its official

10   communications between the IRS and the Joint Committee

11   on Taxation.  And importantly, the IRS has acknowledged

12   this.

13           In its IRM, in its chief counsel directives

14   notice it has said that it understands that the Joint

15   Committee on Taxation has manifested an intent to

16   control all of its communications.

17           THE COURT:  I understand.  But words matter.

18   So a second ago you said all of its official

19   communications.

20           MS. CARTER:  Yes, all of its official

21   communications.

22           THE COURT:  Are there communications that are

23   unofficial?

24           MS. CARTER:  Sure, there are personal

25   communications.

42

1          THE COURT:  Not personal.  Unofficial.  What

2     is an official communication?

3          MS. CARTER:  I don't know what an unofficial

4     communication would be.  If there's a communication

5     between the joint committee and the IRS it's either

6     going to be an official communication or it's going to

7     be --

8          THE COURT:  I don't know.  You have the

9     records and you haven't endeavored to tell me what's

10    there.  What I'm suggesting is that there may be a

11    letter on official letterhead from the Joint Committee

12    on Taxation signed by its chief of staff that is an

13    official communication.  But if he picks up the phone or

14    he writes an email and he says, Hey, do you guys have X,

15    is that considered an official communication?

16         MS. CARTER:  Absolutely.  Everything that is

17    an exercise of the joint committee's oversight authority

18    is an official communication.

19         THE COURT:  All right.  To the extent that --

20    so tell me what the manifestation is that indicates that

21    in all forms under all circumstances every communication

22    and record that is transmitted between these two

23    entities is intended by Congress to be a congressional

24    record, because I don't see that in the legend.  Now,

25    maybe you're saying when we add the legend to the

43

1  affidavits or something we get to every single

2  communication, even those about whether or not to

3  disclose records come in.

4        MS. CARTER:  The Joint Committee on Taxation

5  has sent letters to the IRS communicating that.

6        THE COURT:  About correspondence related to

7  the disclosure of FOIA?

8        MS. CARTER:  Yes.

9        THE COURT:  Okay.

10        MS. CARTER:  They have put in their policy

11  manual that all communications are intended to be

12  congressional communications, in its training of new

13  hires and in its informal conversations with the IRS.

14        THE COURT:  I'm sorry.  I didn't hear the

15  last --

16        MS. CARTER:  Its informal conversations.  When

17  Mr. Barthold picks up the phone and is talking with

18  someone at the IRS, his declaration states that he has

19  communicated then that all of its communications are

20  intended to be congressional records.

21        THE COURT:  That's notwithstanding the fact

22  that the legend says only official communications.

23        MS. CARTER:  Legend is just extra.  It's one

24  example of many.  The legend is specific to certain

25  documents, but beyond the legend they have taken the

1    extra step of making sure that in those cases where they

2    accidentally forget to include the legend that they have

3    also made sure they communicated that all of these

4    documents are supposed to be congressional records.

5              THE COURT:  All right.  What about the

6    records?  The six 103(p) records, the plaintiff says

7    these have previously been disclosed, and in addition,

8    it's unclear as to why the reports of the IRS should be

9    deemed Congress congressional records in this sense.

10             MS. CARTER:  Your Honor, I would submit that

11   the statute governs when those reports can be released.

12             THE COURT:  Right.  I understand that.  But

13   that seems to me to be an argument under the FOIA

14   exemptions, right.  We have a statutory exemption that's

15   under FOIA that you don't even get to because we haven't

16   really searched and found the records and said we're

17   withholding them for these reasons.  But if you were to

18   do that, I would anticipate that maybe you would use

19   that statutory exemption to state that we're withholding

20   these pursuant to the statute that says we're not

21   allowed to give them to the public.  Fine.

22             What I don't understand, we're in the world of

23   is this a congressional record, because that's what you

24   told me is the issue.  Why is it that these count as

25   congressional records?

1          MS. CARTER:  It is a communication between the

2    joint committee and the IRS, and the joint committee has

3    manifested its intent to control all communications

4    between the two that are official communications.

5          THE COURT:  But it's not a communication

6    between.  It is a report of the IRS that is transmitted

7    to the JCT pursuant to this other statute.  It's not a

8    communication.  It's a report.  So you're saying all

9    reports of the IRS if they somehow end up with the JCT

10   whether it's pursuant to statute, not requested, just

11   generated.

12         MS. CARTER:  It is requested.  I mean, there

13   were -- the joint committee is working with the IRS

14   on -- the reports are a compilation of work done with

15   the Joint Committee on Taxation.  It relates to the work

16   done with the Joint Committee on Taxation.  So in that

17   sense yes, it is a communication.  It's a report of

18   prior work accomplished between the two entities, the

19   two organizations.

20         THE COURT:  Again, what's so confusing about

21   your position is that it just obviates the entire sort

22   of D.C. Circuit case law analysis, because if it doesn't

23   matter whether it reveals the nature, if it's just a

24   report that has anything to do with it, then what was

25   Judge Tatel talking about?  It doesn't matter, right?

46

1          MS. CARTER:  May I address the case law?

2          THE COURT:  Yes.

3          MS. CARTER:  So, Your Honor, in each of the

4   instances -- and there's five cases that really deal

5   with whether records are agency records or congressional

6   records:  *Goland*, *Holy Spirit*, *Paisley*, *United We Stand*

7   and *ACLU*.  Those are the five cases that deal with

8   whether the specific documents in those cases are agency

9   records or congressional records.  None of those cases

10  describe what Congress must specifically do in order to

11  manifest its intent.  And actually, *Holy Spirit* says

12  it's not our place for the Court to say how Congress

13  must manifest its intent in order to be sufficient.

14  Instead --

15          THE COURT:  Can --

16          MS. CARTER:  -- it just looks at the specific

17  facts of each case before them.

18          THE COURT:  And can you just enlighten me with

19  respect to the five cases, which ones were dealing with

20  records that were presumptively congressional records in

21  the sense that they were generated by Congress and

22  transmitted to the agency versus those that were created

23  by the agency in the first instance?

24          MS. CARTER:  Okay.

25          THE COURT:  Do you know which are which,

1    because I see those as different things with respect to

2    the analysis of whether or not something is a

3    congressional record.

4         MS. CARTER:  Yes, Your Honor.  Absolutely.  In

5    the very first case, 1978 case of *Goland v. The CIA*,

6    that was a transcript of a hearing held before the House

7    Committee on Expenditures that was in the CIA's

8    possession.  So that was a Congressionally created

9    document transmitted to the IRS.

10        THE COURT:  Okay.

11        MS. CARTER:  That was found to be a

12   congressional document.

13        THE COURT:  Okay.

14        MS. CARTER:  In *Holy Spirit*, Your Honor, there

15   were five documents generated by Congress and sent to

16   the CIA.  And there were additional 15 documents that

17   originated at the CIA and were sent to Congress, but the

18   CIA also had copies of them.

19        The only evidence of a manifestation of intent

20   in that case was a post hoc letter that was written

21   after the start of litigation by the congressional

22   committee after the FOIA request had been made.  And the

23   Court found that those are clearly agency documents.

24   And the only manifestation of intent was after this

25   litigation began.

