**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                              )
CAUSE OF ACTION INSTITUTE,        )
                                              )
              Plaintiff,                       )
                                              )
       v.                                      )          Civil Action No. 16-2354 (FYP)
                                              )
INTERNAL REVENUE SERVICE        )
                                              )
              Defendant.                     )
_____)


**MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO
DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND
<u>IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT</u>**


Ryan P. Mulvey
(D.C. Bar No. 1024362)
Lee A. Steven
(D.C. Bar No. 468543)

CAUSE OF ACTION INSTITUTE
1310 North Courthouse Road, Suite 700
Arlington, VA 22201
Telephone: (571) 482-4182
ryan.mulvey@causeofaction.org
lee.steven@causeofaction.org

_Counsel for Plaintiff CoA Institute_

# TABLE OF CONTENTS

Table of Authorities .......................................................................................................... iv

Introduction ........................................................................................................................ 1

Factual and Procedural Background ................................................................................... 2

I.    CoA Institute's FOIA Requests .............................................................................. 2

II.   IRS Rules Governing the Treatment of JCT-Related Records ............................... 3

Standard of Review ............................................................................................................. 5

Argument ............................................................................................................................ 7

I.    The Court has subject-matter jurisdiction to adjudicate this case.......................... 7

II.   The IRS has not justified the redaction of its *Vaughn* index and the
      Cummiskey Declaration.......................................................................................... 8

III.  The records at issue are "agency records" subject to the FOIA. ......................... 10

      A.    Congressional intent to retain control over records must be affirmatively
            and expressly manifested prior to their creation or transfer. ..................... 11

      B.    As a general matter, the JCT has not expressed sufficient intent to retain
            control of the records at issue in this case................................................. 17

            1.    The Barthold Declaration and JCT Exhibits do not establish the
                  requisite intent to retain control. ..................................................... 17

            2.    The Second Landes Declaration is insufficient to establish the
                  JCT's requisite intent to retain control............................................ 20

      C.    The E-TRAK records are "agency records." ............................................. 22

      D.    The records located in Scott Landes's e-mail and electronic folders are
            "agency records."....................................................................................... 23

            1.    Internal IRS Communications........................................................... 24

            2.    External IRS-JCT Communications .................................................. 25

            3.    Alleged "Personal Records" ............................................................. 26

            4.    The Additional "12 email" Records................................................... 27

      E.    Secretarial reports under I.R.C. § 6103(p)(3) are "agency records.".......... 27

IV.   The records at issue are not "congressionally privileged.".................................. 29

V.    The IRS cannot rely on Exemption 5 to withhold certain e-mail records. ......... 31

      A.    The IRS cannot use the deliberative-process privilege to withhold records........... 31

      B.    The IRS cannot use the attorney-client privilege to withhold records.................... 34

      C.    The IRS cannot use the attorney work-product privilege to withhold records. ....... 35

      D.    The IRS has not satisfied its burden under the "foreseeable harm" standard.......... 37

VI.   The IRS has failed to segregate and release non-exempt portions of records. ................ 40

VII.  The Court should conduct *in camera* review of the records withheld
       under Exemption 5. ............................................................................................ 41

Conclusion ................................................................................................................. 42

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Allen v. Department of Defense*,
  580 F. Supp. 74 (D.D.C. 1983) ....................................................................30

*American Civil Liberties Union v. Central Intelligence Agency*,
  823 F.3d 655 (D.C. Cir. 2016) ..................................................12, 16, 17, 18

*American Oversight, Inc. v. Department of Health & Human Services*,
  No. 17-827, 2018 WL 4381099 (D.D.C. Aug. 3, 2018) .............................29

*Ancient Coin Collectors Guild v. Department of State*,
  641 F.3d 504 (D.C. Cir. 2011) ....................................................................31

*Brinton v. Department of State*,
  636 F.2d 600 (D.C. Cir. 1980) ....................................................................34

*Bureau of National Affairs, Inc. v. Department of Justice*,
  742 F.2d 1484 (D.C. Cir. 1984) .............................................................26, 27

*Burka v. Department of Health & Human Services*,
  87 F.3d 508 (D.C. Cir. 1996) ................................................................11, 26

*Carter v. Department of Commerce*,
  830 F.2d 388 (D.C. Cir. 1987) ....................................................................42

*Cause of Action Institute v. Internal Revenue Service*,
  390 F. Supp. 3d 84 (D.D.C. 2019) ................................................................3

*Cause of Action Institute v. Office of Management & Budget*,
  10 F.4th 849 (D.C. Cir. 2021) ...........................................................7, 8, 26

*Coastal States Gas Corp. v. Department of Energy*,
  617 F.2d 854 (D.C. Cir. 1980) ......................................................31, 34, 35, 36

*Competitive Enterprise Institute v. Environmental Protection Agency*,
  232 F. Supp. 3d 172 (D.D.C. 2017) ..............................................................7

*Consumer Federation of America v. Department of Agriculture*,
  455 F.3d 283 (D.C. Cir. 2006) .............................................................26, 27

*Defenders of Wildlife v. U.S. Border Patrol*,
  623 F. Supp. 3d 83 (D.D.C. 2009) ................................................................6

*Department of the Interior v. Klamath Water Users Protective Ass'n,*
    532 U.S. 1 (2001) ............................................................................................... 31

*Department of Justice v. Tax Analysts,*
    492 U.S. 136 (1989) ................................................................................... 6, 11, 16

*Dow Jones & Co. v. Department of Justice,*
    917 F.2d 571 (D.C. Cir. 1990) .......................................................................... 33

*Edelman v. Securities & Exchange Commission,*
    172 F. Supp. 3d 133 (D.D.C. 2016) .................................................................. 26

*Edmonds Institute v. Department of the Interior,*
    383 F. Supp. 2d 105 (D.D.C. 2005) .................................................................. 41

*Electronic Frontier Foundation v. Department of Justice,*
    826 F. Supp. 2d 157 (D.D.C. 2011) .................................................................. 35

*Electronic Privacy Information Center v. Internal Revenue Service,*
    910 F.3d 1232 (D.C. Cir. 2018) ........................................................................ 28

*Federal Trade Commission v. Grolier, Inc.,*
    462 U.S. 19 (1983) ............................................................................................ 38

*Fitzgibbon v. Central Intelligence Agency,*
    911 F.2d 755 (D.C. Cir. 1990) .......................................................................... 28

*Gallant v. National Labor Relations Board,*
    26 F.3d 168 (D.C. Cir. 1994) ............................................................................ 26

*Goland v. Central Intelligence Agency,*
    607 F.2d 339 (D.C. Cir. 1978) .......................................................................... 12

*Hertzberg v. Veneman,*
    273 F. Supp. 2d 67 (D.D.C. 2003) .................................................................... 36

*Holy Spirit Ass'n for the Unification of World Christianity v.*
    *Central Intelligence Agency,*
    558 F. Supp. 41 (D.D.C. 1983) ......................................................................... 30

*Holy Spirit Ass'n for the Unification of World Christianity v.*
    *Central Intelligence Agency,*
    636 F.2d 838 (D.C. Cir. 1980) .................................................................. *passim*

*Huffman v. Western Nuclear, Inc.,*
    486 U.S. 663 (1988) ............................................................................................ 7

*John Doe Agency v. John Doe Corp.*,
  493 U.S. 146 (1989)....................................................................................6

*Judicial Watch, Inc. v. Department of Commerce*,
  375 F. Supp. 3d 93 (D.D.C. 2019) ...................................................37, 39

*Judicial Watch, Inc. v. Food & Drug Administration*,
  449 F.3d 141 (D.C. Cir. 2006).............................................................8, 9

*Judicial Watch, Inc. v. U.S. Postal Service*,
  297 F. Supp. 2d 252 (D.D.C. 2004) .......................................................34

*Judicial Watch, Inc. v. U.S. Secret Service*,
  726 F.3d 208 (D.C. Cir. 2013)..........................................................12, 23

*Krikorian v. Department of State*,
  984 F.2d 461 (D.C. Cir. 1993)................................................................40

*In re Lindsey*,
  148 F.3d 1100 (D.C. Cir. 1998)..............................................................34

*Loving v. Department of Defense*,
  550 F.3d 32 (D.C. Cir. 2008)..................................................................41

*Lykins v. Department of Justice*,
  725 F.2d 1455 (D.C. Cir. 1984)................................................................9

*Machado Amadis v. Department of State*,
  971 F.3d 364 (D.C. Cir. 2020).................................................................39

*Mapother v. Department of Justice*,
  3 F.3d 1533 (D.C. Cir. 1993)..................................................................31

*Mead Data Center, Inc. v. Department of the Air Force*,
  566 F.2d 242 (D.C. Cir. 1977).....................................................34, 35, 41

*Military Audit Project v. Casey*,
  656 F.2d 724 (D.C. Cir. 1981)..................................................................6

*Multi Ag Media LLC v. Department of Agriculture*,
  515 F.3d 1224 (D.C. Cir. 2008)................................................................6

*National Archives & Records Administration v. Favish*,
  541 U.S. 157 (2004)..................................................................................6

*National Labor Relations Board v. Robbins Tire & Rubber Co.*,
  437 U.S. 214 (1989)..................................................................................6

*National Labor Relations Board v. Sears, Roebuck & Co.*,
    421 U.S. 132 (1975)............................................................................31, 38

*North v. Walsh*,
    881 F.2d 1088 (D.C. Cir. 1989).....................................................................38

*Paisley v. Central Intelligence Agency*,
    712 F.2d 686 (D.C. Cir. 1983).............................................................. *passim*

*Paisley v. Central Intelligence Agency*,
    724 F.2d 201 (D.C. Cir. 1984).....................................................................29

*People for the American Way Foundation v. National Park Service*,
    503 F. Supp. 2d 284 (D.D.C. 2007)...........................................................32, 42

*Phillippi v. Central Intelligence Agency*,
    546 F.2d 1009 (D.C. Cir. 1976)...................................................................9, 10

*Powell v. McCormack*,
    395 U.S. 486 (1969)...................................................................................30

*Quick v. Department of Commerce*,
    775 F. Supp. 2d 174 (D.D.C. 2011).................................................................5

*Quiñon v. Federal Bureau of Investigation*,
    86 F.3d 1222 (D.C. Cir. 1996).......................................................................42

*Ray v. Turner*,
    587 F.2d 1187 (D.C. Cir. 1978)...............................................................9, 10, 41

*Reporters Committee for Freedom of the Press v. Customs & Border Protection*,
    No. 18-00155, 2021 WL 4843970 (D.D.C. Oct. 18, 2021) ........................35, 38, 39

*Reporters Committee for Freedom of the Press v.*
    *Federal Bureau of Investigation*,
    3 F.4th 350 (D.C. Cir. 2021).................................................................7, 37, 38

*Roane v. Leonhart*,
    741 F.3d 147 (D.C. Cir. 2014).......................................................................29

*Rockwell International Corp. v. Department of Justice*,
    235 F.3d 598 (D.C. Cir. 2001).......................................................................33

*Rosenberg v. Department of Defense*,
    342 F. Supp. 3d 62 (D.D.C. 2018)..................................................................37

*Schoenman v. Federal Bureau of Investigation*,
    575 F. Supp. 2d 136 (D.D.C. 2008).................................................................7

*Senate of the Commonwealth of Puerto Rico v. Department of Justice,*
    823 F.2d 574 (D.C. Cir. 1987) ...................................................................37

*Shapiro v. Department of Justice,*
    153 F. Supp. 3d 253 (D.D.C. 2016) ..........................................................32

*Spirko v. U.S. Postal Service,*
    147 F.3d 992 (D.C. Cir. 1997) ...................................................................42

*Stolt-Nielsen Transportation Group Ltd. v. United States,*
    534 F.3d 728 (D.C. Cir. 2008) ...................................................................32

*Trans-Pacific Policing Agreement v. U.S. Customs Service,*
    177 F.3d 1022 (D.C. Cir. 1999) .................................................................40

*United States v. Brewster,*
    408 U.S. 501 (1972) ...................................................................................30

*United States v. Weber Aircraft Corp.,*
    465 U.S. 792 (1984) ..............................................................................31, 38