1        THE COURT:  All of the documents, all 50

2   documents were --

3        MS. CARTER:  Yes.

4        THE COURT:  -- the agency documents?

5        MS. CARTER:  The agency documents, and the

6   reason why was because there was absolutely no

7   manifestation of intent except for a letter written

8   after the FOIA request.

9        THE COURT:  Okay.

10        MS. CARTER:  In *Paisley v. CIA*, Your Honor, a

11   1983 case from the D.C. Circuit, there were three

12   documents that were created by the Senate Select

13   Committee on Intelligence and two FBI documents created

14   by the Senate Select Committee on Intelligence.  There

15   were 57 documents that -- there were 57 documents total,

16   and all the rest were agency-created.

17        THE COURT:  Okay.

18        MS. CARTER:  Here the Court found that there

19   were agency documents, and the reason why was because

20   the agencies presented a total of six letters that were

21   supposed to show the manifestation, a congressional

22   manifestation of intent to control.  Only one letter out

23   of the six actually stated that it was Congress's desire

24   that the records remain congressional records and that

25   the agency may not release the document without

1   congressional approval.

2           THE COURT:  Let me ask you two questions

3   really quickly on the substance of this.  First of all,

4   is this at summary judgment or at motion to dismiss, do

5   you know?

6           MS. CARTER:  I don't know, Your Honor.

7           THE COURT:  Second, are the letters and the

8   manifestations of letters of intent that are being

9   discussed specific to the documents at issue in that

10  case?

11          MS. CARTER:  Here the only letter that

12  actually expressed an intent to control the records from

13  Congress was written three years after the document in

14  question.

15          THE COURT:  So they are talking about the

16  document at question.  In other words, the manifestation

17  of intent is specific to the document in question, not

18  so much just the relationship between the agency and

19  Congress?

20          MS. CARTER:  They didn't look at it -- the

21  Court never said anything about whether the document had

22  to be specific.  But in this case yes.  It was another

23  post hoc letter where after the litigation began

24  Congress wrote a letter saying We don't want these

25  documents to be agency records.  We want to control

50

1   them.  And the Court said that wasn't good enough.

2          THE COURT:  But they were talking about the

3   particular documents at issue?

4          MS. CARTER:  They were.  It was a letter after

5   the fact from Congress saying, Hold on, we wanted these

6   to be congressional documents.

7          THE COURT:  All right.  And that wasn't good

8   enough to manifest intent?

9          MS. CARTER:  It was after the litigation.

10         THE COURT:  Understood.  But Congress was

11  specifically talking about the very documents in the

12  litigation, and the Court said not enough to manifest

13  your intention with respect to those documents?

14         MS. CARTER:  The reason for that, Your Honor,

15  goes back to the Supreme Court case of *DOJ v. Tax*

16  *Analysts*.  *Tax Analysts* says that in order to be an

17  agency record, the agency must have the documents in

18  their possession, and the agency must have control of

19  the documents at the time the FOIA request was made.

20         So here really the rule is going to be whether

21  Congress manifested that intent before the FOIA request

22  was made.  It's our position that as long as Congress

23  manifested an intent to control the documents in

24  question before the request is made, the FOIA request is

25  made, then they are congressional documents.

1          THE COURT:  But they have to manifest its

2     intent to control the documents in question.

3          MS. CARTER:  And it can do so generally.

4     There's nothing in any case law that says that they have

5     to do it specifically to a particular document.  In

6     fact, in *Paisley*, the opposing counsel, their big thing

7     is they're saying you have to do it specifically and

8     contemporaneously.  And they get that language from the

9     *Paisley* case.  But *Paisley* doesn't actually say that.

10          *Paisley* is dealing with this case where they

11     have a subset of six letters that are after the fact,

12     after the document's creation and transmission.

13     *Paisley* -- the Court in *Paisley* compared those documents

14     where all we had is a post hoc letter to other documents

15     that had been transmitted from Congress to the CIA, and

16     those particular documents had a letter that came with

17     the boxes of documents that said We intend these to be

18     congressional documents.

19          And so what the Court said is in one example

20     you clearly have a manifestation of intent.  There's

21     no -- there's no question that when it is specifically

22     and contemporaneously manifested -- when Congress's

23     intent is specifically and contemporaneously manifested,

24     they're congressional records.  There's no question

25     there.

1    At the other end of the spectrum all we have

2 is this instance of a single letter done after the start

3 of litigation that says, Oh, yeah, we also, we intended

4 to control these documents also.  And the Court said

5 that's clearly not good enough.

6    THE COURT:  Yes, and I understand that.  But

7 do you see how at least from my perspective in this

8 moment your argument is off the spectrum, because what

9 you appear to be saying is let's not even look at what

10 Congress's intent is with respect to the documents at

11 issue in this request.  Let's just say it's Congress's

12 intent that no matter what the document is, no matter

13 what the communication is, if there's any form of

14 connection between the agency and Congress, it's

15 covered.

16    Congress intended -- we don't have to care

17 what the document is at all, you say.  And I don't

18 understand that.  How can I possibly determine whether

19 something is a congressional record or an agency record

20 in the abstract without knowing what the record is?

21    MS. CARTER:  Because what we do know is the

22 record is a communication between the two.  It's a

23 communication between Joint Committee and IRS.  And for

24 all those communications we have --

25    THE COURT:  But --

53

 1          MS. CARTER:  We are manifesting that intent.

 2          THE COURT:  But you realize that no other

 3   court has done this.  You're -- so --

 4          MS. CARTER:  No court has been given these

 5   facts before.  It's not saying that they can't do it.

 6   It's just that no court has addressed this.  Every time

 7   we've had this issue come up, it's been in very

 8   specific, a specific letter, a specific report, a

 9   specific box of documents.  We've never had --

10          THE COURT:  I'm sorry.  They are making

11   specific requests.  What you've said is we don't have to

12   care about your specific request because our legal

13   argument is regardless, because this relates to JCT

14   communications with the IRS, it's covered.  It's not

15   that we don't have specificity, we don't know what it is

16   they're asking for.  It's that the agency has taken what

17   I perceive to be a very novel position.  Because all of

18   the other courts in all of the cases that you're talking

19   about evaluate things in the context of particular

20   records, the *Paisley* discussion that you just talked

21   about.

22          If you were right and that was the way you're

23   supposed to analyze it, there's no need to talk about a

24   spectrum on the one hand.  Did you do it

25   contemporaneously or not.  All of that legal analysis is

1    irrelevant.  All that needed to be said was Congress has

2    indicated as a general matter that any communications

3    from the CIA and Congress should be treated as

4    congressional records, so they don't even have to open

5    the file drawer to look for these communications.