*United We Stand America, Inc. v. Internal Revenue Service,*
    359 F.3d 595 (D.C. Cir. 2004) ........................................................... *passim*

*Vaughn v. Rosen,*
    523 F.2d 1136 (D.C. Cir. 1975) .................................................................31

**Constitutional Provisions**

U.S. Const. art. I, § 6, cl. 1 ...............................................................................30

**Statutes**

5 U.S.C. § 552(a)(4)(B) ................................................................................6, 41

5 U.S.C. § 552(a)(8)(A)(i)(I) .............................................................................37

5 U.S.C. § 552(a)(8)(A)(ii)(II) ...........................................................................40

5 U.S.C. § 552(b) ...............................................................................................40

5 U.S.C. § 552(b)(5) ..........................................................................................31

I.R.C. § 6103(p)(3)(B) .......................................................................................28

I.R.C. § 6103(p)(3)(C) .......................................................................................28

**Regulations**

26 C.F.R. § 301.6103(p)(2)(B)-1 ...................................................................................28

**Rules**

Fed. R. Civ. P. 56(a) ...................................................................................................6

**Internal Revenue Manual**

I.R.M. § 11.3.13.5.4(2) (Aug. 14, 2013)............................................... *passim*

I.R.M. § 35.5.4.9 (Dec. 28, 2015)....................................................... *passim*

**Legislative Materials**

162 Cong. Rec. S1496 (daily ed. Mar. 15, 2016) .........................................37

**Other Authorities**

Department of Justice, Office of Information Policy, FOIA Update: OIP
    Guidance: Applying the "Foreseeable Harm" Standard Under Exemption
    Five, FOIA Update vol. XV, No. 2 (Jan. 1, 1994)....................................40

Webster's Third New International Dictionary (1961).................................33

## INTRODUCTION

In December 2015, Defendant Internal Revenue Service ("IRS") published a notice of revisions to the Chief Counsel Directives Manual ("CCDM") that modified the treatment of records reflecting the agency's dealings with the Joint Committee on Taxation ("JCT"). Those revisions were subsequently incorporated in the Internal Revenue Manual ("IRM"). Although the IRS claims the changes merely codify longstanding IRS policy and practice, in truth they prescribe an overbroad and unjustified approach to distinguishing "agency records" and "congressional records" for purposes of the Freedom of Information Act ("FOIA").

The IRS has used the December 2015 CCDM guidance as *carte blanche* to sweep a broad range of records outside the scope of disclosure. This case provides a troubling illustration of the unprecedented breadth of the IRS's position. The agency initially denied the validity of a pair of FOIA requests filed by Plaintiff Cause of Action Institute ("CoA Institute"). After CoA Institute filed this lawsuit, the IRS attempted to dismiss the case for lack of subject-matter jurisdiction. The Court rejected the agency's arguments in July 2019, and the D.C. Circuit has since confirmed the legal reasoning undergirding the Court's decision.

Forced to conduct a search, the IRS finally issued a determination in April 2021. It now argues nearly all responsive records are outside agency control. It also argues a smaller collection of admitted agency records must be withheld in full under Exemption 5. On both points, the IRS is wrong. The records at issue are "agency records." They are not protected by Exemption 5. And the JCT—although well-aware of this lawsuit for years—has not intervened to raise its own privilege claims. Simply put, there is no basis for the Court to accept the IRS's withholdings.

CoA Institute respectfully requests the Court deny the IRS's motion for summary judgment, grant CoA Institute's cross-motion, and order the release of the records at issue.

## FACTUAL AND PROCEDURAL BACKGROUND

**I.      CoA Institute's FOIA Requests**

In December 2015, the IRS Office of Chief Counsel published a notice concerning revisions to the CCDM that would require the IRS to treat most, if not all, records relating to the JCT as "congressional records" not subject to the FOIA.  Pl.'s Statement of Undisputed Material Facts ¶ 1 [hereinafter "Pl.'s SUMF].  The language in the December 2015 notice was subsequently incorporated into the IRM at I.R.M. § 35.5.4.9 and remains in force today.  Pl.'s SUMF ¶¶ 2–3.  Although the IRS argues these changes codify "longstanding agency practice on the treatment of JCT documents," in fact they contradict established case law concerning the definition of an "agency record" under the FOIA.  *See* Second Decl. of Ryan P. Mulvey ¶ 3.

Following publication of the CCDM notice, CoA Institute, by letter in June 2016, submitted a FOIA request to the IRS seeking access to five categories of records:

1.      All records transmitted between the IRS and the JCT, and all communications concerning such transmissions, which do not contain a legend restricting their use or dissemination.

2.      All communications between IRS Privacy, Governmental Liaison, and Disclosure ("PGLD") personnel, as well as other affected IRS functions or components, and the JCT concerning any determination whether to disclose or withhold IRS records that were the subject of a JCT oversight inquiry.

3.      All records generated or maintained by the IRS in the normal course of its operations that were subsequently provided to the JCT in response to a general oversight inquiry.

4.      All records generated or maintained by the IRS in the normal course of its operations that were subsequently provided to the JCT as part of IRS general oversight responsibilities, but which were not provided in response to a JCT inquiry.

5.      All records created by or originating at the JCT but which were provided to the IRS and are maintained by the IRS in any agency records system, including but not limited to the E-Trak Communications and Correspondence tracking system.

2

Pl.'s SUMF ¶ 4. CoA Institute clarified the IRS should "exclude from the scope" of its search "any records concerning 26 U.S.C. §§ 6045, 6405, and 8022(2)." Pl.'s SUMF ¶ 5. CoA Institute also submitted a second FOIA request, on the same day, which sought "communications between the IRS and JCT" containing any one of thirty-eight identified search terms. Pl.'s SUMF ¶ 6.

After the IRS denied the requests, CoA Institute exhausted its administrative remedies and filed suit. *See* Pl.'s SUMF ¶¶ 7–13. In July 2019, the Court denied the IRS's motion to dismiss for lack of subject-matter jurisdiction. *See Cause of Action Inst. v. Internal Revenue Serv.*, 390 F. Supp. 3d 84 (D.D.C. 2019). The IRS thereafter conducted a series of negotiated searches with the involvement of CoA Institute. Pl.'s SUMF ¶ 14; 2d Mulvey Decl. ¶ 10. As part of the parties' negotiations, CoA Institute narrowed the scope of its first request and withdrew the second request in its entirety. 2d Mulvey Decl. ¶ 10. CoA Institute agreed to accept the adequacy of the IRS's search for responsive records, Pl.'s SUMF ¶ 18, and agreed to exclude discovery documents pertaining to two litigation matters. 2d Mulvey Decl. ¶ 14. Finally, the parties agreed the time period for the IRS's search was "January 21, 2009 through December 1, 2016." Pl.'s SUMF ¶ 19.

In April 2021, the IRS notified CoA Institute it had completed its search but "identified no agency records." Pl.'s SUMF ¶ 15; 2d Mulvey Decl. ¶ 12. The agency confirmed it would "not be releasing any records," but "reserve[d] its right to assert . . . that any documents responsive to [CoA Institute's] FOIA request" are "exempted from disclosure." Pl.'s SUMF ¶¶ 15–16.

## II.    IRS Rules Governing the Treatment of JCT-Related Records

The JCT is a joint congressional committee tasked, among other things, with conducting oversight of the IRS. Pl.'s SUMF ¶¶ 24–25. As part of its oversight function, the JCT requests records and other types of information from the IRS. Pl.'s SUMF ¶ 26. That correspondence is managed, in most cases, through the IRS's Office of Legislative Affairs. Pl.'s SUMF ¶ 27. Most

communications between the JCT and the IRS occur through formal channels and are recorded in the IRS's E-TRAK Communications and Correspondence System. Pl.'s SUMF ¶ 28. Occasionally, however, JCT personnel will make "oral" requests, such as by telephone. Pl.'s SUMF ¶ 29. And IRS staff will respond, in turn, through "informal" means, including by e-mail, telephone, or in person. Pl.'s SUMF ¶ 30.

Unsurprisingly, given the nature of its responsibilities, the JCT frequently expresses its intent to retain control over records reflecting its dealings with the IRS. The JCT recognizes any failure to provide evidence of its intent to retain control of documents may result in their treatment as "agency records" subject to the FOIA. *See* Decl. of Thomas A. Barthold Ex. A at 4, ECF No. 11-4. The IRS, in turn, has implemented a variety of "rules" governing the treatment of JCT-related records, as well as guidance for their processing under the FOIA. The legitimacy of some of those "rules" is at issue here.

As the IRM and CCDM explain, "[w]hen the [JCT] corresponds with the IRS . . . it generally includes a legend on the incoming correspondence" restricting the use of the record and any IRS replies. I.R.M. § 35.5.4.9(3) (Dec. 28, 2015); *see id.* § 11.3.13.5.4(2) (Aug. 14, 2013)[1]; *see also* 2d Mulvey Decl. Exs. 1 & 2. For the time period relevant to the processing of CoA Institute's FOIA request, the IRM provided two different (but substantially similar) versions of this restrictive legend. Pl.'s SUMF ¶ 31. The legend memorialized in the December 2015 CCDM notice reads as follows:

> This document is a record of the Joint Committee on Taxation ('Joint Committee') and is entrusted to the Department of the Treasury for your use only in handling this matter. Additionally, any documents created by the Department of the Treasury in connection with a response to this Joint Committee document, including (but not limited to) any replies to the Joint Committee, are records of the Joint Committee and shall be segregated from agency records and remain subject

---

[1] Unless otherwise indicated, citations to I.R.M. § 33.5.4.9 date to December 28, 2015, and citations to I.R.M. § 11.3.13.5.4 date to August 14, 2014.

> to the control of the Joint Committee.  Accordingly, the aforementioned documents
> are not 'agency records' for purposes of the Freedom of Information Act.  Absent
> explicit Joint Committee authorization, access to this document and any responsive
> documents shall be limited to Treasury personnel who need such access for the
> purposes of providing information or assistance to the Joint Committee.

2d Mulvey Decl. ¶ 17.  The language of this restrictive legend, by its own terms, is limited to the

JCT inquiry letter and "any documents created" in response to it, including the IRS's reply letter.

I.R.M. § 35.5.4.9(3)–(4), (6); *see also id.* § 11.3.13.5.4(4) ("[T]he inquiry letter from the [JCT],

and any records created by the IRS as a result of, or in response to, that inquiry, are not agency

records responsive to a FOIA request and must not be released under the FOIA.").

 Although the IRS maintains in another part of the IRM that the JCT "legend is included as

a matter of best practice," *id.* § 35.5.4.9(7), in other instances the IRM is silent.  *See id.*

§ 11.3.13.5.4.  Regardless, in cases where the legend is absent, the IRS recommends consultation

with its Office of Chief Counsel to determine whether disclosure is appropriate.  *Id.* § 35.5.4.9(7).

Finally, the IRM contains other guidelines for the treatment of records created in the ordinary

course of agency business that are later requested by JCT after their creation.  *See id.* § 35.5.4.9(9);

*id.* § 11.3.13.5.4(6).  Even though these records are not created "in response" to a JCT inquiry, the

IRS argues they should be treated as "congressional records," which goes beyond the manifest

intent of the JCT.  Again, the legality of those guidelines remains at issue here, even though the

IRS recently eliminated them from the IRM.  *See* 2d Mulvey Decl. ¶ 20; 2d Mulvey Decl. Ex. 3.

**STANDARD OF REVIEW**

 "Congress enacted the FOIA to introduce transparency into government activities."  *Quick*

*v. Dep't of Commerce*, 775 F. Supp. 2d 174, 179 (D.D.C. 2011) (citing *Stern v. Fed. Bureau of*

*Investigation*, 737 F.2d 84, 88 (D.C. Cir. 1984)).  The statute serves as a "means for citizens to

know what the Government is up to" and "defines a structural necessity in a real democracy."

5

*Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 171–72 (2004) (citation and internal quotation marks omitted); *see Nat'l Labor Relations Bd. v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 242 (1989) ("The basic purpose of FOIA is to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed."). The rights afforded under the FOIA are a bulwark to the "fundamental principles of public access" to records of the administrative state, which can often be "shielded unnecessarily from public view . . . [by] possibly unwilling official hands." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 151 (1989) (cleaned up and citation omitted).