6         That is not what's happening in any of these

7    cases.  And so to the extent that that's what you're

8    asking me to do, I am nervous because I've never seen it

9    before.

10        MS. CARTER:  That is the rule.  The rule is

11   not that Congress must manifest its intent and it must

12   do so in X, Y, Z way.

13        THE COURT:  I'm not asking way.  I'm asking

14   whether, whatever, however the manifestation of intent

15   comes, does it have to relate to the documents that are

16   being manifested, or can it manifest its intent to treat

17   every communication in whatever form under whatever

18   circumstances as a congressional record before we even

19   know what the record is or looks like.

20        MS. CARTER:  That's what I'm asking the Court.

21        THE COURT:  Correct, and do you have a case

22   that says that that can be done in the FOIA context?

23        MS. CARTER:  Your Honor, I would submit that

24   the case law sets out a rule that does not restrict that

25   interpretation.  The case law suggests that the rule is

1    whether Congress has manifested an intent to control

2    records.  Here it doesn't say it can only control a

3    specific number of records.

4           In *ACLU*, Your Honor, the most recent case from

5    2016, Congress sent a letter stating that it was going

6    to -- a single letter controlled thousands upon

7    thousands of documents.  It was in the context of one

8    investigation, but it was extremely broad, a

9    far-reaching investigation.  It's not a far leap to say

10   a single letter can control an extremely far-reaching

11   six-year investigation.  And all records created in six

12   years over a massive investigation into CIA practices to

13   then say they can't just, they can't --

14          THE COURT:  To then say that a manifestation

15   of intent to treat as congressional records all CIA

16   investigations, not one investigation that took place

17   over six years, but any and every communication we ever

18   had with the CIA about anything, any report the CIA ever

19   generates independently and sends to us, anything that

20   the CIA ever says that has "Congress" in it should be

21   treated as a congressional record.

22          MS. CARTER:  That's Congress's prerogative.

23          THE COURT:  Interesting.  And you don't think

24   that they have to have a more clear, right, the more

25   far-reaching implication of an intent -- I think there

1    is Supreme Court case law to suggest this -- that given

2    the implications of what you are suggesting, is it

3    enough to just have a legend that doesn't exactly say

4    that, plus Mr. Barthold's affidavit that seems to

5    suggest that, but really may not.  I mean, don't we

6    really have to have almost a statute where Congress is

7    saying this is what we mean when we're talking about

8    congressional records when the implication is everything

9    that ever comes out of the JCT or the IRS and is

10   exchanged between the two of them is covered?

11          MS. CARTER:  We have to look at what the

12   purpose of this whole rule is, Your Honor.  The purpose

13   of the manifestation of intent rule is to put the agency

14   on notice that Congress intends to control these

15   records.  The purpose is not to make this manifestation

16   of intent for simply to make a manifestation.

17          The purpose of making the manifestation of

18   intent is to have it clear to the agency that Congress

19   has -- that Congress wants to control these documents

20   and for the agency to acknowledge and recognize that

21   those documents need to be treated differently than

22   their normal documents.

23          THE COURT:  I see.  So you don't think this

24   has anything to do with a public's right to have access

25   to information?  I mean, we're all, we're operating

57

1    entirely against the backdrop of FOIA, and so it doesn't

2    seem to me quite right that the agency can sort of

3    collude with Congress in a way to keep documents that

4    would otherwise be discoverable under the FOIA statute

5    from being disclosed.

6         MS. CARTER:  But they are not otherwise

7    discoverable under the FOIA statute.  Congress can

8    designate any records that are communications with its

9    agencies as congressional records.

10        THE COURT:  Right.  And my question to you is

11   doesn't it have to do it so specifically when the

12   implications are that those records get pulled from the

13   public domain?

14        MS. CARTER:  That's creating a new test,

15   Your Honor.  There's no -- the question of whether, what

16   the implications of those records, the implication being

17   that the public can't see it is not part of the test

18   here.  The test is whether Congress has manifested the

19   intent to control and whether the agency has agreed to

20   that manifestation of intent.

21        THE COURT:  All right.  That's very

22   interesting.  I'm sorry, we're running out of time, but

23   you had two more cases that you were going to --

24        MS. CARTER:  The last two, Your Honor, were

25   *United We Stand* from 2004.  That is whether the response

58

1    to a Joint Committee on Taxation request was a

2    congressional record.  The correspondence to the joint

3    committee had a legend on it but did not incorporate the

4    letter in response from the IRS back.

5         And there the Court found sufficient indicia

6    of congressional intent to control the joint committee's

7    request and those portions of the IRS request that would

8    reveal that request.  And then I already addressed the

9    last one, the *ACLU* case --

10        THE COURT:  I'm sorry, were the circumstances

11   different in terms of manifestation of intent at that

12   time?  This is pre-legend, right?  Or pre-language.

13        MS. CARTER:  There was a legend, but it was a

14   different legend than the one that we're operating under

15   here.  In the original legend it just says This document

16   is intended to be a congressional document, so just the

17   letter from JCT to IRS.

18        THE COURT:  Right.

19        MS. CARTER:  Now our legend says this document

20   or any replies or any documents created thereto are

21   intended to be congressional documents.

22        So the legend has since widened the scope from

23   simply the document that the legend is on to the

24   document the legend is on plus all of the documents

25   created in response.

1              THE COURT:  Okay.

2              MS. CARTER:  And then the last case,

3    Your Honor, was the *ACLU* case from 2006.  In that case

4    there was a copy of a report authored by the Senate

5    Select Committee on Intelligence, which was in the CIA's

6    possession, and the Court found that a single letter

7    from 2009 manifested a clear intent by the senate

8    committee to maintain continuous control over its work

9    product and that the report had always been a

10   congressional document, even though the head of the

11   Senate Select Committee at the time actually distributed

12   it to other people and distributed it to other agencies

13   along with a letter saying You should use this so you

14   don't mess up again in the future.  And that wasn't

15   enough to vitiate the command of the congressional

16   control.

17             So, Your Honor, I would submit that in each of

18   these cases these are fact patterns where the Court was

19   only looking at specific documents, a single document or

20   a small subset of documents and the Court was not

21   presented with the evidence we have in this case, which

22   is that -- which is where a congressional committee has

23   manifested an intent to control all documents.  That's

24   not the facts --

25             THE COURT:  Do you see no world in which I

1    agree with you on some of these requests and not others?

2    You're all in, either the select committee has

3    investigated its or expressed, manifested its intent

4    with respect to all these categories of records or none

5    of them as far as you're concerned?

6            MS. CARTER:  Absolutely not, Your Honor.  I

7    think everybody is in agreement that the letters that

8    have legends on them are --

9            THE COURT:  They don't ask for those.  They

10   ask for the ones without.

11           MS. CARTER:  Well, in later requests or the

12   later paragraphs they don't distinguish between

13   communications that have a legend or don't.