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "FOIA cases typically and appropriately are decided on motions for summary judgment." *Defs. of Wildlife v. U.S. Border Patrol*, 623 F. Supp. 3d 83, 87 (D.D.C. 2009). In a FOIA case, "the burden is on the agency to sustain its action[.]" 5 U.S.C. § 552(a)(4)(B). The district court must determine *de novo* "'whether the agency has sustained its burden of demonstrating that the documents requested . . . are exempt from disclosure[.]'" *Multi Ag Media LLC v. Dep't of Agric.*, 515 F.3d 1224, 1227 (D.C. Cir. 2008) (citation omitted). Similarly, with respect to the particular question of whether a record is subject to the FOIA—or, put differently, whether a record is under agency control— "[t]he burden is on the agency to demonstrate, not the requester to disprove, that the materials sought are not 'agency records[.]'" *Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989).

An agency meets its burden on summary judgment by proffering affidavits that "describe the documents and the justifications for nondisclosure with reasonably specific detail" that is "not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). The agency "must show that

. . . any exemptions claimed actually apply, and that any reasonably segregable non-exempt parts of records have been disclosed[.]" *Competitive Enter. Inst. v. Envtl. Prot. Agency*, 232 F. Supp. 3d 172, 181 (D.D.C. 2017). The agency must also meet its added burden to justify withholding under the FOIA's "foreseeable harm" standard. *See Reporters Comm. for Freedom of the Press v. Fed. Bureau of Investigation*, 3 F.4th 350, 357–58 (D.C. Cir. 2021). Courts should analyze "all underlying facts and inferences . . . in the light most favorable to the FOIA requester." *Schoenman v. Fed. Bureau of Investigation*, 575 F. Supp. 2d 136, 148 (D.D.C. 2008) (citation omitted). If both parties seek summary judgment, each motion must stand on its own. *Huffman v. W. Nuclear, Inc.*, 486 U.S. 663, 664 n.11 (1988).

## ARGUMENT

**I.     The Court has subject-matter jurisdiction to adjudicate this case.**

Under the guise of "preserv[ing] its objections" to the Court's denial of its motion to dismiss, the IRS attempts to relitigate the question of subject-matter jurisdiction. Mem. in Supp. of the Internal Revenue Serv.'s Mot. for Summ. J. at 31 [hereinafter "Def.'s Br."]. Specifically, the IRS persists in claiming that precedent requires treating the agency-control issue as a threshold "jurisdictional" question. *See id.* at 31–33.

The Court need not pay much heed to the IRS's arguments. Earlier this summer, the D.C. Circuit squarely confirmed "[t]he text and structure of FOIA . . . make clear that whether the requested materials are 'agency records' goes to the merits of the dispute—the 'court's authority to impose certain remedies'—rather than the court's jurisdictional power to hear the case." *Cause of Action Inst. v. Office of Mgmt. & Budget*, 10 F.4th 849, 854 (D.C. Cir. 2021) (citation omitted). To conclude otherwise would have forced the Circuit "either to overrule [its] case law explaining that agencies bear the burden of demonstrating that the materials sought are not agency records, or

create a class of cases where the plaintiff does not bear the burden of demonstrating subject matter jurisdiction." *Id.*  Such a false dichotomy flies in the face of the "plain meaning of Section 552(a)(4)(B)," *id.*, which the IRS would rather continue to disregard.

## II.  The IRS has not justified the redaction of its *Vaughn* index and the Cummiskey Declaration.

In support of its motion for summary judgment, the IRS offered the declaration of one of its attorneys, Kevin Cummiskey.  *See* Decl. of Kevin Cummiskey.  Important sections of Mr. Cummiskey's declaration are redacted—sections that provide the very basis for the IRS's application of the attorney work-product privilege, Cummiskey Decl. ¶ 14(a), (c)–(d); deliberative-process privilege, Cummiskey Decl. ¶¶ 17(a)–(b), 17(d), 17(g)–(k), 18, 20, 22, 22(a)–(c), 23(a); and attorney-client privilege.  Cummiskey Decl. ¶ 27.  The IRS also redacted significant portions of the attached *Vaughn* index on nearly every line.  *See* Cummiskey Decl. Ex. A.  The IRS offered no legal justification for its use of an *ex parte* declaration and *Vaughn* index, and it redacted more information than necessary to preserve its privilege claims.[2]

The IRS's redaction of the essential elements of its argument for the use of Exemption 5 is patently unfair and prejudicial to CoA Institute.  It cuts against the very purpose of a *Vaughn* index.  As the D.C. Circuit has explained, requesters "face[] an 'asymmetrical distribution of knowledge'" in challenging agency action under the FOIA because "the agency alone possesses, reviews, discloses, and withholds the subject matter of the request."  *Judicial Watch, Inc. v. Food & Drug Admin.*, 449 F.3d 141, 146 (D.C. Cir. 2006) (citation omitted).  An agency has "a nearly impregnable defensive position save for the fact that the statute places the burden 'on the agency

---

[2] The parties discussed the use of redacted submissions prior to the IRS filing its motion.  CoA Institute indicated it did not believe the use of redacted submissions was necessary, and the IRS acknowledged CoA Institute could reserve judgment as to the propriety of redactions once the agency's motion had been filed.  CoA Institute requested—and the agency agreed—that, insofar as the IRS did file redacted submissions, it would file two versions of the *same* declaration, rather than an unredacted public declaration and second one for *in camera* review.

to sustain its action.'"  *Id.* (citation omitted).  That burden is met with a *Vaughn* index, which "provide[s] descriptions of the withheld documents" and "gives the court and the challenging party a measure of access without exposing the withheld information."  *Id.*; *see Lykins v. Dep't of Justice*, 725 F.2d 1455, 1463 (D.C. Cir. 1984) ("detailed indexes and justifications" are needed to "enable[] the adversary system to operate by giving the requester as much information as possible, on the basis of which he can present his case to the trial court").

Accordingly, *in camera* review of *ex parte* submissions—especially, declarations and affidavits—is generally disfavored.  *See Ray v. Turner*, 587 F.2d 1187, 1211 n.43 (D.C. Cir. 1978) ("In camera affidavits, unlike in camera inspection, provide no real check on the accuracy of an agency's representations.").  Such submissions are reserved for "unusually and especially sensitive circumstances."  *Id.*; *see Phillippi v. Cent. Intelligence Agency*, 546 F.2d 1009, 1012–16 (D.C. Cir. 1976) (involving *in camera* review of justifications for *Glomar* response).  And whenever *in camera* review is permitted, it should be "accompanied by at least some form of *in camera* inspection" of the records in dispute.  *Ray*, 587 F.2d at 1211 n.43.

This case does not present "unusually and especially sensitive circumstances," and the IRS has not given the Court any reason to believe redaction of its supporting submissions was necessary.  To be sure, Mr. Cummiskey suggests the redacted sections of his declaration (and the accompanying *Vaughn* index) contain "identifying information about the cases and the substance of the IRS and JCT's communications," which could somehow "disclos[e] the content of those congressional records."  Pl.'s SUMF ¶ 77; Cummiskey Decl. ¶ 10.  But that argument makes little sense.  The Cummiskey Declaration and *Vaughn* index contain the IRS's arguments for its treatment of admitted *agency records* that have been withheld in full under Exemption 5.  Pl.'s SUMF ¶ 76; *see* Cummiskey Decl. ¶ 8.  The IRS has not identified what "those" supposed

"congressional records" are that would be inadvertently disclosed if it were forced to make public the basis for its use of various privileges. Pl.'s SUMF ¶ 78. Incredibly, the IRS has literally redacted its explanation for why records are "predecisional" and "deliberative." *See* Cummiskey Decl. ¶ 17(b). And, despite intimations to the contrary, only *eight* of the fifty-eight e-mail records described in Mr. Cummiskey's declaration and *Vaughn* index even involve JCT personnel; the majority reflect internal IRS correspondence. Cummiskey Decl. ¶¶ 7– 8.

The Court should "require the [IRS] to explain why the information" redacted in the Cummiskey Declaration and *Vaughn* index "should not have been" made public. *Ray*, 587 F.2d at 1211 n.43. It "should make available to [CoA Institute] any portions . . . that it determines, after full consideration of the agency's arguments, do not warrant a protective order."[3] The Court should also give CoA Institute the opportunity, if it so desires, to move for a stay and "appropriate discovery . . . to clarify the [IRS's] position [on redaction] or to identify the procedures by which that position was established." *Phillippi*, 546 F.2d at 1013. Finally, as appropriate, the Court should afford CoA Institute the opportunity to supplement its arguments.

**III.    The records at issue are "agency records" subject to the FOIA.**

The IRS argues nearly all records in this case are "congressional records" outside of agency control and, thus, are not subject to the FOIA. *See* Pl.'s SUMF ¶ 75; Def.'s Br. at 10 ("Here, the vast majority of the responsive records . . . are not 'agency records.'"). The IRS is mistaken. The mere fact that a record relates to the JCT, was created by the JCT, or was transmitted by the IRS to the JCT, does not by itself render it a congressional record outside the scope of the FOIA. Its status as an "agency record," and its availability under the FOIA, is instead dependent upon two

---

[3] Relatedly, the Court should consider CoA Institute's evidentiary objections raised in response to the IRS's Separate Statement of Undisputed Material Facts. CoA Institute challenges the admissibility of testimony underlying paragraphs 34, 102, 108, 126, and 141.

factors: *First*, the IRS must have "'*either* create[d] or obtain[ed]'" the record. *Tax Analysts*, 492 U.S. at 144 (citation omitted). Here, the IRS does not deny that it created or obtained all the responsive records at issue.

*Second*, the IRS must have "control" of the record "at the time [a] FOIA request is made." *Id.* at 145. "Control" is typically analyzed through the four-factor *Burka* test, which examines:

> (1) the intent of the document's creator to retain or relinquish control over the records; (2) the ability of the agency to use and dispose of the record as it sees fit; (3) the extent to which agency personnel have read or relied upon the document; and (4) the degree to which the document was integrated into the agency's record systems of files.

*Burka v. Dep't of Health & Human Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996) (citation omitted).

With purported congressional records, the first two *Burka* factors are dispositive, as they speak to "whether Congress manifested a clear intent to control the document." *United We Stand Am., Inc. v. Internal Revenue Serv.*, 359 F.3d 595, 597 (D.C. Cir. 2004) [hereinafter "*United We Stand*"]; *see Paisley v. Cent. Intelligence Agency*, 712 F.2d 686, 693 n.30 (D.C. Cir. 1983) ("[E]xplicit focus on Congress' intent to control (and not on the agency's) reflects those special policy considerations which counsel in favor of according due deference to Congress' affirmatively expressed intent to control its own documents."), *vacated in part on other grounds*, 724 F.2d 201 (D.C. Cir. 1984).

### A.    Congressional intent to retain control over records must be affirmatively and expressly manifested prior to their creation or transfer.

For the records at issue to be "congressional records," the JCT must have "affirmatively expressed [its] intent to control" them. *Paisley*, 712 F.2d at 693, 693 n.30. Such an affirmative and express manifestation of intent could have occurred in one of two ways. *First*, the JCT might have provided the IRS with "*contemporaneous* and *specific* instructions" limiting the future use or disclosure of the records. *Id.* at 694; *see Holy Spirit Ass'n for the Unification of World Christianity*

*v. Cent. Intelligence Agency*, 636 F.2d 838, 843 (D.C. Cir. 1980) [hereinafter "*Holy Spirit*"], *vacated in part on other grounds*, 455 U.S. 997 (1982). Alternatively, the JCT could have provided the IRS with instructions particular to the treatment of *specific* records *prior to their creation*. *See Am. Civil Liberties Union v. Cent. Intelligence Agency*, 823 F.3d 655, 666–67 (D.C. Cir. 2016) [hereinafter "*ACLU*"].