14           THE COURT:  I guess what my question is, is to

15   the extent that I am interested in understanding the

16   universe of documents that would be responsive to their

17   request, except for your argument that they can't be

18   released because they're congressional records rather

19   than our records, I'm trying to understand whether the

20   agency's position that I not do that, get some sort of a

21   Vaughn index, figure out what it is, is about your stand

22   that they have made an expression of intent with regard

23   to all categories of records and -- period -- or is

24   there some room for me to look at their expression of

25   intent and see that it covers, for example, the

1  correspondence from the JCT to the IRS with respect to a

2  particular investigation, and those things are clearly

3  covered by the legend and the intent of Congress but

4  maybe the records that are generated, the six 103(p)

5  reports are not covered by the legend and no other

6  convincing evidence indicates that Congress intended for

7  those to be in.

8         You're clearly encouraging me not to do that,

9  but I'm wondering is your position that I can't as a

10  matter of law, either that it's all in or nothing.

11         MS. CARTER:  I don't think there's any legal

12  authority that says you can't do that.  I would just

13  submit that under the tests set out in *Goland*, we've

14  satisfied that test.  The IRS, the Joint Committee on

15  Taxation has manifested its intent to control all of

16  these records, and the IRS has acknowledged this

17  manifestation of intent, has accepted it and has created

18  internal procedures to make sure that all of these

19  records are limited and used only for the, for the

20  purposes that the Joint Committee on Taxation has

21  allowed them to use them for.  And if the whole purpose

22  of this test is to, in fact, limit the control of the

23  agency, it's done so here.

24         THE COURT:  All right.  Thank you.

25         Mr. Mulvey.  You have been here the whole

1    time.  I know you've thought I forgot you.  You're up.

2           MR. MULVEY:  Thank you, Your Honor.  Just a

3    few quick points and then some more general responses to

4    what opposing counsel has offered.

5           To begin with, I know offhand that both

6    *Paisley* and *United We Stand*, the congressional records

7    question came up on summary judgment and not on motion

8    to dismiss.  I couldn't tell you off the top of my head

9    for the other cases.

10          Also, I'd like to thank opposing counsel for

11   very helpfully pointing out that there were a discrete

12   number of records at issue in every other case in this

13   line of cases from *Goland* to *ACLU*.  And that's because

14   either the requester in the case of *ACLU* asked for a

15   discrete and specific identifiable record, the Senate

16   Select Committee on Investigation's full report into the

17   CIA's former detention program, or the agency had

18   conducted a search.

19          And at least in *Goland*, *Paisley* and *Holy*

20   *Spirit*, I would submit that the requesters had sought a

21   much broader range of records.  So *Goland* I believe was

22   pretty much anything related to the CIA organic statute.

23   Mrs. Paisley suggested any and all records concerning

24   the mysterious death of her husband and *Holy Spirit* --

25   I'm sorry.  In *United We Stand*, *United We Stand* asked

63

1    for any and all records relating to itself.  I think

2    that those are much broader requests than what Cause of

3    Action has submitted to the IRS.

4             THE COURT:  And what are the implications of

5    that for the conversation that I had with the

6    government?

7             MR. MULVEY:  I think Your Honor is right, that

8    at the very least the IRS needs to conduct a preliminary

9    search and then in the style of a Vaughn-type index be

10   able to describe with specificity to identifiable

11   records why intent has been properly manifested.

12            THE COURT:  So you don't agree or don't think

13   that the agency's -- obviously the JCT has said

14   something about its interest in maintaining

15   confidentiality and control over certain types of

16   records and you've heard the IRS's position, which is

17   that they don't have to say with specificity anything

18   with respect to particular records.

19            Why are they wrong about that?  Isn't there

20   case law that suggests that?

21            MR. MULVEY:  Sure.  So two responses to that,

22   Your Honor.  First, we don't even need to turn to case

23   law for my first point.  We can look at the record and

24   add the JCT's policy manual, which is Document 11-4 on

25   the docket.  This was attached to Mr. Barthold's

1    declaration.  And if I may, I just would like to read a

2    few lines.

3           This is not the legend but in the introductory

4    paragraph.  "Congressional documents, including those of

5    the joint committee staff, generally are not subject to

6    disclosure under FOIA.  However, such documents may

7    become agency records for FOIA purposes if transferred

8    to an agency without evidence that Congress intended to

9    retain control of the documents."

10          So that's the JCT in its policy manual which

11   Mr. Barthold has introduced to the Court as part of its

12   declaration.  The JCT seems to admit that some records

13   relating to its dealings with the IRS can become agency

14   records.  That stands in stark contrast to the radical

15   position that I think DOJ has offered today.

16          THE COURT:  Can we get to Barthold's

17   affidavit?  I'm sorry, as a threshold matter you heard

18   me talk about (b)(1) and (b)(6) and where we are in the

19   overall scheme of things with respect to the motion to

20   dismiss.  And I keep having this feeling we're really in

21   summary judgment world as we discuss all of these other

22   things.  Am I wrong about that?

23          MR. MULVEY:  Your Honor, so I know in *Scolaro*

24   *v.  D.C. Board of Elections and Ethics* that the Court

25   can look outside the pleadings in the context of a

1    12(b)(1) motion to dismiss.  I'm not aware off the top

2    of my head of what the rule would be or what any case

3    law might be with respect to 12(b)(6).  I'm sorry,

4    *Scolaro* applies to looking outside the pleadings in

5    12(b)(1) world.

6            THE COURT:  Which is standard.  When you're

7    doing (b)(1), you can talk about jurisdiction, you can

8    look at everything.  (b)(6) is, I understood, a more

9    narrow circumstance with respect to the Court's role in

10   evaluating the complaint.

11           MR. MULVEY:  I think Your Honor is probably

12   right.  And there's another aspect that's unique to FOIA

13   cases and the assignment of where the burden is in

14   proving one's case that I think demonstrates why the IRS

15   is probably wrong here.  And that has to do -- so the

16   *Department of Justice v. Tax Analysts* we cited for the

17   proposition that under FOIA the burden is on the agency

18   to demonstrate and not the requester to disprove that

19   the requested records are not agency records.  Right.

20           And the IRS says that that burden doesn't make

21   sense and the Supreme Court was wrong and the

22   legislative history shows otherwise.  And I don't think

23   that's the case, because as recently as *Judicial Watch*

24   *v. Secret Service*, which was 2013, this Circuit had

25   accepted and cited to *Tax Analysts* for the proposition

1    that the burden is on the agency -- in that case Secret

2    Service -- to prove to the Court that the requested

3    records in the context there were presidential and not

4    agency records.

5            The exception to that rule and, Your Honor,

6    you cited one case, which was the *Office of*

7    *Administration*, *CREW v. OA*, another one would be

8    *Armstrong v. the Executive Office of the President*, you

9    have an exception with cases where the matter in dispute

10   is whether the entity in receipt of a FOIA request is

11   itself an agency under 5 U.S.C. 552.  Whether it is an

12   entity subject to the FOIA.  There's no dispute here

13   that the IRS is subject to the FOIA.