Together, these requirements address the first two *Burka* factors: Congress's intent to retain or relinquish control, and the ability of the IRS to use or dispose of records as it sees fit. "In the absence of any manifest indications that Congress intended to exert control over documents in an agency's possession," a court should conclude the requested documents are agency records. *Paisley*, 712 F.2d at 692–93.[4] Any "uncertainty" in the matter should "redound to the benefit" of the requester." *Judicial Watch, Inc. v. U.S. Secret Serv.*, 726 F.3d 208, 220 (D.C. Cir. 2013).

The IRS's characterization of relevant D.C. Circuit caselaw in light of the foregoing requirements is both incomplete and misleading. *See* Def.'s Br. at 11–13. The decisions leading up to *United We Stand*—all of which pre-date *Burka*—show a developing appreciation that congressional intent must be indicated in a specific, non-generalized manner. In the first of these cases, *Goland v. Central Intelligence Agency*, a requester sought a "reproduction of a stenographic transcript" of a congressional hearing. 607 F.2d 339, 347 (D.C. Cir. 1978). That hearing had been conducted in closed session, and the CIA's copy of the transcript was marked "Secret," apparently "at the time [it] was made." *Id.* The court concluded the congressionally created transcript was not subject to the FOIA because of "the circumstances attending [its] generation and the conditions attached to its possession by the CIA." *Id.* Thus, contrary to the IRS's contentions, the D.C.

---

[4] If sufficient indicia suggest Congress intended to retain only *some* control, existing caselaw suggests the records may still be disclosed as "agency records" after being redacted to protect the substance of any confidential congressional inquiries. *United We Stand*, 359 F.3d at 601; *Holy Spirit*, 636 F.2d at 841 n.3.

Circuit has long recognized the importance of a *specific* and *pre-established* manifestation of congressional intent to retain control of records later possessed by Executive Branch agencies.

In *Holy Spirit*, the court was faced with two types of records, both of which are at issue here: records generated by Congress and transmitted to an agency, and agency-created records transmitted to Congress. With respect to the former, the court held the exemption of congressional records could "be lost" if Congress did not appropriately "designate[] the documents as falling within congressional control." 636 F.2d at 841. Records about "'sensitive investigations concerning Korean-American relations'" were therefore not exempt simply because of a "general characterization" that they were confidential. *Id.* Indeed, the *Holy Spirit* court rejected a non-specific affidavit discussing the conditions under which the records were transferred as insufficient to have entirely restricted the CIA's ability to use and dispose of the records as the agency saw fit. *Id.* at 841–42.[5] The court also rejected a letter from the Clerk of the House of Representatives, "which objected to the release of any portion of the . . . documents" but was written "as a result of the [plaintiff's] FOIA request and this litigation long after the actual transfer [of records] to the CIA." *Id.* at 842 (citations omitted); *see id.* ("We do not consider the letter sufficient evidence that Congress forwarded the documents to the Agency only 'for a limited purpose and on condition of secrecy.'") (citing *Goland*, 607 F.2d at 348 n.48, and *Halperin v. Dep't of State*, 565 F.2d 699, 705 (D.C. Cir. 1977)). With respect to the latter category—documents created by the CIA and sent to Congress in response to an official inquiry—the court found the records "lost their exemption as

---

[5] The *Holy Spirit* court contrasted the indicia of intent surrounding these records to the transfer of "three sealed cartons of additional congressional documents," which were "accompanied by a memorandum from the House Committee on International Relations" indicating Congress's retained jurisdiction, explaining that the documents were classified, and restricting access to their contents. *Holy Spirit*, 636 F.2d at 842. The subsequent treatment of those records was also telling: the agency never "opened the sealed cartons, [did] not know their contents, and maintain[ed] them for the express purpose of safekeeping." *Id.*

congressional records when Congress failed to retain control" upon returning them to the agency without any further instructions.  *Id.* at 843.

Although the *Holy Spirit* court stopped short of requiring Congress to intend to control and to restrict an agency's use of records contemporaneous with any transfer (or, by extension, any request to create records), *id.* at 842, the D.C. Circuit *explicitly adopted* that approach in *Paisley*. 712 F.2d at 694 ("The Government points to no *contemporaneous* and *specific* instructions from the SSCI to the agencies limiting either the use or disclosure of the documents.") (emphasis in original).  The records in *Paisley* included agency phone logs summarizing conversations between the CIA and the Senate Select Committee on Intelligence ("SSCI"), agency memoranda detailing meetings with the SSCI, and requests for information from the SSCI and the CIA's responses thereto.  *Id.* at 690.  The *Paisley* court found there were "no external indicia of control or confidentiality on the faces of the [congressionally generated] documents," unlike other records that had been stamped "secret."  *Id.* at 694.  The court rejected the CIA's attempt to rely on a "'pre-existing agreement'" that "any and all documents exchanged between the CIA and the SSCI would require review and approval by the [SSCI] prior to public disclosure," *id.*, and the court likewise rejected post-hoc agency letters indicating the CIA's belief that records were "congressional in nature."  *Id.* at 695 (citing *Holy Spirit*, 636 F.2d at 842).  Finally, the *Paisley* court disregarded the agency's reliance on an earlier letter from the SSCI that was "too general and sweeping to provide sufficient proof, when standing alone, of a specific intent to transfer" the particular records at issue "for a 'limited purpose and on condition of secrecy.'"  *Id.* (citing *Goland*, 607 F.2d at 348 n.48).

As for agency-created records, the *Paisley* court found the "connection [with the SSCI] [to be] far too insubstantial and commonplace to establish congressional control," particularly because it could lead to exempting "a broad array of materials otherwise clearly categorizable as agency

14

records, thereby undermining the spirit of broad disclosure that animates the [FOIA]." *Id.* at 696. Absent "strong indicia of congressional intent," specific to the investigation and the records at hand, the court refused to find Congress intended to retain control of agency-created records. *Id.*

*United We Stand* is the first post-*Burka* decision of import to the congressional record question. 359 F.3d at 595. In that case, a political organization sought disclosure of a document created by the IRS in response to a request from the JCT concerning politically motivated audits of tax-exempt organizations. *Id.* at 597. A directive appended to the end of the JCT's request stated that "'[t]his document is a Congressional record and is entrusted to the [IRS] for your use only. This document may not be disclosed without the prior approval of the [JCT].'" *Id.* (citation omitted). The court held the "limited scope of the confidentiality directive" was insufficient to cover the IRS's prepared responses, finding that, by "[r]eferring to 'this document,' the letter could not be clearer. If the [JCT] intended to keep confidential not just 'this document' but also the IRS response, it could have done so by referring to 'this document and all IRS documents created in response to it.'" *Id.* at 600–01.

The *United We Stand* court also refused to accept as dispositive certain IRM provisions pertaining to the confidentiality of JCT communications. *Id.* at 601–02. That "far too general," albeit "consistent course of dealing," the IRS claimed had formed a "pre-existing agreement" regarding congressional control of records submitted in response to JCT requests was insufficient to remove the records from the ambit of FOIA. *Id.* Finally, the court found the JCT's post-hoc objections to disclosure "insufficient to evince congressional intent to control," *id.* at 602, and ordered the IRS to disclose its responses, except to the extent they "would disclose the [JCT] request." *Id.* at 601.[6]

---

[6] The IRS argues the legend used by the JCT, and the relevant provisions in the IRM, was updated to cover "any documents created by [the IRS] in connection with a response," "including (but not limited to) any replies to the

The IRS also relies on the D.C. Circuit's most recent congressional records decision, *ACLU*, which involved a request for the SSCI's report on a former CIA detention and interrogation program. 823 F.3d at 658. The court determined the report—which had been transmitted to the President with a directive that it "'be made available within the CIA and other components of the Executive Branch for use as broadly as appropriate,'" *id.* at 660 (citation omitted)—was a congressional record because the SSCI had explicitly and "unambiguously," *id.* at 665, indicated in a letter to the CIA that records generated during the investigation would be "property of the Committee" and "remain congressional records in their entirety . . . , even after the completion of the Committee's review[.]" *Id.* at 658 (citation omitted). Even in the absence of a "secret" marking or legend on the report itself, the existence of the detailed letter created at the outset of the SSCI's investigation, and prior to the creation and dissemination of the requested report, was sufficiently clear to indicate the SSCI's intent to retain control over any work-product. *Id.* at 665. Unlike the letters rejected in *United We Stand* and *Paisley*, the SSCI's letter was neither "too general and sweeping" nor a "post hoc" manifestation of intent, let alone evidence of a "pre-existing arrangement." *Id.* at 665–67. Still, the court explained such intent could still be "overcome if the record reveal[ed] that Congress subsequently acted to vitiate the intent to maintain exclusive control over the documents that was manifested at the time of the documents' creation." *Id.* at 664. As such, it cannot properly be said, as the IRS suggests, that "expansive language," by itself, immunizes congressional documents from ever becoming agency records. *See* Def.'s Br. at 13.

\*      \*      \*

The foregoing cases establish the requisite indicia of congressional intent to retain control of records acquired by agencies within the "legitimate conduct of [their] official duties." *Tax*

---

[JCT]." Def.'s Br. at 13 n.6. That is inapposite, however, as CoA Institute explicitly seeks records that "do not contain a legend restricting their use or dissemination." 1st Am. Compl. Ex. 2 at 2, ECF No. 44-2.

*Analysts*, 492 U.S. at 145.  Congress must manifest its intent clearly and with specific language particular to the records at issue.  *Paisley*, 712 F.2d at 692–93.  Neither Congress nor agencies can rely on general, far-reaching, and pre-existing arrangements.  *United We Stand*, 359 F.3d at 601–602; *Holy Spirit*, 636 F.2d at 841.  Post-hoc attempts to establish intent after the filing of a FOIA request or after the beginning of litigation also are inadequate.  *United We Stand*, 359 F.3d at 601–02; *Holy Spirit*, 636 F.2d at 842.  Congress must instead establish its intent to maintain control over records before they are created, *ACLU*, 823 F.3d at 665, or contemporaneous with their transfer to an agency, *Paisley*, 712 F.2d at 694, and it must not act in some subsequent way as to vitiate that original intent.  *ACLU*, 823 F.3d at 664.

### B.    As a general matter, the JCT has not expressed sufficient intent to retain control of the records at issue in this case.

The JCT has failed to affirmatively express its intent to control all records responsive to CoA Institute's FOIA request.  The evidence proffered by the IRS and its declarants underscores the agency's improper attempt to use broad, generalized language, and references to pre-existing "practice and policy," to exempt a wide swath of records that should be available under the FOIA.

### 1.    The Barthold Declaration and JCT Exhibits do not establish the requisite intent to retain control.

In support of its claim that most responsive records are "congressional records," the IRS re-introduces an old declaration from the JCT's Chief of Staff, Thomas Barthold, which it filed with its unsuccessful motion to dismiss several years ago.  *See* Barthold Decl., ECF No. 11-2.  The two attachments to that declaration include an excerpt from the JCT's "Policy Manual," *see* Barthold Decl. Ex. A, and a letter Mr. Barthold wrote to then-Commissioner John Koskinen about CoA Institute's FOIA requests.  Barthold Decl. Ex. B, ECF No. 11-5.  None of these submissions supports the IRS's blanket conclusion that most responsive records are outside of agency control.

*First*, Mr. Barthold's letter to then-Commissioner Koskinen does not manifest the requisite congressional intent to retain control over records because it mischaracterizes the scope of the CoA Institute requests, is non-specific, and—most importantly—post-dates the creation or transfer of the records at issue.  For this reason alone, it is ineffective.  *United We Stand*, 359 F.3d at 601–02; *Holy Spirit*, 636 F.2d at 842.  The letter also refers to IRM "paragraph 11.3.13.5.4," but that section only addresses records containing a legend that explicitly indicates the JCT's intent and instructions.  I.R.M. § 11.3.13.5.4(2) ("Whenever the [JCT] corresponds with the IRS under [its] general oversight authority, it includes a legend on the incoming correspondence that restricts the dissemination and use of both the inquiry and responsive records."); *see also id.* § 11.3.13.5.4(4) ("Whenever the [JCT]'s inquiry letter includes the restrictive legend, that letter remains a congressional record.  In addition, any records created by the IRS in connection with the agency's response . . . [are] congressional records.").  Mr. Barthold never addresses the actual substance of CoA Institute's request, which seeks access to a broader range of records, and which *explicitly does not seek records exempt under the conditions set forth in the JCT's legend*.