14           THE COURT:  Why is that an exception to the

15   rule?

16           MR. MULVEY:  Why -- well --

17           THE COURT:  In other words, and how does that

18   distinguish, because I cited that case for the

19   proposition that the instant case is indistinguishable

20   insofar as the kind of issue that we're talking about

21   here, whether or not these things are agency records

22   means that it's a merits question rather than a subject

23   matter jurisdiction question, which the Court held in

24   that case.

25           So what I don't understand is your attempt in

1    a way to separate yourself from the case that I thought

2    helped you with regard to --

3           MR. MULVEY:  I'm not trying to separate,

4    Your Honor.  What I'm saying is that the IRS's

5    contention about where the burden ought to lie in this

6    case, we don't have to say that the Supreme Court was

7    wrong if Your Honor is correct, right, that this

8    shouldn't be 12(b)(1) motion.

9           THE COURT:  Right.

10          MR. MULVEY:  And that the jurisdictional

11   question is not about agency records but rather, as in

12   *CREW v. OA* and *Judicial Watch v. Secret Service*, that

13   the jurisdictional question is whether the entity that

14   received the request is subject to the FOIA.  And

15   obviously that's not in dispute here; the IRS is subject

16   to the FOIA.

17          THE COURT:  All right.  So there's no

18   impediment from your perspective to consideration of

19   this as a 12(b)(6) motion consistent with my

20   understanding, at least, of how similar questions have

21   been treated under the law.

22          MR. MULVEY:  I think that's right, Your Honor.

23          THE COURT:  Okay.

24          MR. MULVEY:  In either case I think --

25          THE COURT:  Any -- as far as that's the case,

1    then it is potential that I'm not even supposed to be

2    looking at all of the extrinsic evidence with respect to

3    the intent of Congress at this stage.  It comes in, it

4    just comes in later at the summary judgment stage.

5         MR. MULVEY:  Once the search has been

6    conducted and we've identified what records, if any --

7    there may not be responsive records for all the items of

8    our request -- at that stage it may become important.

9    But either way, Your Honor, I think even if you are

10   looking at Mr. Landes's declaration and Mr. Barthold and

11   the other extrinsic evidence, I still think the IRS has

12   failed to make its case.  And in that respect I'd like

13   to, if I may just make a few more points.

14        THE COURT:  Yes.

15        MR. MULVEY:  Opposing counsel again and again

16   has said that Cause of Action is arguing that the JCT

17   must and can only provide contemporaneous and specific

18   instructions.  That misreads our brief.  We were very

19   clear both I think on page 6 but more importantly on

20   page 12 where we've sort of summarized what we

21   understand the standards that are applicable here.

22        Congress or a subunit of Congress such as the

23   JCT can either provide contemporaneous and specific

24   instructions such as the mark of confidentiality in

25   *Goland* or it can provide instructions prior to the

1    creation or transfer of a record.  But when you're there

2    and we're not looking at contemporaneous instructions,

3    there's still a level of specificity that's required

4    with respect to the instructions that are given to the

5    agency by Congress.  Or in this case the JCT.

6              THE COURT:  Why?  Why do you say that?  She

7    says no.  She says they can do that as a sweeping

8    categorical general matter.

9              MR. MULVEY:  Well, to begin with, I think

10   there are some records which we've already discussed

11   such as agency-obtained records that aren't created by

12   the agency like our FOIA request.  Which Congress can't

13   ever intend for those sorts of records to become

14   congressional records.

15             THE COURT:  Which kinds, I'm sorry?

16             MR. MULVEY:  For example, there are probably

17   some, such as our FOIA requests, that have been sent to

18   the JCT.  Those are submitted to the agency.  They are

19   obtained in the legitimate course of its activities.

20   It's under its control.  Cause of Action doesn't believe

21   that records such as those by will of JCT can suddenly

22   be transformed into congressional records.

23             And I'll give you an example of why to rule

24   otherwise would be absurd.  If today -- and this might

25   actually happen -- I submit a FOIA request to the IRS

1    for the processing notes on the FOIA request at issue in

2    this case, Mr. Barthold's letter and the JCT's -- the

3    IRS's communications with the JCT forwarding our FOIA

4    requests would have to under the proposed approach be

5    ruled congressional records.

6          And I think that's just a ridiculous outcome

7    that we submit FOIA requests to the IRS, the IRS under

8    its CCDM and IRM sends it to the JCT.  We ask for

9    processing notes which would include copies of our

10   requests.  And all of a sudden we're told we can't get

11   them because they are congressional records.

12         THE COURT:  Do you get processing requests in

13   other -- is that a standard thing?

14         MR. MULVEY:  It's a standard type of request

15   to get processing notes.

16         THE COURT:  All right.

17         MR. MULVEY:  And we've sent processing note

18   requests to the IRS before in the past, and copies of

19   the FOIA requests have been provided.  But if we do it

20   today, the IRS knows that we know that it sent the

21   requests to JCT.  So it would, I would imagine it would

22   have to, if it were consistent with its stance in this

23   case, rule that portion of the processing notes --

24         THE COURT:  All right.  So we're in the world

25   of prior congressional manifestation of intent.

1            MR. MULVEY:  Yes, Your Honor.

2            THE COURT:  You say certain categories

3    definitely can't fit into that.  What else?  Why else do

4    you think you can't get -- why can't they give prior

5    authorization at the level of generality that the IRS

6    indicates in this case?

7            MR. MULVEY:  Yes, Your Honor.  Thank you.

8            So I think if we look at *United We Stand v.*

9    *IRS*, that case is very much on point.  Because there the

10   Court looked first to the legend and it said Okay, well,

11   the stuff that's clearly included under the legend is

12   out of bounds.  That's not subject to the FOIA, those

13   aren't agency records.

14           We're kind of in that similar place here

15   because as we've stated, contrary to opposing counsel's

16   representations, in our brief and I think even on the

17   face of the request we're not seeking all the

18   legend-stamped records.  So when you're out of that

19   world, like in *United We Stand*, the Court had to look on

20   what else was the IRS citing to.  And there the IRS was

21   citing to the "consistent course of dealing" in its

22   dealings with the JCT.  In its affidavits and in letters

23   and other descriptions it said, Well, you know, the JCT,

24   it's very important that we have confidentiality in our

25   interaction with that part of Congress, and Congress has

1    certain prerogatives of secrecy in what it does.

2             So, you know, though we don't have a legend

3    specifically covering those documents, they still ought

4    to be released.  And the Court rejected that approach.