Although it was (and still is) possible that records without a legend might be exempt under conditions memorialized in another document, *see, e.g.*, *ACLU*, 823 F.3d at 665, Mr. Barthold's testimony does not indicate as much, nor could it.  Because his letter post-dates CoA Institute's FOIA request by two months and was written before the IRS even conducted a search, Mr. Barthold would have had no knowledge of what records might be identified as responsive.  The letter is exactly the sort of last minute or post-hoc attempt to manifest intent that courts have repeatedly rejected.  *See Holy Spirit*, 636 F.2d at 842 (citing *Goland*, 607 F.2d at 348 n.48); *Paisley*, 712 F.2d at 695 (also citing *Goland*); *United We Stand*, 359 F.3d at 601–02.

*Second*, for similar reasons, the excerpts from the JCT Policy Manual are unavailing. As the manual itself indicates, "to protect [JCT] documents as Congressional documents, the . . . legend *must be included* on written communications (including electronic mail)[.]" Barthold Decl. Ex. A 4 (emphasis added); *see* Barthold Decl. Ex. A at 5 ("[I]f a Treasury, IRS, or other Federal agency recipient is among the addressees, the legend *must be included*.") (emphasis added). It is impossible to reconcile the manual with the IRS's broad assertion that "the absence of the legend" is not determinative to the control question. I.R.M. § 35.5.4.9(7). The JCT manual says nothing about records that *do not* contain a legend, which constitute the bulk of records at issue here.

*Third*, with respect to the substance of Mr. Barthold's declaration, it is unclear how such a document prepared for the present litigation could evidence the manifest intent courts have required. Although Mr. Barthold stresses the importance of confidentiality in the JCT's work, *see* Barthold Decl. ¶¶ 6–9, courts have rejected such broad and non-specific assertions of JCT confidentiality, *see United We Stand*, 359 F.3d at 601–02, just as they have with other congressional committees. *See Paisley*, 712 F.2d at 696 (expressing concern the SSCI's "insubstantial and commonplace" claims could "undermin[e] the spirit of broad disclosure that animates the [FOIA]"). Mr. Barthold's references to pre-existing arrangements and "longstanding polic[ies] and practice," Barthold Decl. ¶¶ 10, 13, are likewise insufficient. *See Paisley*, 712 F.2d at 694 (rejecting a "pre-existing agreement" for treatment of "documents exchanged between the CIA and the SSCI"). And despite the fact the "JCT endeavors to include the legend on all correspondence," Barthold Decl. ¶ 15, the fact remains that sometimes a legend is *not* used. *See* Pl.'s SUMF ¶¶ 42–44, 51, 65, 68. If the JCT could at once, and by fiat, intend to treat all records of its dealings with the IRS, or any other agency, as congressional records, *see* Barthold Decl.

¶ 16, it would obviate the purpose of a legend in the first place and defeat the need for specific expressions of congressional intent that courts have consistently required.[7]

### 2. The Second Landes Declaration is insufficient to establish the JCT's requisite intent to retain control.

The IRS also relies on a new declaration from Scott Landes, a supervisory management and program analyst in the IRS's Office of Legislative Affairs.  *See* Second Decl. of Scott S. Landes.  Mr. Landes's declaration fails for the same reasons the IRS's reliance on the JCT exhibits must fail.  It does not and cannot establish the requisite congressional intent.

More than half of Mr. Landes's new declaration describes the process by which the IRS responds to JCT inquiries.  For example, "[w]hen the JCT's Chief of Staff sends a letter to the Commissioner of the IRS requesting . . . information, it is directed to [Mr. Landes's] office," along with "e-mail request[s] for information."  2d Landes Decl. ¶ 5.  These communications are catalogued and stored in the E-TRAK Communications and Correspondence System database, 2d Landes Decl. ¶ 8, and in "separate electronic folders on . . . desktop computers."  2d Landes Decl. ¶ 9.  "Oral" requests are "memorialized in writing in an email" after the fact.  2d Landes Decl. ¶ 10.  With respect to the confidentiality of records and their status as "congressional records," Mr. Landes points to a "longstanding policy and practice" that is "reflected and communicated to the IRS in several ways," 2d Landes Decl. ¶ 11, including (1) legends at the end of letters or e-mail messages, 2d Landes Decl. ¶¶ 12–13; (2) the IRM, 2d Landes Decl. ¶ 14; and (3) the CCDM guidance to treating anything without a legend as a "congressional record."  2d Landes Decl. ¶ 15.

---

[7] Mr. Barthold misrepresents the scope of the JCT's restrictive legend.  He states, for example, that "*all communications* from the JCT to the IRS . . . sent in the course of JCT's official business, and *all records compiled or prepared* by the IRS . . . in connection with such communications, constitute congressional records[.]"  Barthold Decl. ¶ 10 (emphasis added).  But the legend only covers "[t]his document"—meaning the formal JCT inquiry letter— and "any documents *created* . . . in connection with a response . . . including (but not limited to) any replies to [the inquiry letter]."  I.R.M. § 35.5.4.9(3) (emphasis added).  Mr. Barthold cannot unilaterally expand the scope of what is covered by the JCT's restrictive legend.

There are deficiencies with all three of these expressions; none of them manifest Congress's clear intent to control records responsive to the CoA Institute FOIA requests. *First*, regarding the legend, CoA Institute's FOIA request specifically *excludes* records containing a legend restricting their use or dissemination. *See* 1st Am. Compl. Ex. 2 at 2. And the IRS concedes most (if not all) of the records at issue *lack* a legend. *See, e.g.*, Pl.'s SUMF ¶¶ 42–44, 51, 65, 68.

*Second*, the IRS's reliance on the IRM is misplaced.[8] I.R.M. § 11.3.13.5.4 only addresses incoming correspondence from the JCT containing a legend and IRS responses to such inquiries. And I.R.M. § 35.5.4.9 merely "transmits" and reproduces the contents of the December 2015 CCDM directive. By parroting the JCT legend and the CCDM guidance, the IRS cannot manifest Congress's non-existent intent to maintain control of records that *do not contain* a legend. The IRM, in other words, cannot make up for what Congress has failed to assert. *See United We Stand*, 359 F.3d at 601–02; *see also Paisley*, 712 F.2d at 695; *Holy Spirit*, 636 F.2d at 842.

*Third*, with respect to the CCDM, the IRS would like to have its cake and eat it too. The presence and wording of the JCT legend is the most important indicium of Congress's intent to retain control over its own records and those created by the IRS in response to an official inquiry. *See United We Stand*, 359 F.3d at 601 ("[F]or essentially the same reason that courts do not allow unambiguous statutory language to be revised through legislative history, we cannot accept [the IRS's] revisionist reading of the [JCT's legend]. . . . [The legend] could not be clearer.") (citation omitted). In this sense, "the absence of the legend," I.R.M. § 35.5.4.9(7) is likely determinative in most cases. Any practice of treating records without a legend as "congressional records"—at least, in the absence of extrinsic evidence of Congress's manifest intent—violates the FOIA. *See* I.R.M.

---

[8] Mr. Landes cites to an older 2007 version of the IRM. *See* 2d Landes Decl. ¶ 14. The 2013 and 2015 versions of the IRM, which are relevant here, do not appear substantially different. *See* Pl.'s SUMF ¶ 31; *see also* I.R.M. § 11.3.13.5.4(2); *id.* § 35.5.4.9(3).

§ 11.3.13.5.4(4) (IRS policy of not searching for responsive records believed to be "associated with" JCT requests).  Such is the case here with most of the records identified by the IRS.

### C.    The E-TRAK records are "agency records."

The IRS has located 378 pages of responsive records in its E-TRAK Communications and Correspondence System.  Pl.'s SUMF ¶ 36.  These records are categorized in the Second Landes Declaration into several "topics," Pl.'s SUMF ¶ 38, but the IRS has not explained what a "topic" actually refers to or includes in terms of responsive material.  Pl.'s SUMF ¶ 39.  The agency claims "[t]here is no question that the[se] responsive records . . . are congressional records."  Def.'s Br. at 15.  CoA Institute disagrees.

At least for twenty-nine "topics," the responsive records appear to include formal inquiry letters from the JCT that contain a legend—which is odd, seeing as those letters should fall outside the scope of CoA Institute's FOIA request—as well as the IRS's "formal responses," fax cover pages, e-mail cover pages, "informal" e-mails, and internal IRS correspondence about the JCT inquiry.  2d Landes Decl. ¶ 18(a); *see* Pl.'s SUMF ¶ 41.  Although formal responses from the IRS to the JCT that do not contain a legend may still be covered by the restrictive legend on the original JCT inquiry, Mr. Landes has failed to offer adequate detail to establish this fact; he refers instead to what each topic "usually" contains.  2d Landes Decl. ¶ 18(a).  The IRS concedes the remainder of the records in these "topics"—"informal emails," fax and e-mail covers, and internal IRS e-mail—do *not* contain a legend.  2d Landes Decl. ¶ 18(a); *see* Pl.'s SUMF ¶ 42.  And it fails to explain how these records either constitute a "reply" or were generated as part of a "response" to the original JCT inquiry.  *See* I.R.M. § 11.3.13.5.4(2); *id.* § 35.5.4.9(3).

The IRS faces an uphill battle to justify its treatment of the responsive records in the remaining nine "topics."  Six of these "topics" pertain to IRS inquiries that never included a legend

in the first place, and which do not contain a legend on any of the IRS-originated records.  Pl.'s SUMF ¶¶ 43–44; 2d Landes Decl. ¶ 18(b).  The IRS also has identified one "topic" where it cannot locate any corresponding JCT inquiry letter, *see* Pl.'s SUMF ¶ 45; 2d Landes Decl. ¶ 18(c)—a situation which should, no doubt, redound to CoA Institute's benefit.  *Judicial Watch, Inc.*, 726 F.3d at 220.  And the IRS has refused to disclose two final "topics"—or, more precisely, "communications"—that pertain to the provision of Section 6103(p)(3) secretarial reports.  *See* Pl.'s SUMF ¶¶ 47–48, 51.  These reports are addressed in detail below.  *See infra* at pp. 27–29.

In the absence of a legend on many of the E-TRAK records, the IRS tries to fall back on its tired argument about its "longstanding" policy and practice of treating JCT-related records as "confidential" and outside "agency control."  The IRS insists it segregates these records into special folders, relies on the JCT policy manual, and trains its staff about the importance of confidentiality in communications with Congress.  *See* Def.'s Br. at 16.  Yet none of those efforts can satisfy the requirements of the law.  *See supra* at pp. 17–22.  The IRS cannot rely on general, far-reaching, and pre-existing confidentiality arrangements that are unmoored from particular records.  *United We Stand*, 359 F.3d at 601–602; *Holy Spirit*, 636 F.2d at 841; *Paisley*, 712 F.2d at 696.  And it cannot attempt to make up for the JCT's failure to properly assert its intent by relying on the IRM, staff trainings, or record-keeping practices.

### D.    The records located in Scott Landes's e-mail and electronic folders are "agency records."

The IRS has located 1,191 pages of responsive records in the e-mail and electronic folders of its declarant, Scott Landes.  Pl.'s SUMF ¶ 59.  These records are grouped into a series of ninety-four "topics."  Pl.'s SUMF ¶ 60.  There are also an additional twelve e-mail records, of unknown length, which reflect JCT-initiated correspondence about so-called "privileged inquiries."  Pl.'s SUMF ¶ 62.  These records are "agency records" subject to the FOIA.

### 1.    Internal IRS Communications

Thirty-five "topics," consisting of 525 pages of responsive records, reflect internal communications between IRS employees about JCT matters or the IRS's statutory reporting requirements to the JCT.  Pl.'s SUMF ¶ 64.  None of these records, including attachments, contains a restrictive legend.  Pl.'s SUMF ¶ 65.