5    They rejected it.  And they looked back to cases like

6    *Holy Spirit Association* where the Court rejected a

7    "general characterization" of confidentiality.  It

8    looked to *Paisley* and took very seriously what I think

9    has been the demonstrated concern of the D.C. Circuit

10   that we take FOIA seriously and that there's a

11   presumption that agency records or records in an

12   agency's possession are probably disclosable.  And that

13   Congress "knew quite well how to classify its

14   documents."  The burden should be on Congress, otherwise

15   it defeats the spirit of disclosure under the spirit of

16   FOIA.

17             THE COURT:  So you read *United We Stand* to

18   essentially indicate that in the prior authorization

19   realm we have to have something like a legend, and it

20   has to be stamped on the document in order to

21   sufficiently manifest Congress's intent?

22             MR. MULVEY:  So I wouldn't characterize it

23   that way, Your Honor.  But I think we're getting at the

24   same thing.  So in *Paisley* when looking at

25   congressionally created documents and agency-created

1    documents that had come into the possession of Congress,

2    the Court said things like it looked -- and where there

3    was no legend at issue, right.  Just a consistent course

4    of dealing or a kind of preexisting agreement.  The

5    Court looked and determined with agency-created records

6    a connection was far too insubstantial and commonplace

7    to establish congressional control.  "To hold otherwise

8    would be to exempt from FOIA's purview a broad array of

9    materials otherwise clearly categorizable as agency

10   records, underlining the spirit of broad disclosure."

11        When it looked at Congressionally created

12   records, it looked and saw no discussion of any of --

13   this is a quote --  "No discussion of any particular

14   documents or of any particular criteria by which to

15   evaluate and limit the breadth of the committee's

16   interdiction" and that what the agency had presented

17   into the record as evidence was "too general and

18   sweeping to provide sufficient proof when standing alone

19   of a specific intent to transfer records for a limited

20   purpose and on condition of secrecy."

21        And I think if we look at *ACLU v. CIA*, which

22   the IRS seems to believe supports its position, I think

23   it cuts the other way.  What we see in that case and

24   also in *Judicial Watch v. Secret Service*, which is not a

25   congressional records case but a presidential records

1    case, the modified control test was applied in both.

2    And in each case the D.C. Circuit looked to *Paisley*,

3    looked to *Goland*, cited the standard that at too far a

4    generalized point the intent is insufficient.  And it

5    said --

6              THE COURT:  Because we have -- why?  Because

7    we have to look at the records because Congress has to

8    indicate its intent regarding the records at issue.

9    It's not enough just to say this is our relationship

10   with this kind of other entity?

11             MR. MULVEY:  I think that's exactly right,

12   Your Honor.  And if you look at the Court's application

13   of *Paisley*, *United We Stand* and *Goland*, in the *Judicial*

14   *Watch-Secret Service* case and also in *ACLU*, it looked at

15   the general standards and then it looked at what had

16   been presented.

17             So in *ACLU* you had a memorandum of

18   understanding, a formal one, that was specific to one

19   inquiry.  And there was expansive language within the

20   memorandum of understanding to apply to any work product

21   that came from the investigation into the CIA's torture

22   program.  But it wasn't anything and everything that the

23   Senate Select Committee might have created in the course

24   of dealing with the CIA.

25             And it's the same thing with the *Judicial*

1  *Watch* case.  You have direct quotes to *Paisley* and to

2  *United We stand* about the danger of general preexisting

3  agreements.  And the Court applied that to a very

4  specific memorandum of understanding between the White

5  House and the Secret Service to retain presidential

6  control over White House visitor access logs.  Not all

7  records reflecting the interaction of the White House

8  office with the Secret Service.

9        THE COURT:  All right.  Do you have any other

10  points you want to make?

11        MR. MULVEY:  If you could just give me one

12  second, Your Honor, I just want to make sure that I've

13  covered all the bases.

14        THE COURT:  What about the fact that with

15  respect to -- what is your contention with respect to

16  the argument that the legend may or may not be on every

17  document but it should be -- it's an omission, it's a

18  mistake if it's not.  The intention was that it be

19  placed on every document.  Does that matter?

20        MR. MULVEY:  I don't think we actually have --

21  we have Mr. Barthold's declaration would suggest that --

22  well, two things.  First, he says in Paragraph 13, and

23  if you'd like, why don't I --

24        THE COURT:  Isn't there a presumption of

25  regularity that applies when we're talking about agency,

1    agency action such that, you know, to the extent that

2    Barthold or anybody else said we train people, we're

3    supposed to put it on everything and the fact that there

4    may be a document or two that slipped by is a mistake?

5    Why shouldn't I credit that?

6         MR. MULVEY:  Well, I think there are a few

7    things to consider.  First, Paragraph 13 of

8    Mr. Barthold's declaration, he says, "I have continued

9    the longstanding and routine JCT practice of including

10   the legend in all letters that I have sent."

11        Well, that's false.  Demonstratively.  With

12   his own attachment to his declaration we have the letter

13   from JCT to the IRS about Cause of Action's FOIA

14   request.  It doesn't include a legend.  We have

15   Mr. Barthold's description that JCT endeavors to include

16   the legend on all its correspondence.

17        But I don't think we -- I don't think we've

18   seen anything exactly on point to suggest that JCT could

19   never actually have any sort of correspondence with the

20   IRS where it doesn't include.  I mean, they're very

21   careful, if I recall, in all of the descriptions of what

22   their consistent course of dealing is to say that it's

23   for official correspondence or correspondence in the

24   course of its oversight authority.

25        But, Your Honor, you had raised the

1    possibility that there might be communications between

2    staffers of a more personal nature.  I'm not sure that

3    those would immediately be excluded as non-agency

4    records under the FOIA just because they may not be

5    about JCT's statutory exercises.  We've seen that there

6    are communications about FOIA disclosure and decision

7    making at the IRS.  I mean, I don't believe --

8            THE COURT:  Yes, but to the extent the

9    underlying issue is Congress's or JCT's intent to

10   designate such communications as congressional records

11   as opposed to agency records, I'm trying to understand

12   the implication of it having a legend or not.  And your

13   position suggests that someone somewhere is making,

14   within JCT, is actively making a determination to stamp

15   the legend when they want to make it a congressional

16   record and to exclude it when they don't.  And that's

17   not the story that's coming from the agency.

18            They say, Oh, when it doesn't have it, it's an

19   accident.  We intended and even Mr. Barthold suggests

20   that we intended to put it on everything because

21   everything is covered.  Doesn't the agency deserve some

22   deference or, you know, aren't I supposed to credit

23   their representation about the function of the legend

24   more so than I guess COA's speculation that when it

25   doesn't appear that the agency, the JCT intended not to

1    include that as a congressional record?

2         MR. MULVEY:  Well, Your Honor, I think based

3    on the content of the chief counsel's December 2015

4    notice and in the actual content of the IRM, the fact

5    that internally when they come across a document that

6    doesn't contain a legend, they are supposed to consult

7    with the chief counsel of procedure and administration

8    at the IRS.  The fact that they had that consultation

9    procedure to me seems to imply that while there may be

10   instances where a legend is inadvertently omitted, that

11   may not always be the case and that there has to be a

12   determination made on a case-by-case basis whether JCT

13   actually intended to retain control.