The IRS's arguments for withholding these records are difficult to follow.  Although the agency admits the internal e-mail correspondence do not "contain a restrictive legend on the email itself," it tries to claim that relevant legends exist in the "original JCT request in E-TRAK or in other related emails between the IRS and JCT."  2d Landes Decl. ¶ 19(a)(i).  This is contradictory.  The "original JCT" requests are not at issue, and the IRS offers no explanation for why *these* e-mails could be covered by a legend on *other* (apparently non-responsive) records.  The IRS also fails to explain whether any of these e-mails either constitute a "reply" to the JCT or were part of the agency's formal "response."  *See* I.R.M.§ 11.3.13.5.4(2); *id.* § 35.5.4.9(3).  That would typically be the only basis for withholding an e-mail (or any record) that does not contain a legend.  Yet it is unlikely either case could be true here as these particular records reflect *internal* IRS correspondence, including communications that have nothing to do with JCT inquiries.  *See* 2d Landes Decl. ¶ 19(a) (describing e-mail about "the IRS's statutory reporting duties to JCT").

For a subset of ten "topics," consisting of seventy-four pages of records, the IRS has been unable to find any sort of restrictive legend even in related documents.  Pl.'s SUMF ¶ 66; *see* 2d Landes Decl. ¶ 19(a)(ii).  The agency again falls back on its arguments about the "longstanding" policy and practice of treating JCT-related records as "confidential" and outside "agency control."  But as CoA Institute has explained, the IRS may not rely on general, far-reaching, and pre-existing confidentiality arrangements to treat anything it wants as a "congressional record."  *United We*

*Stand*, 359 F.3d at 601–602; *Holy Spirit*, 636 F.2d at 841; *Paisley*, 712 F.2d at 696.  The IRS cannot remedy the JCT's failure to properly assert its intent to retain control, and it cannot go beyond whatever intent the JCT has in fact manifested.

### 2.    External IRS-JCT Communications

There are at least 666 pages of e-mail records and attachments that reflect communications between the IRS and the JCT.  Pl.'s SUMF ¶ 67.  None of these records contains a restrictive legend.  Pl.'s SUMF ¶ 68.  Once again, the IRS has offered a series of confusing arguments to justify its treatment of the e-mail correspondence.  These records are under agency control.

Fifty-nine "topics" reflect communications about "general oversight inquir[ies]," Pl.'s SUMF ¶ 69.  Despite the fact the IRS concedes these records do not contain a legend, the agency tries to claim a relevant legend either exists in the "original JCT request in E-TRAK or in other related emails between the IRS and JCT," 2d Landes Decl. ¶ 19(b)(i), or the records can be protected from disclosure (despite the fact no relevant legend can be found in any IRS files) because they relate to a "specific JCT oversight inquir[y]."  2d Landes Decl. ¶ 19(b)(ii).  These are the same arguments offered vis-à-vis internal IRS correspondence, and the same counterarguments apply.  *See supra* at pp. 24–25.  The "original JCT" requests are not at issue; the IRS offers no explanation for why *these* e-mails could be covered by a legend on *other* (apparently non-responsive) e-mail records; and the IRS cannot fall back on general, far-reaching, and pre-existing confidentiality arrangements to treat anything it wants as a "congressional record."  *United We Stand*, 359 F.3d at 601–602; *Holy Spirit*, 636 F.2d at 841; *Paisley*, 712 F.2d at 696.

As for the remaining thirty-five pages of "administrative emails" or correspondence about other matters, *see* Pl.'s SUMF ¶ 71, the IRS admits these records "do not appear to concern a JCT general oversight inquiry" and do not contain a legend.  *See* Def.'s Br. at 19.  The sole basis for

their treatment as "congressional records" is Mr. Barthold's suggestion that the JCT intends to retain control over *anything* "sent in the course of JCT's official business." Barthold Decl. ¶ 10. There are two problems with this argument. *First*, as discussed above, Mr. Barthold has mischaracterized the JCT legend and expanded its scope beyond anything recognized in a formal confidentiality agreement or even the IRM. *See supra* at note 7. *Second*, these records may not even reflect correspondence "sent in the course of JCT's official business," as the IRS has not clarified which, if any, of the e-mail chains originated at the JCT.

### 3.    Alleged "Personal Records"

The IRS has argued, in the alternative, that seven pages of records are "personal records." Pl.'s SUMF ¶ 72. Courts occasionally use a different control test for purported "personal records," which takes into account "the totality of the circumstances surrounding the creation, maintenance, and use of [a] document to determine whether [it] is in fact an 'agency record' and not an employee's record that happens to be located physically within an agency." *Bureau of Nat'l Affairs, Inc. v. Dep't of Justice*, 742 F.2d 1484, 1492–93 (D.C. Cir. 1984) [hereinafter "*BNA*"]; *see Gallant v. Nat'l Labor Relations Bd.*, 26 F.3d 168 (D.C. Cir. 1994).

The exact state of the "totality of the circumstances" test is unclear. Jurists have raised concerns about whether it is still good law after *Tax Analysts*. *See Consumer Fed'n of Am. v. Dep't of Agric.*, 455 F.3d 283, 293–96 (D.C. Cir. 2006) (Henderson, J., concurring). And some district courts treat it as distinct from the *Burka* test. *See, e.g., Edelman v. Sec. & Exch. Comm'n*, 172 F. Supp. 3d 133, 150 (D.D.C. 2016). Recently, the D.C. Circuit has explained that when it comes to the two tests, "there is little daylight between them." *Cause of Action Institute*, 10 F.4th at 855.

No matter which test is applied, the records at issue do not qualify as "personal records." They are "agency records." As the IRS itself concedes, the records were created on IRS e-mail

systems by IRS employees using official IRS e-mail accounts.  2d Landes Decl. ¶ 19(b)(iv).

Moreover, the records are stored in IRS record-keeping systems on Mr. Landes's IRS-issued

computer.  2d Landes Decl. ¶ 19(b)(iv).  Although the agency protests the content of the

communications does not reflect IRS or JCT business, this is hardly dispositive.  The mere

presence of personal information within agency records does not take them outside agency control.

*See BNA*, 742 F.2d at 1496 ("The inclusion of personal information does not, by itself, take

material outside the ambit of FOIA, for personal information can be redacted[.]"); *see also*

*Consumer Fed. of Am.*, 455 F.3d at 293 ("That documents must be redacted to protect personal

information does not contravene the conclusion that they are 'agency records.'").

### 4.    The Additional "12 email" Records

The IRS has located "12 emails," of unknown length and consisting of an unidentified

number of responsive records, which reflect JCT-initiated communications about the

administrative processing of CoA Institute's FOIA requests, as well as the IRS's revisions to the

IRM and CCDM.  Pl.'s SUMF ¶¶ 73–74.  The IRS appears to have omitted any discussion of these

records in its brief.  Nevertheless, the e-mail records are under agency control and should be

disclosed.  There is no indication the records contain a legend, and the IRS cannot rely on general,

far-reaching, and pre-existing confidentiality arrangements to treat any and all communications

with the JCT as "congressional records."  *United We Stand*, 359 F.3d at 601–602; *Holy Spirit*, 636

F.2d at 841; *Paisley*, 712 F.2d at 696.

### E.    Secretarial reports under I.R.C. § 6103(p)(3) are "agency records."

As mentioned above, the IRS has identified two sets of "communications" in E-TRAK that

pertain to the provision of Section 6103(p)(3) secretarial reports to the JCT.  *See* Pl.'s SUMF ¶ 47.

In addition to the reports themselves, responsive records include at least one cover letter and an

additional two-page attachment.  Pl.'s SUMF ¶ 48.  None of the records, including the secretarial reports, contains a restrictive legend.  Pl.'s SUMF ¶ 51.  Nor could they, as they would not have been created in response to any sort of JCT inquiry.

Under Section 6103(p)(3) of the Tax Code, the IRS annually provides the JCT with a pair of reports on various types of requests for inspection or disclosure of tax returns and return information.  *See* I.R.C. § 6103(p)(3)(B)–(C).  Although the JCT has statutory discretion to release its own copies of these reports, in whole or in part, to any person (or the public), *see id.* § 6103(p)(3)(B), the Tax Code does not restrict the IRS's own use of the reports in a manner consistent with taxpayer confidentiality.  That much is demonstrated by the IRS's prior treatment of Section 6103(p)(3) secretarial reports as "agency records" and its disclosure of them to CoA Institute with minimal redaction.  *See* Pl.'s SUMF ¶¶ 52–56.[9]

Coincidentally, the same reports the IRS previously disclosed to CoA Institute should have been identified as responsive to the request here.  Pl.'s SUMF ¶ 57.  Although the IRS has not identified the calendar years to which the reports contained in the "two communications" identified in E-TRAK pertain, *see* Pl.'s SUMF ¶ 58, insofar as they concern 2009, 2010, or 2011, they are likely the very same reports previously released to CoA Institute, and they must now be disclosed again.  *Cf. Fitzgibbon v. Cent. Intelligence Agency*, 911 F.2d 755, 765 (D.C. Cir. 1990).

Even if the IRS were correct in its interpretation of Section 6103(p)(3)(B), the agency would still need to release any responsive reports prepared under Section 6103(p)(3)(C).  These reports are not created in response to any JCT inquiry, and the JCT has no power to prevent their disclosure to the public.  In fact, Section 6103 *requires* publication.  On this point, it is important to note the IRS's reliance on *Electronic Privacy Information Center v. Internal Revenue Service*,

---

[9] Relevant IRS regulations are likewise silent on the treatment of these reports under the FOIA.  *See* 26 C.F.R. § 301.6103(p)(2)(B)-1.

910 F.3d 1232 (D.C. Cir. 2018), is inapt. CoA Institute's FOIA request does not rely on any exception to the general rule of taxpayer confidentiality because Section 6103(p)(3) reports are neither returns nor return information and are not protected by Exemption 3. Pl.'s SUMF ¶ 50.

**IV.    The records at issue are not "congressionally privileged."**

The IRS admits it "does not raise additional grounds or privileges that JCT could raise on its own behalf." Def.'s Br. at 1 n.1. At the same time, the IRS has offered a supporting declaration from the JCT's Chief of Staff, Thomas Barthold, which indicates the JCT has "object[ed] to disclosure" because all records responsive to CoA Institute's request are "absolutely privileged from production under the Speech or Debate Clause[.]" Barthold Decl. ¶ 21; Barthold Decl. Ex. B; *see* Pl.'s SUMF ¶ 33. The Court should reject such procedurally improper privilege claims.

*First*, as the IRS concedes, the JCT is neither a party nor friend of the court in this action. Pl.'s SUMF ¶ 20. The JCT has not sought to intervene or raise additional grounds for the IRS's treatment of responsive records. Pl.'s SUMF ¶¶ 21–22. This is not to say the JCT *cannot* intervene. On the contrary, timely intervention may have been entirely appropriate. *See, e.g.*, *Am. Oversight, Inc. v. Dep't of Health & Human Servs.*, No. 17-827, 2018 WL 4381099, at *2–3 (D.D.C. Aug. 3, 2018). But nearly five years have passed since CoA Institute filed its lawsuit, and the JCT would face an uphill battle in arguing a motion to intervene in the face of the unfair prejudice and procedural disruption it would cause at this stage. *See Roane v. Leonhart*, 741 F.3d 147, 151 (D.C. Cir. 2014). As the D.C. Circuit has made clear "in the strongest possible terms," "governmental parties" must "agree in advance on a common litigating posture in FOIA cases" or "see to it that [their] views are fully represented before the court in some other way at a suitably early stage of the proceedings." *Paisley v. Cent. Intelligence Agency*, 724 F.2d 201, 204 (D.C. Cir. 1984). In short, the time for assertions of congressional privilege have passed.