14        I think that also accords with the wording not

15   of Mr. Barthold's description of what the JCT does but

16   rather in the actual wording of the JCT staff manual

17   where it says it's important to keep this on, and when

18   we don't we run the risk that a record may be treated as

19   an agency record.

20        I don't think we've seen any evidence to

21   suggest that Congress may not come across a situation

22   where it would be okay with a record that it transmits

23   to the IRS becoming an agency record.  I think when

24   we're at the abstract level where we're at now, because

25   the IRS has refused to conduct a search, it really is

1    hard to get down to the nitty gritty that needs to be

2    gotten down to for the application of the modified

3    control --

4             THE COURT:  Well, you might have gleaned that

5    that's my position feeling that this is hard insofar as

6    I had the discussion with agency counsel, but let me ask

7    you because she makes a decent point related to the fact

8    point that the fact that at bottom these, this

9    expression or manifestation of intent is really about

10   making clear to the agency what it is that it can

11   disclose in FOIA world and what is intended to be

12   withheld.

13            And there is evidence that the agency

14   understands Congress's position to be every

15   communication we have with you is supposed to be a

16   congressional record, and nothing goes out into FOIA

17   land.  What significance is that, if any, to the

18   analysis that I have to apply?

19            MR. MULVEY:  Your Honor, I would just

20   respectfully direct your attention again to *United We*

21   *Stand*.  There the JCT and the IRS found themselves in

22   the awkward and undesirable position of having a legend

23   that didn't go as far as they thought it was supposed to

24   go.

25            THE COURT:  Which appears to be the case here

1    as well.

2              MR. MULVEY:  Which appears to be the case

3    here.

4              THE COURT:  All right.

5              MR. MULVEY:  What did the D.C. Circuit do in

6    *United We Stand*?  It ruled against the IRS.  It said,

7    Look, we're going to take the wording and the presence

8    of the legend seriously.  And if you haven't an oops

9    moment, that, you know, if it's truly an oops moment, I

10   think we can read the D.C. Circuit of saying, Well, the

11   benefit goes to the requester.

12             THE COURT:  So that's interesting.  Your point

13   is even if the, this is really about making clear to the

14   agency what it's supposed to do, to the extent the

15   agency overreads the legend and says we're going to

16   withhold more things than even Congress is indicating

17   that should be withheld or called congressional records

18   because we don't want to run afoul of Congress, your

19   position is that the D.C. Circuit, if I read *United We

20   Stand*, indicates that the agency is not permitted to do

21   that.

22             MS. CARTER:  I think that's certainly true,

23   Your Honor, with respect to a category of, a subcategory

24   of records that we've discussed a lot, which is

25   agency-obtained records or agency-created records that

1    were created in the course of IRS operations and which

2    don't owe their creation to the existence of a JCT

3    inquiry.

4            So I think that the legend certainly has been

5    overapplied, especially when you look at the actual

6    wording.  Your Honor, I'm sure you've read it and I'm

7    sure you will again, but I can only stress that the

8    actual wording of the legend is nowhere near as

9    expansive as opposing counsel has described it or as

10   Mr. Barthold has described it in his declaration.  It

11   doesn't say anything about compilation of records.  It

12   says, "Any documents created by the Department of

13   Treasury in connection with response to this joint

14   committee document" -- meaning like a records request

15   record -- "including but not limited to any replies."

16           I don't see how that covers records that

17   already exist.  And I think *United We Stand* stands for

18   the proposition that --

19           THE COURT:  If the agency's interpretation of

20   that to be broad enough to include records that aren't

21   on its face covered by this --

22           MR. MULVEY:  That's right.

23           THE COURT:  -- doesn't carry the day.

24           MR. MULVEY:  There's an important line in

25   *United We Stand* when the Court was considering the

1    consistent course of dealing in the IRS's expectations

2    and so forth.  I think it's on page 603 of *United We*

3    *Stand* where it says -- it's talking about a couple of

4    things, but it says, "The IRS's own expectation over its

5    handling of the document -- neither the IRS's own

6    expectation nor its handling of the document can turn

7    agency-created records into a congressional document.

8    Otherwise, agency-created records could become

9    congressional documents even if Congress expressed its

10   intent -- no intent to keep them secret."

11          So the IRS can't make up where JCT has failed.

12          THE COURT:  All right.  Anything else?

13          MR. MULVEY:  No, Your Honor.  We would just

14   ask that you deny the pending motion and direct the IRS

15   to conduct a search for responsive records.

16          THE COURT:  Thank you.

17          MR. MULVEY:  Thank you.

18          THE COURT:  Ms. Carter.  I'll give you one

19   more opportunity here.  I'm mindful of the time, all

20   right.

21          MS. CARTER:  Two points, Your Honor.  Going to

22   the holding in *United We Stand*, I would point out that

23   the Internal Revenue manual that the Court considered in

24   that case stated that documents generated in response to

25   Joint Committee on Taxation --

1          THE COURT:  Let me have you speak right into

2     the microphone so we can hear you.

3          MS. CARTER:  I'm sorry.  Internal Revenue

4     manual that the parties and the Court reviewed in *United*

5     *We Stand* stated that documents generated in response to

6     a Joint Committee on Taxation request must not be

7     disclosed to the extent that they reveal the existence

8     or substance of a JCT request.

9          So in that case the agency was relying on an

10    understanding that documents may not be disclosed to the

11    extent they revealed the existence or substance of a JCT

12    request.  And the Court in its ruling held that exact

13    thing.  It held that even though the legend didn't say,

14    specifically address documents created in response, the

15    Court did at least consider the fact that the IRS, the

16    IRS's understanding was that those documents should be

17    treated as congressional records and the IRS -- and the

18    Court considered that the IRS's understanding in its

19    ruling.

20         THE COURT:  Let me just direct your attention,

21    because I'll have to go back and really delve into

22    *United We Stand* to understand the argument that both

23    sides are making.  But Mr. Mulvey makes a point that I

24    think is interesting.  You made a very forceful argument

25    that this is really about the relationship between

84

1   Congress and the agency and the extent to which the

2   agency understands Congress to want to keep certain

3   documents out of the FOIA domain.  Mr. Mulvey says the

4   agency can't be overbroad in that determination.  The

5   agency hears from Congress and it basically has to do

6   only what Congress intends with regard to the treatment

7   of records as congressional versus agency.

8           We know in this very case that when we look at

9   the legend, it says, "created by," right, and it is only

10  these other manifestations, people's affidavits,

11  et cetera, that you say allows for the agency to

12  interpret Congress's intent to include records that are

13  compiled by, that are created by the agency in its

14  ordinary course or whatever.

15          Why is that appropriate in light of *United We*

16  *Stand*?  Isn't that expanding upon what Congress has

17  clearly stated or the JCT has clearly stated in its

18  legend in a way that we can't really countenance?