*Second*, assuming the IRS or the JCT had properly raised a congressional privilege claim, that claim must fail.  The disclosure of the requested records would not compromise the ability of the JCT to conduct its oversight of the federal tax system, nor would it implicate any of the concerns associated with the policy underlying the Speech or Debate Clause.  The Speech or Debate Clause provides that, "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place."  U.S. Const. art. I, § 6, cl. 1.  The purpose of the clause is to "protect the integrity of the legislative process."  *United States v. Brewster*, 408 U.S. 501, 507 (1972).  To that end, it is understood to protect Members from being "distracted from or hindered in the performance of their legislative tasks[.]"  *Powell v. McCormack*, 395 U.S. 486, 505 (1969).  Here, no individual Member or congressional aide has asserted the Speech or Debate Clause.  The fundamental purpose of the Clause would not be served by recognizing Mr. Barthold's ineffective assertion of privilege on behalf of the JCT.  *See Allen v. Dep't of Def.*, 580 F. Supp. 74, 84 (D.D.C. 1983) ("No member of the House of Representatives has sought to intervene . . . or has alleged impairment of the legislative process as a result of plaintiff's FOIA requests."); *see also Holy Spirit Ass'n for the Unification of World Christianity v. Cent. Intelligence Agency*, 558 F. Supp. 41, 44 (D.D.C. 1983) ("No member of Congress or appropriate representative has come forward as a party to raise the issue.").

It also is unclear how release of the records at issue would interfere with ongoing JCT activity.  Mr. Barthold's declaration is so broad that he fails to indicate whether there are, in fact, *any* ongoing investigations that would be jeopardized by disclosure.  In any case, the IRS has failed to demonstrate how and why the Speech or Debate Clause can be used with Exemption 5.

**V.       The IRS cannot rely on Exemption 5 to withhold certain e-mail records.**

The IRS concedes that fifty-eight responsive e-mail records are "agency records" but it has withheld them in full under Exemption 5, in conjunction with various privileges.  Pl.'s SUMF ¶ 76.  These records relate to either the processing of CoA Institute's FOIA request or the IRS's revisions to the CCDM and IRM.  *See* Def.'s Br. at 23.  They are not exempt from disclosure.

Exemption 5 covers "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C. § 552(b)(5).  The Supreme Court has construed Exemption 5 to cover "only those documents that are normally privileged in the civil discovery context."  *Nat'l Labor Relations Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975) (footnote omitted); *see Dep't of the Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8 (2001).  The exemption encompasses various statutory and common law privileges.  *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 800–01 (1984).

Here, the IRS has failed to satisfy the technical requirements for any of the asserted privileges.  The agency also has failed to demonstrate reasonably foreseeable harm in disclosure.

**A.       The IRS cannot use the deliberative-process privilege to withhold records.**

To withhold a record under the deliberative-process privilege, an agency must demonstrate the record is "both pre-decisional and deliberative."  *Mapother v. Dep't of Justice*, 3 F.3d 1533, 1537 (D.C. Cir. 1993).  A record is "predecisional" when it is generated "'[a]ntecedent to the adoption of an agency policy.'"  *Ancient Coin Collectors Guild v. Dep't of State*, 641 F.3d 504, 513 (D.C. Cir. 2011) (citation omitted).  It is "deliberative" when it forms "a direct part of the deliberative process in that it makes recommendations or expresses opinion on legal or policy matters," *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C. Cir. 1975), thereby reflecting the "give-and-take of the consultative process" typical of agency decision-making. *Coastal States Gas Corp.*

*v. Dep't of Energy*, 617 F.2d 854, 867 (D.C. Cir. 1980). "The key question" is "whether disclosure would tend to diminish candor within an agency." *People for the Am. Way Found. v. Nat'l Park Serv.*, 503 F. Supp. 2d 284, 298 (D.D.C. 2007).

The IRS has invoked the deliberative-process privilege to withhold twenty-seven e-mail records pertaining to the processing of CoA Institute's FOIA requests, and twenty-five e-mail records concerning revisions to the IRSM and CCDM. *See* Pl.'s SUMF ¶¶ 84 & 88. Neither category is exempt in full. With respect to internal correspondence about the processing of CoA Institute's FOIA requests, such records are frequently the subject of disclosure. Moreover, courts have been reticent to accept "categorical" deliberative-process claims over FOIA processing notes, particularly in light of an agency's "obligation to segregate factual material from deliberative material." *See Shapiro v. Dep't of Justice*, 153 F. Supp. 3d 253, 292–93 (D.D.C. 2016). "[A]n agency cannot justify withholding an entire document simply by showing that it contains some exempt material[.]" *Stolt-Nielsen Transp. Grp. Ltd. v. United States*, 534 F.3d 728, 734 (D.C. Cir. 2008). Yet the IRS tries to do so here, while also redacting its declarant's explanations for why any of the responsive records are predecisional and deliberative. *See* Cummiskey Decl. ¶ 17(a)–(c), (e)–(k). Simply put, there are bound to be non-deliberative aspects of these e-mails, including factual recitation and references to the IRM and CCDM, which should not be withheld.

The same can be said for records about revisions to the IRM and CCDM. The IRS's categorical withholding in full of all responsive records lacks adequate justification in the record and the agency's attempt to redact any explanation of the deliberative nature of the records in the Cummiskey Declaration deprives CoA Institute of a fair opportunity to provide an intelligible counterargument. *See* Cummiskey Decl. ¶¶ 20 & 22–22(a)–(c).[10]

---

[10] It appears the IRS has gone so far as to redact even the precise provision of the CCDM under revision, *see* Cummiskey Decl. ¶ 22(b), even though that provision has been repeatedly cited by both parties.

Finally, a quick note on records exchanged with the JCT.  As far as Exemption 5 is concerned, the prefixes "inter-" and "intra-" have ordinary meanings that work in tandem with the term "agency" to define the scope of the exemption.  These prefixes limit the use of any attendant privileges to "memorandums or letters" exchanged *within* or *among* entities subject to the FOIA.  *See, e.g.*, Webster's Third New International Dictionary 440 (1961) (defining "inter" to mean "between" or "among"); *id.* at 444 (defining "intra" to mean "within").  The JCT, of course, is not an agency.  *See* Pl.'s SUMF ¶ 24.

Although the D.C. Circuit recognizes "Congress . . . [could] have drafted [Exemption 5] more broadly to include Executive Branch communications to Congress" but "did not," *Dow Jones & Co. v. Dep't of Justice*, 917 F.2d 571, 574 (D.C. Cir. 1990), courts still permit an agency to withhold records exchanged with a legislative entity so long as they "are part and parcel of *the agency's* deliberative process."  *Id.* at 575 (emphasis added and cleaned up).  Yet Exemption 5 is unavailable if an agency's records were "created specifically to assist Congress," or shared "for the sole purpose of assisting [the legislature] . . . with *its* deliberations."  *Rockwell Int'l Corp. v. Dep't of Justice*, 235 F.3d 598, 604 (D.C. Cir. 2001) (emphasis added).

In this instance, the IRS attempts to argue that IRS-JCT communications serve its own deliberative processes, as well as those of the JCT.  But the agency cannot have it both ways.  Elsewhere is insists that the same external correspondence about the processing of CoA Institute's FOIA requests and revisions to the CCDM qualify as "congressional records" because they relate, broadly speaking, to the JCT's operations.  *See* 2d Landes Decl. ¶ 19(c).  The IRS's attempted distinction on the basis of which entity originated an e-mail record is hardly intelligible, at least when the subject-matter of the correspondence is the same.  Admittedly, the records here relate in some sense to IRS decision-making, but they ultimate pertain to the JCT's intention to retain

control.  The JCT's involvement is therefore hardly advisory vis-à-vis the "IRS's own policy-setting deliberations."  Def.'s Br. at 27.  Either *all* the IRS-JCT correspondence about CoA Institute's FOIA requests and the CCDM revisions are "congressional records"—which is not the case—or they are all "agency records" that cannot be withheld under the deliberative-process privilege because they relate to issues that are not a matter of IRS policy-making.

### B.    The IRS cannot use the attorney-client privilege to withhold records.

The attorney-client privilege covers "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice."  *Mead Data Ctr., Inc. v. Dep't of the Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977) (footnote omitted).  The privilege is "not limited to communications made in the context of litigation of even a specific dispute," but those communications must reflect a client's request for his "attorney's counsel . . . on a legal matter."  *Coastal States Gas Corp.*, 617 F.2d at 862.  The privilege "must be 'strictly confined within the narrowest possible limits consistent with the logic of its principle[.]'"  *In re Lindsey*, 148 F.3d 1100, 1108 (D.C. Cir. 1998) (citation omitted).

Here, the IRS has invoked the attorney-client privilege to withhold two e-mail records. Pl.'s SUMF ¶ 97.  Although those records reflect internal correspondence between IRS employees, including between IRS attorneys, Pl.'s SUMF ¶ 98, that is not enough to bring them within the ambit of the privilege.  *See Brinton v. Dep't of State*, 636 F.2d 600, 603 (D.C. Cir. 1980) ("[T]he attorney-client privilege applies only when information is the product of an attorney-client relationship and is maintained as confidential between attorney and client.").

The IRS must provide some further, reasonably specific, explanation for how the Office of Legislative Affairs supplied the Office of Chief Counsel with "private information" that was expected to be kept secret, *Coastal States Gas Corp.*, 617 F.2d at 863; *see Judicial Watch, Inc. v.*

*U.S. Postal Serv.*, 297 F. Supp. 2d 252, 267 (D.D.C. 2004), and with the clear purpose of soliciting legal advice. *See Elec. Frontier Found. v. Dep't of Justice*, 826 F. Supp. 2d 157, 164 (D.D.C. 2011); *Mead Data Ctr., Inc.*, 566 F.2d at 251. The IRS should also clarify whether the supposed "legal advice" at issue was merely "neutral, objective analys[is]" of the interplay of the FOIA, the IRM, and the congressional-record question. *Coastal States Gas Corp.*, 617 F.2d at 863. "That distinction matters because" neutral, objective analysis "does not receive protection under the privilege." *Reporters Comm. for Freedom of the Press v. Customs & Border Prot.*, No. 18-00155, 2021 WL 4843970, at *12 (D.D.C. Oct. 18, 2021). All the IRS has offered here, though, is a short paragraph that has been redacted in its description of how the IRS sought legal advice from in-house counsel. *See* Cummiskey Decl. ¶ 27.

**C.    The IRS cannot use the attorney work-product privilege to withhold records.**

The attorney work-product privilege protects documents that reflect an attorney's mental impressions, conclusions, opinions, and legal theories "prepared in contemplation of litigation." *Coastal States Gas Corp.*, 617 F.2d at 864. Yet the privilege is "limited" and "'does not extend to every written document generated by an attorney.'" *Id.* (citation omitted).

Here, the IRS has withheld in full sixteen e-mail records and attachments. Pl.'s SUMF ¶ 79. These records reflect internal correspondence between IRS employees, including agency counsel and staff of the Office of Legislative Affairs, about the administrative processing of CoA Institute's FOIA requests. Pl.'s SUMF ¶¶ 80–81. The IRS has not adequately demonstrated these records are privileged work-product. Indeed, the IRS has redacted relevant portions of the Cummiskey Declaration, which supposedly describe how the records reflect IRS counsel's mental impressions, conclusions, opinions, and theories. *See* Cummiskey Decl. ¶ 14(a)–(d). But, more

importantly, the agency has not established—and cannot establish—how any of these records were prepared in contemplation of litigation.

The D.C. Circuit has explained the work-product privilege does not ordinarily attach until at least "some articulable claim, likely to lead to litigation, . . . has arisen." *Coastal States Gas Corp.* 617, F.2d at 865. No such claim had arisen, or could have arisen, at the time any of the e-mail communications here occurred. CoA Institute filed its FOIA requests in late June 2016. Pl.'s SUMF ¶ 4. The IRS acknowledged receipt of those requests and notified CoA Institute that it was extending its response deadline by ten days, as provided by 5 U.S.C. § 552(a)(6)(B)(i). *See* 1st Am. Compl. Ex. 4, ECF No. 44-4. The agency thereafter denied CoA Institute's request *before* its extended deadline. At no point in this process did CoA Institute have valid claim under the FOIA. Prior to the issuance of the IRS's determination, the agency's response was not yet untimely, and after the issuance of the determination, CoA Institute had not exhausted its administrative remedies. Thus, CoA Institute had no cognizable FOIA claim before October 13, 2016, or twenty-one working-days after the IRS received CoA Institute's appeal. All the e-mail records at issue, however, were created months earlier in June and August 2016. Pl.'s SUMF ¶¶ 82–83.