19          MS. CARTER:  In its legend?

20          THE COURT:  In other words, the legend,

21  although you say it's extra, it's just one piece of

22  evidence, it probably is the most clearly defined and

23  understandable evidence of what the intent of the JCT

24  is.  Because there they are, putting in writing what our

25  intentions are with regard to which records that are

1   transmitted back and forth count as congressional

2   records.

3          And when I look at the legend, it doesn't say

4   anything about IRS records crafted in the ordinary

5   course outside of the context of any investigation and

6   transmitted to us, whether in response to an inquiry or

7   not.  It doesn't say anything about those kinds of

8   records standing alone.  And yet somehow the agency

9   looks at the legend, understands its practices and

10   policies in general and says Oh, but we think that JCT

11   really meant to include those kinds of documents in

12   their cover of congressional authority.

13          What I'm trying to understand is the extent to

14   which the law allows the agency to do that, to interpret

15   the JCT's expression of what is actually covered broader

16   than what the JCT says.

17          MS. CARTER:  There's a lot of points.

18          THE COURT:  I know.  I'm sorry.  I go on too

19   long.  And then it's hard to respond.

20          MS. CARTER:  First I would say that the legend

21   is an example of a sufficient manifestation of intent,

22   but it is not a required action to manifest intent.

23          I think that with respect to whether, what the

24   IRS is doing, the IRS, I would submit, is simply

25   memorializing what the Joint Committee on Taxation has

1    expressed to them.  This is not an instance where the

2    IRS is interpreting other manifestations of intent.

3    It's memorializing the expressions of intent made to it

4    by the Joint Committee on Taxation.

5              THE COURT:  In the legend but also in other

6    formats.

7              MS. CARTER:  In other forms, yes.

8              THE COURT:  So what do we do with the manual

9    that suggests that there is a world in which there are

10   going to be records that come from the JCT that don't

11   count or records that in this realm that don't count as

12   congressional records?  Mr. Mulvey read right at the

13   beginning the introductory paragraph of the JCT policy

14   manual that said generally speaking the records are

15   going to be congressional records -- but I think there

16   was a "however" in there -- there is some room, I think,

17   for the possibility that there will be records that

18   don't count.

19             MS. CARTER:  Your Honor, may I look at it and

20   see a copy of that, please?

21             THE COURT:  Yes, please.

22                  (Pause)

23             MS. CARTER:  Your Honor, I would not interpret

24   the language --

25             THE COURT:  Can you read it first so that

1    we're all clear as to what we're talking about.

2          MS. CARTER:  Absolutely, Your Honor.

3    "Protection of Joint Committee documents as

4    congressional records.  The joint committee staff often

5    needs to coordinate with Treasury and the IRS or other

6    federal agencies such as the Department of Labor.

7    Records of federal agencies are subject to disclosure

8    under the Freedom of Information Act unless an exception

9    applies.  Congressional documents, including those of

10   the joint committee staff, generally are not subject to

11   disclosure under the FOIA."

12         So that's saying "congressional documents."

13   They're not talking -- that's not actually talking about

14   agency records.

15         "However, such documents may become agency

16   records for FOIA purposes if transferred to an agency

17   without evidence that Congress intended to retain

18   control of the documents.  In order to protect Joint

19   Committee documents as congressional documents, the

20   following legend must be included on written

21   communications, including electronic mail with the IRS,

22   Treasury or other federal agency."

23         So, Your Honor, I interpret this to mean that

24   they're saying obviously their own documents when

25   they're not transmitted to an agency are congressional

1  documents.  That's what they're talking about.

2  Generally not subject to disclosure.

3           THE COURT:  Okay.

4           MS. CARTER:  But then they're saying that when

5  they are transferred to an agency, the legend must be

6  included on -- they're saying "all documents" you must

7  include the legend.

8           THE COURT:  I'm sorry.  It says, however --

9           MS. CARTER:  It says, "However, such documents

10  may become agency records for FOIA purposes if

11  transferred to an agency without evidence that Congress

12  intended to retain control of the documents."

13           THE COURT:  Okay.  So question:  Doesn't that

14  statement of the law coming from the JCT undermine your

15  assertion that a generalized statement of intent to keep

16  all records, all records, confidential and out of the

17  FOIA world suffices?

18           In other words, he's saying in order to keep

19  them from becoming agency records, please put the stamp

20  on it.  It must have the stamp.  So this goes back to my

21  question of why are they doing that if you are right

22  that stamp or no stamp Congress's intent is to have all

23  of those records or none of them become agency records?

24           MS. CARTER:  Well, I think that this clearly

25  shows that it is Congress's intent to have all documents

1    be agency records, because it's directing its employees

2    to include that legend on every single communication

3    with the IRS.

4           So I do think it's evidence of the joint

5    committee's intent to --

6           THE COURT:  That's interesting.  All right.

7    So you read that as saying put the legend on every

8    document?

9           MS. CARTER:  It says it must be included on

10   every communication.  That is --

11          THE COURT:  Right.  But, of course, it

12   wouldn't need to be included on every communication if

13   they can just make a statement that we intend all of our

14   documents to count; right?  I mean, you see how it could

15   be read either way.

16          MS. CARTER:  Absolutely.

17          THE COURT:  All right.

18          MS. CARTER:  I will say, though, that it does

19   go to the IRS's position and the joint committee

20   position that when the legend is not included it's a

21   mistake.  It is simply an accident, and what Cause of

22   Action is really looking here for are the mistakes.

23   It's going on a fishing expedition to find the

24   accidents, to find the time when the joint committee

25   messed up and forgot to include a legend.

1          THE COURT:  You said you have a second point.

2     You said you have two points when I took you on a foray

3     outside of the two points.

4          MS. CARTER:  Of course.  To go back to your

5     question on subject matter jurisdiction, I would direct

6     the Court to the 2016 D.C. Circuit case of *ACLU v. CIA*.

7          THE COURT:  Yes.

8          MS. CARTER:  That was decided on a motion to

9     dismiss based on subject matter jurisdiction.

10          THE COURT:  It was, but they did not discuss

11    the issue.  They just affirmed the District Court's

12    dismissal on subject matter jurisdiction.

13          MS. CARTER:  But I will say that the Court

14    certainly did look at extrinsic evidence, including the

15    letter from the Senate Select Committee on Intelligence

16    manifesting its control to, control over the documents

17    in the possession of the CIA.

18          THE COURT:  Yes.  Great.  Thank you both.

19    Very interesting case.  I will take the motion under

20    advisement.

21                    (Proceedings adjourned at 12:32 p.m.)

22                    * * * * * * * * * * * * * * * * * * *

23

24

25

91

1                CERTIFICATE OF OFFICIAL COURT REPORTER

2

3    I, Barbara DeVico, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9

10

11    _____          9-13-17

12    SIGNATURE OF COURT REPORTER                   DATE

13

14

15

16

17

18

19

20

21

22

23

24

25