The IRS also has not demonstrated that, considering the circumstances surrounding the creation and purpose of the e-mail records, any of its attorneys or staff had a "subjective belief that litigation was a real possibility," nor would it have been "objectively reasonable" to consider intra-agency discussion of a CoA Institute's FOIA request as prompted by "the prospect of litigation." *Hertzberg v. Veneman*, 273 F. Supp. 2d 67, 78–79 (D.D.C. 2003) (citing *In re Sealed Case*, 146 F.3d 881, 884 (D.C. Cir. 1998)). If that were so, all records created by an attorney that may relate to a pending FOIA matter would qualify as work-product. But "the policies of the FOIA would be largely defeated" if an agency could "withhold any document prepared by any person in the

Government with a law degree simply because litigation might someday occur[.]" *S. of the Commonw. of P.R. v. Dep't of Justice*, 823 F.2d 574, 587 (D.C. Cir. 1987) (internal quotation marks and citation omitted).

   **D.   The IRS has not satisfied its burden under the "foreseeable harm" standard.**

   The requirements for use of any of the foregoing privileges are only the first hurdle the IRS must overcome to justify its withholding in full of records.  As the law stands now, an agency may withhold information "only if [it] reasonably foresees that disclosure would harm an interest protected by an exemption[.]"  5 U.S.C. § 552(a)(8)(A)(i)(I).  Under this foreseeable harm standard, is it not enough that an agency make a case for the *technical* application of an exemption (or privilege); it must articulate *precise* reasons why *specific* records, or portions thereof, should remain secret.  *See* 162 Cong. Rec. S1496 (daily ed. Mar. 15, 2016) (statement of Sen. Leahy) ("[C]odifying the presumption of openness will help reduce the perfunctory withholding of documents through the overuse of FOIA exemptions.").

   Courts have consistently recognized the added burden the foreseeable standard places on agencies before they can withhold information.  *See, e.g.*, *Rosenberg v. Dep't of Def.*, 342 F. Supp. 3d 62, 78 (D.D.C. 2018).  It is not enough for an agency to recite "boiler plate language to justify [its] redactions."  *Judicial Watch, Inc. v. Dep't of Commerce*, 375 F. Supp. 3d 93, 100 (D.D.C. 2019).  An agency must instead "specifically and thoughtfully determine whether it 'reasonably foresees that disclosure' of *each particular record* 'would harm an interest protected by [an] exemption.'"  *Reporters Comm. for Freedom of the Press*, 3 F.4th at 372 (emphasis added).  "[P]erfunctory, sweeping, and undifferentiated declaration[s] that release of every single record withheld would have," for example, "an 'inhibiting effect' by chill[ing] full and frank discussions,"

must be rejected.  *Id.*  The foreseeable harm analysis proffered for each of the asserted privileges is considered in turn.

With respect to the attorney-client and attorney work-product privileges, the IRS insists there is "foreseeable harm" because disclosure would "waive" those privileges and "amount to impermissible discovery."  Def.'s Br. at 29–30.  Neither argument is convincing.  *First*, although the IRS maintains responsive records are protected by the attorney-client and work-product privileges, the agency has not actually *asserted* those privileges as it would in other civil cases, and so disclosure would not amount to a compelled "waiver."[11]

*Second*, and relatedly, although the IRS protests disclosure would run afoul of the notion that requesters should not be able "to obtain through the FOIA material that is normally privileged," *Weber Aircraft Corp.*, 465 U.S. at 801, that reading of the attendant caselaw is deeply mistaken.  The FOIA is "litigation neutral."  A requester's rights of access do not vary according to its interests in or intended use of records.  *See Sears, Roebuck & Co.*, 421 at 143 n.10; *see also North v. Walsh*, 881 F.2d 1088, 1099 (D.C. Cir. 1989) ("FOIA rights are unaffected by the requester's involvement in other litigation; an individual may therefore obtain under FOIA information that may be useful in non-FOIA litigation, even when the documents could not be obtained through discovery.").  More importantly, this Court must grapple with the text of the FOIA *as it exists today*.  The statute imposes on agencies an additional burden of demonstrating foreseeable harm beyond meeting the technical requirements for any exemption.

*Third*, insofar as the IRS argues disclosure would undermine the purpose of either privilege, that is "not sufficient to show a risk of foreseeable harm."  *Reporters Comm. for*

---

[11] As the IRS rightly observes, the courts have adopted a "routine" disclosure rule, rather than import the typical qualified-absolution distinction from civil discovery.  *See Fed. Trade Comm'n v. Grolier, Inc.*, 462 U.S. 19, 27 (1983).  Agencies do not actually invoke privileges and, as a result, there is no grounds for a requester to attempt to overcome the asserted privilege.

*Freedom of the Press*, 2021 WL 4843970 at *16.  "[A]n agency must still provide a non-generalized explanation o[f] the foreseeable harm that would result from disclosure of attorney-client communications" and attorney work-product.  *Id.*  Yet the IRS's argument tends to be thin on substance and say little about specific harms beyond "evisceration" of the underlying privileges.  *See* Cummiskey Decl. ¶¶ 15 & 28.

With respect to the deliberative-process privilege, the IRS's foreseeable-harm analysis is no more compelling.  The agency offers two arguments.  *First*, it claims the disclose of records concerning the processing of CoA Institute's FOIA request, as well as revisions to the IRM and CCDM, would destroy the confidentiality expected in IRS-JCT correspondence.  *See* Def.'s Br. at 30 ("[U]nlike the typical intra-agency deliberation, it is important that both the consultation with the JCT, and the consultation internally *about* that consultation with JCT, be kept from public view."); *see also* Cummiskey Decl. ¶¶ 24–25.  But that is a circular argument.  It also presumes the IRS has properly determined that any record reflecting its dealings with the JCT is a "congressional record" not subject to the FOIA.  If an iota of the IRS's position is incorrect, then this entire aspect of its foreseeable-harm argument must fail.

*Second*, the IRS argues disclosure would "chill" its internal deliberations, as well as its staff's willingness to engage with the JCT.  *See* Def.'s Br. at 30–31; *see also* Cummiskey Decl. ¶¶18 & 26.  Yet the IRS does little to elaborate on this claim.  Mere "general explanations of the possibility of a 'chilling effect' fall short of articulating 'a link between the specified harm and specific information contained in the material withheld.'" *Judicial Watch, Inc.*, 375 F. Supp. 3d at 100; *see Machado Amadis v. Dep't of State*, 971 F.3d 364, 371 (D.C. Cir. 2020) ("[A]gencies . . . cannot simply rely on 'generalized' assertions that disclosure 'could' chill deliberations.").  The IRS must offer more than conjecture.

As a final note, it is worth noting the age of the records at issue. The Department of Justice Office of Information Policy's longstanding guidance on foreseeable harm determinations, which continues to be relevant today, advises agencies to consider, among other things, the "status of the decision" implicated by records, as well as the "age of the information" in a record. Dep't of Justice, Office of Info. Policy, FOIA Update: OIP Guidance: Applying the "Foreseeable Harm" Standard Under Exemption Five, FOIA Update vol. XV, No. 2 (Jan. 1, 1994), *available at* https://bit.ly/3iDJhSi. Here, the responsive records all date from 2015 and 2016. *See* Pl.'s SUMF ¶¶ 82–83, 85–87, 90–92, 94–96, 99; *see also* Cummiskey Decl. Ex. A. Considering the administrative process for CoA Institute's FOIA requests ended five years ago, and the relevant revisions to the IRM and CCDM were finalized six years ago, it unlikely any real harm would arise from disclosure.

## VI.    The IRS has failed to segregate and release non-exempt portions of records.

Regardless of whether the IRS can sustain its use of Exemption 5, the agency has not shown it released all reasonably segregable portions of the e-mail correspondence at issue. The IRS's failure to carefully review responsive records conflicts with the explicit mandate of the FOIA, which demands the release of "any reasonably segregable portion of a record . . . after deletion of the portions which are exempt." 5 U.S.C. § 552(b); *see id.* § 552(a)(8)(A)(ii)(II). An adequate segregability analysis is so vital to the FOIA's broad mandate of disclosure that a court has "an affirmative duty to consider the segregability issue *sua sponte*." *Trans-Pac. Policing Agreement v. U.S. Customs Serv.*, 177 F.3d 1022, 1028 (D.C. Cir. 1999). "A district court that 'simply approve[s] the withholding of an entire document without entering a finding on segregability, or lack thereof,' errs." *Krikorian v. Dep't of State*, 984 F.2d 461, 467 (D.C. Cir. 1993).

"[U]nless the segregability provision of the FOIA is to be nothing more than a precatory precept, agencies must be required to provide the reasons behind their conclusions in order that they may be challenged by FOIA plaintiffs and reviewed by the courts." *Mead Data Cent., Inc.*, 566 F.2d at 261. Mere allegations of complying, absent an adequate showing that "explain[s] in detail which portions" of a record "are disclosable and which are allegedly exempt," are not enough to win the day. *Edmonds Inst. v. Dep't of the Interior*, 383 F. Supp. 2d 105, 108 (D.D.C. 2005).

In this case, the IRS does not even provide a boiler-plate statement that it satisfied its segregability obligations. It ignores the issue entirely. Considering the heavy redaction of the agency's *Vaughn* index, its selective (and seemingly strategic) redaction of the Cummiskey Declaration, and its withholding in full of *all* admitted agency records under Exemption 5, it seems unlikely a diligent line-by-line review was ever undertaken.

## VII.   The Court should conduct *in camera* review of the records withheld under Exemption 5.

The FOIA authorizes a district court to conduct *in camera* inspection of an agency's withholdings to determine whether it has met its burden in justifying the application of any statutory exemptions. 5 U.S.C. § 552(a)(4)(B). Here, it is appropriate for the Court to conduct an *ex parte* and *in camera* inspection of the records withheld under Exemption 5. *See Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) ("[D]istrict courts have 'broad discretion' to decide whether *in camera* review is necessary to determine whether the government has met its burden[.]"). *In camera* review would be particularly apt considering the IRS's heavy redaction of its *Vaughn* index and its use of an *ex parte* declaration. *See supra* at pp. 8–10. When a court permits *in camera* review of such redacted submissions, it should be "accompanied by at least some form of in camera inspection." *Ray*, 587 F.2d at 1211 n.43. Direct review of the unredacted

41

records is therefore warranted.  *See Spirko v. U.S. Postal Serv.*, 147 F.3d 992, 997 (D.C. Cir. 1997); *Quiñon v. Fed. Bureau of Investigation*, 86 F.3d 1222, 1229 (D.C. Cir. 1996).

*In camera* review would not be onerous.  *See Quiñon*, 86 F.3d at 1228 (the number of records to be inspected is "another . . . factor to be considered" when determining whether *in camera* review is appropriate); *see also People for the Am. Way Found.*, 503 F. Supp. 2d at 307 ("*In camera* review may be appropriate when . . . 'the number of records involved is relatively small[.]" (citation omitted)).  The IRS has withheld only fifty-eight e-mail records under Exemption 5.  Pl.'s SUMF's ¶ 76.  *In camera* review also would serve judicial economy.  *See Carter v. Dep't of Commerce*, 830 F.2d 388, 393 (D.C. Cir. 1987) ("[W]hen the requested documents 'are few in number and of short length,' *in camera* review may save time and money.").

## CONCLUSION

For these reasons, CoA Institute respectfully requests that the Court deny Defendant's motion for summary judgment and grant CoA Institute's cross-motion for summary judgment. CoA Institute further requests the Court order Defendant to re-process and produce all responsive records in their entirety within the next twenty days.


//


//


//


42

Dated: February 2, 2022

Respectfully submitted,

*/s/ Ryan P. Mulvey*
Ryan P. Mulvey
(D.C. Bar No. 1024362)
Lee A. Steven
(D.C. Bar No. 468543)

CAUSE OF ACTION INSTITUTE
1310 North Courthouse Road, Suite 700
Arlington, VA 22201
Telephone: (571) 482-4182
ryan.mulvey@causeofaction.org
lee.steven@causeofaction.org

*Counsel for Plaintiff CoA Institute*