IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CAUSE OF ACTION INSTITUTE, Plaintiff, | Case No. 1:16-cv-2354-ACR |
| v. | |
| INTERNAL REVENUE SERVICE, Defendant. | |

**MEMORANDUM IN SUPPORT**
**OF THE INTERNAL REVENUE SERVICE'S**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Introduction .......... 1

Background .......... 2

A. Cause of Action's FOIA Requests and the Parties' Subsequent Agreements Related to the Scope of the Requests .......... 2

B. The Joint Committee on Taxation's Policy and Procedures Regarding Records and Communications between JCT and IRS .......... 3

C. The Internal Revenue Service's Treatment of Communications with the JCT .......... 5

Standard of Review .......... 10

Argument .......... 11

I. The Test for Whether a Record is a Congressional Record Turns on Whether Congress Manifested a Clear Intent to Control the Document. .......... 11

II. The Records in this Case are Congressional Records because Congress Has Manifested Its Intent to Control the Records in Multiple Ways, and the IRS Has Treated the Records as Congressional Records .......... 14

A. JCT has manifested its intent to retain control over the responsive records in multiple ways. 14

B. The IRS Has Acknowledged in Multiple Ways the JCT's Intent to Retain Control over the Responsive Records. .......... 15

C. The E-TRAK Records are All Congressional Records. .......... 16

D. The responsive records identified in Scott Landes' email and electronic folders are congressional records. .......... 18

*1. Internal IRS Communications are all congressional records.* .......... 18

*2. External IRS-JCT Communications are also congressional records.* .......... 19

*3. Personal Communications are not agency records.* .......... 21

III. IRS Reports to JCT under 26 U.S.C. § 6103(p) are, by Statute, Records which Only JCT Has the Authority to Make Public. .......... 22

IV. 58 Records Responsive to Plaintiff's Request are Exempt from Disclosure under Exemption 5 (5 U.S.C. § 552(b)(5)) of the FOIA. .......... 23

A. Records About the Processing of Cause of Action's FOIA Request Are Protected by the Work-Product Privilege. .......... 24

B. Certain Records About the Processing of Cause of Action's FOIA Request Before August 8, 2016 and All the Records about the Revision of the C.C.D.M. and I.R.M. are Protected by the Deliberative Process Privilege. .......... 26

*1. Records about the processing of Cause of Action's FOIA Request are exempt because they are predecisional and deliberative.* .......... 26

*2. Records about the revision of the C.C.D.M. and I.R.M. are also exempt because they are predecisional and deliberative.* ........ 27

C. Two Emails About Cause of Action's FOIA Request are Exempt Under the Attorney-Client Privilege. ........ 29

D. Disclosure of the Exempt Records Would Harm the IRS. ........ 29

*1. Disclosure of the IRS's records about the processing of Cause of Action's Request would severely harm the IRS's Attorneys' ability to represent their agency client and communicate confidentially.* ........ 30

*2. Disclosure of the IRS's deliberations about the revision of the C.C.D.M. and I.R.M. would undermine the entire purpose of those deliberations and the purpose of the privilege itself.* ........ 32

V. The Question of Whether Records are Agency Records or Congressional Records is a Threshold Jurisdictional Issue ........ 33

Conclusion ........ 35

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*ACLU v. CIA*,
823 F.3d 655 (D.C. Cir. 2016) ........ *passim*

*American Oversight v. Dep't of Health and Human Servs.*,
101 F.4th 909 (D.C. Cir. 2024) ........ 28, 29

*Banks v. Office of Senate Sergeant-at-Arms*,
222 F.R.D. 1 (D.D.C. 2004) ........ 25, 26, 31

*Bureau of Nat'l Affairs v. U.S. Dep't of Justice*,
742 F.2d 1484 (D.C. Cir. 1984) ........ 21

*Burka v. United States Dep't. of Health & Human Servs.*,
87 F.3d 508 ........ 12

*Cause of Action Inst. v. Exp-Imp. Bank of the United States*,
No. CV 19-1915 (JEB), 2021 WL 706612 (D.D.C. Feb. 23, 2021) ........ 28

*Cause of Action Inst. v. Nat'l Archives and Records Admin.*,
753 F.3d 210 (D.C. Cir. 2014) ........ 11

*Cause of Action Inst. v. U.S. Dep't of Justice*,
330 F. Supp. 3d 336 (D.D.C. 2018) ........ 31

*Consumer Fed'n of Am. v. U.S. Dep't of Agric.*,
455 F.3d 283 (D.C. Cir. 2006) ........ 10, 21, 22

*Ctr. for Investigative Reporting v. U.S. Customs and Border Prot.*,
436 F. Supp. 3d 90 (D.D.C. 2019) ........ 30

*Elec. Priv. Info. Ctr. v. IRS*,
910 F.3d 1232 (D.C. Cir. 2018) ........ 23

*FDIC v. Meyer*,
510 U.S. 471 (1994) ........ 33

*FTC v. Grolier, Inc.*,
462 U.S. 19 (1983) ........ 31

*Goland v. CIA*,
607 F.2d 339 (D.C. Cir. 1979) ........ 12, 13

*Holy Spirit Ass'n v. CIA*,
636 F.2d 838 (D.C. Cir. 1980) ........ 12, 17

*Jud. Watch, Inc. v. FDA*,
449 F.3d 141 (D.C. Cir. 2006) ........ 26

*Jud. Watch, Inc. v. U.S. Dep't of Justice*,
365 F.3d 1108 (D.C. 2004) ........ 24

*Jud. Watch, Inc. v. United States Secret Serv.*,
726 F.3d 208 (D.C. Cir. 2013) ........ 11, 12, 26

*Justice v. IRS*,
798 F. Supp. 2d 43 (D.D.C. 2011) ........ 32

*Kalodner v. Abraham*,
310 F.3d 767 (D.C. Cir. 2002) ........ 34

*Kissinger v. Reporters Comm. for Freedom of Press*,
445 U.S. 136, 150 (1980) ........ 11

*Lane v. Pena*,
518 U.S. 187 (1996) ........ 34

*Leopold v. United States Dep't of Justice*,
487 F. Supp. 3d 1 (D.D.C. 2020) ........ 25

*Mobley v. CIA*,
806 F.3d 568 (D.C. Cir. 2015) ........ 10

*N.L.R.B. v. Sears, Roebuck & Co.*,
421 U.S. 148 (1975) ........ 26

*Nat'l Ass'n of Crim. Def. Lawyers v. Dep't of Justice Executive Office for United States Attorneys*,
844 F.3d 246 (D.C. Cir. 2016) ........ 25, 26

*Negley v. F.B.I.*,
825 F. Supp. 2d 63 (D.D.C. 2011) ........ 10

*Porter v. CIA*,
579 F. Supp. 2d 121 (D.D.C. 2008) ........ 34

*Rockwell Int'l Corp. v. U.S. Dep't of Justice*,
235 F.3d 598 (D.C. Cir. 2001) ........ 28, 29

*Rollins v. U.S. Dep't of State*,
70 F. Supp. 3d 546 (D.D.C. 2014) ........ 10

*SafeCard Servs., Inc. v. SEC*,
926 F.2d 1197 (D.C. Cir. 1991) ........ 10

*Tax Analysts v. IRS*,
117 F.3d 607 (D.C. Cir. 1997) ....................29

*Tax Analysts v. IRS*,
294 F.3d 71 (D.C. Cir. 2002) ....................24

*Tax Analysts v. United States Dep't of Justice*,
845 F.2d 1060 (D.C. Cir. 1988) ....................11

*U.S. Dep't of Justice v. Tax Analysts*,
429 U.S. 136 (1989) ....................33

*United States Dep't of Justice v. Tax Analysts*,
492 U.S. 136 (1989) ....................11, 33

*United States v. Sherwood*,
312 U.S. 584 (1941) ....................34

*United We Stand Am., Inc. v. IRS*,
359 F.3d 595 (D.C. Cir. 2004) ....................11, 13

*Williams & Connolly v. Sec. Exch. Comm'n*,
662 F.3d 1240 (D.C. Cir. 2011) ....................31

**Statutes**

5 U.S.C.
§ 551 ....................33
§ 552 .................... *passim*

26 U.S.C.
§ 6045 ....................2
§ 6103 ....................22, 23
§ 6405 ....................2
§ 8022 ....................2, 3

**Regulations**

26 C.F.R. §§ 301.9000-4 ....................6, 9, 16, 20

## Introduction

In this Freedom of Information Act ("FOIA") (5 U.S.C. § 552) case, Cause of Action Institute ("COA") seeks to compel the release of communications between the Internal Revenue Service ("IRS") and the Joint Committee on Taxation ("JCT"). The IRS completed its search for responsive records in 2021, and COA is not challenging the adequacy of the search. Since the IRS has not released any records to COA, the only remaining legal issue in this case is whether any of the records at issue are subject to, and required to be released under, the FOIA.[1]

They are not. Most of the records are congressional records (a small sub-set are personal records), not agency records subject to the FOIA. Others are records that, by statute, only JCT may make public. And the remaining records are exempt under 5 U.S.C. § 552(b)(5) because they are privileged under the attorney-client, work-product, or deliberative process privileges.

In short, the IRS has not improperly withheld any agency records in response to COA's request. And because the only remedy provided by the FOIA is the power "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld," Cause of Action cannot, as a matter of law, prevail on its FOIA claim. 5 U.S.C. § 552(a)(4)(B). The Court should grant summary judgment for the IRS, and dismiss this case in its entirety.[2]

[1] The parties originally fully-briefed their cross-motions for summary judgment, served them on each other in late 2021–2022, and filed them as batches on February 2, 2022 as the Court ordered. ECF Nos. 51–56. The IRS also filed separately a motion for leave to file certain unredacted documents *in camera.* ECF No. 57. Pursuant to the Court's June 3, 2025 Minute Order, the parties conferred further and submitted a joint status report and joint briefing schedule on July 16, 2025. ECF No. 62.

[2] Because the JCT is not a party to this action, this motion does not raise other grounds or privileges that JCT could raise on its own behalf.

## Background

### A. Cause of Action's FOIA Requests and the Parties' Subsequent Agreements Related to the Scope of the Requests

By letter dated June 22, 2016, COA submitted two requests for records to the IRS. (First Am. Complaint, Dkt. No. 44, Exs. 2, 3). The First Request sought:

1. All records transmitted between the IRS and the [Joint Committee on Taxation ("JCT")], and all communications concerning such transmissions, which do not contain a legend restricting their use or dissemination.

2. All communications between IRS Privacy, Governmental Liaison, and Disclosure ("PGLD") Personnel, as well as other affected IRS functions or components, and the JCT concerning any determination to disclose or withhold IRS records that were the subject of a JCT oversight inquiry.

3. All records generated or maintained by the IRS in the normal course of its operations that were subsequently provided to the JCT in response to a general oversight inquiry.

4. All records generated or maintained by the IRS in the normal course of its operations that were subsequently provided to the JCT as part of IRS general oversight responsibilities, but which were not provided in response to a JCT inquiry.

5. All records created by or originating at the JCT but which were provided to the IRS and are maintained by the IRS in any agency records system, including but not limited to the E-trak Communication and Correspondence tracking system.[3]

Since the filing of the original complaint, COA agreed to narrow the scope of its First Request by withdrawing Item 5. (First Am. Compl. ¶ 31). COA also agreed to withdraw its Second Request in its entirety. *Id.* Finally, COA agreed that records responsive to Item No. 2 of the First Request pertaining to two litigation matters involving the IRS are excluded from the universe of responsive documents.

---

[3] COA stated neither the First Request nor the Second Request sought records concerning 26 U.S.C. § 6045 (information related to returns filed by brokers), § 6405 (JCT's review responsibility for proposed issuance of large tax refunds), and § 8022(2) (JCT's exercise of its responsibility to simplify tax law).

### B. The Joint Committee on Taxation's Policy and Procedures Regarding Records and Communications between JCT and IRS

The JCT is the oldest joint committee of the Congress. (Declaration of Thomas A. Barthold ["Barthold Decl."], Dkt. No. 11-2, ¶ 2). One aspect of JCT's oversight of the tax system is monitoring the actions and positions taken by the IRS to ensure that the tax system is being administered in a fair, appropriate, and efficient manner that achieves the legislative intent of the Congress. (Barthold Dec. ¶ 4). The governing statute provides that JCT's duties include investigating "the operation and effects of the Federal system of internal revenue taxes" and "the administration of such taxes by the Internal Revenue Service or any executive department, establishment, or agency charged with their administration." 26 U.S.C. § 8022(1)(A) & (B).

In furtherance of its investigative and legislative responsibilities and activities, the JCT has constitutional and statutory authority to obtain various types of information from the IRS, and the IRS is authorized and directed to provide the information requested. (Barthold Dec. ¶ 5). Pursuant to this authority, JCT policy staff often request information from the IRS. (Barthold Dec. ¶ 5). The JCT makes requests for information to the IRS both through letters from the Chief of Staff to the Commissioner of the IRS, as well as through emails and telephone calls from the JCT professional staff to the IRS. (*Id.*).

Because of the JCT's unique role in drafting tax legislation with vast financial implications and in overseeing the IRS and the administration of the tax code, all of the work the JCT does for the tax-writing committees or Members of Congress is considered highly confidential. (*Id.* ¶ 6). Thus, it is critical that all of the JCT's communications with the IRS regarding matters of official JCT business and all records created by the IRS in response to such communications be protected from compelled public disclosure. (*Id.*).

Accordingly, the JCT's longstanding policy and practice is that all communications from the JCT to the IRS and the Department of Treasury sent in the course of JCT's official business, and all records compiled or prepared by the IRS and Treasury in connection with such communications, constitute congressional records, not agency records, and remain subject to congressional control even when in the physical possession of an agency. (*Id.* ¶ 10). In order to maintain the confidentiality of such records, the JCT has taken several steps to demonstrate its intent that these records constitute congressional records and that JCT retains control over them while they are in the physical custody of the IRS. (*Id.*).

For example, it is JCT policy to include a legend on all correspondence to the IRS in the course of JCT's official business, including both letters and emails. (*Id.* ¶ 11). JCT includes this legend on its communications in order to clearly and specifically manifest its intent to retain control over all such JCT communications to the IRS and all records compiled or prepared by the IRS in connection with such communications. (Barthold Dec. ¶ 12). Since 2000, the legend has stated:

> This document is a record of the Joint Committee on Taxation ('Joint Committee') and is entrusted to the [Department of the Treasury/IRS] for your use only in handling this matter. Additionally, any documents created by the [Department of the Treasury/IRS] in connection with a response to this Joint Committee document, including (but not limited to) any replies to the Joint Committee, are records of the Joint Committee and shall be segregated from agency records and remain subject to the control of the Joint Committee. Accordingly, the aforementioned documents are not "agency records" for purposes of the Freedom of Information Act. Absent explicit Joint Committee authorization, access to this document and any responsive documents shall be limited to [Treasury/IRS] personnel who need such access for the purposes of providing information or assistance to the Joint Committee.

(Barthold Dec. ¶ 12).

When the JCT sends a letter to the IRS, JCT's policy and practice is for this legend to be included in the last paragraph of the letter. (*Id.* ¶ 13). When the JCT staff communicates with the IRS via email, the JCT's policy and practice is for this legend to be included at the end of the email. (*Id.* ¶ 14). JCT's policy is communicated to its professional staff during new-employee training and through periodic emails from the Chief of Staff. (*Id.*). JCT's policy is also communicated to its staff through its current staff policy manual, which has been in effect since 2007. (*Id.* ¶ 11). Consistent with JCT's policies, even when the JCT staff relates a request in person or over the phone, it is similarly JCT's intent to retain control over all records created by the IRS in response to that request. (*Id.* ¶ 16).

JCT has manifested its intent to control all official communications to and from the IRS during all relevant times here. *See id.* ¶¶ 10-21). Along with the legend attached to written correspondence, JCT Chief of Staff Thomas A. Barthold has had multiple conversations with IRS personnel informing them of JCT's intent to retain control over all of JCT's communications sent in the course of its official business with the IRS and over all the records created by the IRS in connection with such communications, regardless of the manner in which JCT makes such communications and regardless of whether each specific JCT communication includes the legend. (Barthold Dec. ¶ 17). Mr. Barthold and other staff members have repeatedly and consistently directed the IRS to maintain such records in segregated files. (*Id.*). If JCT discovers that IRS personnel have neglected to segregate such a record, JCT immediately instructs the IRS to correct its error. (*Id.*).

### C. The Internal Revenue Service's Treatment of Communications with the JCT

All communications between Congress and the IRS are subject to various restrictions put in place by Congress, the Office of Management and Budget, the Department of the Treasury, and

the IRS itself. (Second Declaration of Scott S. Landes[4] ("Second Landes Decl.") ¶ 2). In order to ensure compliance with these rules, as well as consistency and fairness in the IRS's relationship with Congress, the IRS created the Office of Legislative Affairs. (*Id.* ¶ 3).

The Office of Legislative Affairs functions as the central coordinating point for IRS-Congress relations. It is tasked with processing inquiries to the IRS from Congress, including communications from the JCT. (*Id.* ¶ 3; Third Declaration of Scott Landes ("Third Landes Decl." ¶ 1). When the JCT's Chief of Staff sends an official letter to the Commissioner of the IRS requesting that the IRS provide information, that letter is directed to the Office of Legislative Affairs. (Second Landes Dec. ¶ 5; Third Landes Dec. ¶ 1). Similarly, if the JCT makes a request by email, that email is typically sent directly by a JCT staff member to the Office of Legislative Affairs. (*Id.*). It is the IRS's policy and practice to forward email sent directly to IRS staff from JCT staff to the Office of Legislative Affairs to be processed in the same manner as a letter on the JCT Chief of Staff's letterhead. (Second Landes Dec. ¶¶ 5, 16). *See also* 26 C.F.R. § 301.9000-4(e) ("An IRS officer, employee or contractor who receives a request or demand in an IRS congressional matter shall notify promptly the IRS Office of Legislative Affairs. The IRS officer, employee or contractor who received the request or demand shall await instructions from the authorizing official.")).

When the Office of Legislative Affairs receives a request from JCT, it reviews it to determine which division or function of the IRS can compile the requested information. (Second Landes Dec. ¶ 6). Each of those divisions designates a liaison between their division and the Office of Legislative Affairs. (*Id.*). Those liaisons are typically management-level IRS employees who

[4] Mr. Landes signed his declaration in August 2021, when the IRS originally served its first Motion for Summary Judgment. Mr. Landes retired from the IRS in August 2024.

work in the office of the Commissioner of their operating division and have the experience necessary to identify and work with subject matter experts within their division to compile the requested data and/or assemble information for draft responses. (*Id.*). The requested data compilations or draft responses go through a review and approval process within the operating division's chain of command. Once the appropriate high-level official (usually the Commissioner of the operating division) has approved the draft compilation or response, it is frequently provided to personnel in the Office of the Deputy Commissioner for their review before it is then provided to the Office of Legislative Affairs for transmission to the JCT. (*Id.* ¶ 7).

After receiving an operating division's draft compilation or response, the Office of Legislative Affairs reviews the data compilation for completeness, and removes extraneous information (if any). (*Id.*). As appropriate, the Office of Legislative Affairs will either respond to the JCT by formal letter signed by the Director of Legislative Affairs or the Commissioner, or by email from a member of the Office of Legislative Affairs staff to the requester at the JCT. (*Id.*).

The IRS employees involved in tracking, processing, and preparing and sending responses to a JCT inquiry understand that Congress intends JCT's communications and the responses thereto to be congressional records. (Second Landes Dec. ¶ 11). Congress has communicated its policy to the IRS, and the IRS has further communicated that policy to its employees, in several ways.

The Internal Revenue Manual ("I.R.M.") has, at all times relevant to this action, included the following substantially the same provision with respect to JCT inquiries:

> Whenever the Joint Committee's inquiry letter includes a legend, that letter remains a congressional record. In addition, any records created by the IRS in connection with the agency's response to the Joint Committee's inquiry, including (but not limited to) the IRS reply letter, and any records created by the IRS as a result of, or in response to, that inquiry, will also be treated as congressional

> records. Accordingly, the inquiry letter from the Joint Committee, and any records created by the IRS as a result of, or in response to, that inquiry, are not agency records responsive to a FOIA request and must not be released under the FOIA.

I.R.M. § 11.3.13.5.3(4) (October 26, 2007); *see also* I.R.M. § 11.3.13.5.4(4) (August 14, 2013)[5]. The I.R.M. further provided at the time relevant to the records responsive to Cause of Action's FOIA request that "[d]epending upon the wording of the FOIA request, copies of records created and maintained by the IRS in the normal course of its operations that are subsequently provided to the Joint Committee in response to a general inquiry may be . . . considered congressional records." I.R.M. § 11.3.13.5.3(6) (Oct. 26, 2007). For example, "[i]f the FOIA request specifically asks for records reviewed by the Joint Committee, the disclosure of any records, or even the acknowledgement that these records exist in the context of a Joint Committee inquiry, may confirm that the Joint Committee had exercised its general oversight responsibilities." *Id.* § 11.3.13.5.3(6)(a) (Oct. 26, 2007).[6]

Additionally, the JCT has communicated to the Office of Legislative Affairs that the absence of a legend in a JCT communication is not determinative of whether any response is a congressional record. (Second Landes Dec. ¶ 15). Even when a request is made verbally, by telephone, or in person, any records or data prepared in response are still intended to be, and are

---

[5] After The IRS of the original summary judgment motions, this section of the I.R.M. was revised. The section, now included at I.R.M. § 11.3.13.3.4(6) now states that "Moreover, the IRS file(s) associated with providing records to the Joint Committee need not be searched for responsive records because the records that the files may contain are not agency records." It also no longer contains the phrase "and any records created by the IRS as a result of, or in response to, that inquiry." Still, the I.R.M. still provides that the prohibition still reaches "any documents created by the IRS in connection with a response to a JCT document" and "the file that is created for the IRS's reply." I.R.M. §§ 11.3.13.3.4(4), (5).

[6] These provisions are no longer in the I.R.M., but as noted above, the I.R.M. still confirms JCT's intent to control "any documents created by the IRS in connection with a response to a JCT document" and "the file that is created for the IRS's reply" are to be treated as congressional records. I.R.M. §§ 11.3.13.3.4(4), (5).

treated as a confidential congressional record. (Second Landes Dec. ¶ 15).[7] That understanding has been further clarified agency-wide by the Office of Chief Counsel, in the Chief Counsel Directive Manual ("C.C.D.M."). (*Id.*). The C.C.D.M. instructed IRS employees that "the absence of the legend is not legally determinative" and that "[i]f a JCT document fails to contain a legend, generally, IRS practice is to treat the JCT document and any IRS responses thereto as a congressional record." (*Id.* [*citing* C.C.D.M. 35.5.4.9(7)]). The JCT relies on the foregoing representations and practices in its communications with the IRS. (Barthold Dec. ¶ 19).

Finally, the Treasury Regulations require that agency employees who receive requests from any congressional office, including the JCT, forward those requests to the Office of Legislative Affairs and await instructions from the official delegated with authority to authorize disclosure of the relevant records before responding to those requests or using those records in any other manner. *See* 26 C.F.R. §§ 301.9000-4(e).

Recognizing that JCT intends that its communications with the IRS regarding matters of official JCT business and the IRS's responses thereto are to be treated as congressional records, the Office of Legislative Affairs takes steps to segregate and safeguard those communications. The IRS's practice is to segregate, track, and preserve all of JCT's written requests for information in the IRS's E-TRAK Communications and Correspondence System. (Second Landes Dec. ¶ 8; Third Landes Dec. ¶¶ 2–3).[8] Each request from JCT is assigned a specific tracking number in E-TRAK, and related correspondence is tracked using that number. (Third Landes Dec. ¶ 3).

---

[7] Typically, verbal or in-person requests, are later memorialized in writing in an email from JCT to the Office of Legislative Affairs, and are processed and tracked just as other written communications. (Second Landes Dec. ¶ 10).

[8] The E-TRAK database is also used to separately track correspondence from Members of Congress, the Department of the Treasury, the White House, the Government Accountability Office, and the Office of Treasury Inspector General for Tax Administration. (Second Landes Dec. ¶ 8).

Additionally, employees of the Office of Legislative Affairs, including Mr. Landes, maintain and segregate their email correspondence with the JCT and the data compilations prepared in response to JCT requests in separate electronic folders on their computer desktops. (Second Landes Dec. ¶ 9; Third Landes Dec. ¶ 3).

**Standard of Review**

"FOIA cases are typically and appropriately decided on motions for summary judgment." *Negley v. F.B.I.*, 825 F. Supp. 2d 63, 68 (D.D.C. 2011). In order to obtain summary judgment in a FOIA action, the agency must typically show two things. First, "the agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested." *Mobley v. CIA*, 806 F.3d 568, 680 (D.C. Cir. 2015). Second, the agency bears the burden of "justifying the applicability of FOIA exemptions, which are exclusive and must be narrowly construed." *Id.* This includes the "burden of demonstrating that the documents requested are not 'agency records.'" *Consumer Fed'n of Am. v. U.S. Dep't of Agric.*, 455 F.3d 283, 287 (D.C. Cir. 2006).

In a FOIA action, the Court may grant summary judgment "based solely on information provided in an agency's affidavits or declarations when they 'describe the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Rollins v. U.S. Dep't of State*, 70 F. Supp. 3d 546, 548 (D.D.C. 2014). Agency declarations are "accorded a presumption of good faith, which cannot be rebutted by purely speculative claims about the existence and discoverability of other documents." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991).

## Argument

Under the FOIA, district courts have power "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld." 5 U.S.C. § 552(a)(4)(B). To succeed in a FOIA case, the plaintiff must show that an agency has (1) 'improperly' (2) 'withheld' (3) 'agency records.'" *United States Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989) (*citing Kissinger v. Reporters Comm. for Freedom of Press*, 445 U.S. 136, 150 (1980)). Here, the vast majority of the responsive records in this case are not "agency records." They are congressional records, and therefore not subject to the FOIA. For the few responsive records that could be considered agency records, all are exempt from disclosure pursuant to one or more exemptions under the FOIA.

### I. The Test for Whether a Record is a Congressional Record Turns on Whether Congress Manifested a Clear Intent to Control the Document.

Congressional records are not "agency records" and are thus not subject to the FOIA. *Cause of Action Inst. v. Nat'l Archives and Records Admin.*, 753 F.3d 210, 212 (D.C. Cir. 2014) (*citing United We Stand Am., Inc. v. IRS*, 359 F.3d 595, 597 (D.C. Cir. 2004)). The test for determining whether a document in the possession of an agency is an "agency record" or a "congressional record" "turns on whether Congress manifested a clear intent to control the document." *ACLU v. CIA*, 823 F.3d 655, 662 (D.C. Cir. 2016); *Jud. Watch, Inc. v. United States Secret Serv.*, 726 F.3d 208, 221 (D.C. Cir. 2013); *United We Stand*, 359 F.3d at 597. Under D.C. Circuit precedent, two factors are "effectively dispositive": "[1] the intent of the document's creator to retain or relinquish control over the records; [2] the ability of the agency to use and dispose of the record as it sees fit." *ACLU*, 823 F.3d at 662 (internal quotation marks omitted).[9]

---

[9] The D.C. Circuit typically applies a four-factor test to determine whether a document is an "agency record." *See Tax Analysts v. United States Dep't of Justice*, 845 F.2d 1060, 1067 (D.C.

The D.C. Circuit has rejected arguments that would require Congress to manifest its intent to control documents in a specific manner, such as a requirement that "Congress must give contemporaneous instructions when forwarding congressional records to an agency." *Holy Spirit Ass'n v. CIA*, 636 F.2d 838, 842 (D.C. Cir. 1980). Indeed, the D.C. Circuit has emphasized that it does not require "Congress to act in a particular way in order to preserve its FOIA exemption for transferred documents." *Id.* Rather, the only question is whether there has been "some clear assertion of congressional control" over the documents. *Id.*

D.C. Circuit case law demonstrates the varied circumstances in which Congress has sufficiently manifested such an intent. For example, in *Goland v. CIA*, 607 F.2d 339 (D.C. Cir. 1979), the D.C. Circuit held that a transcript of a congressional hearing that was in the CIA's possession was not an agency record subject to FOIA. *Id.* at 347. The Court explained that "[w]hen received by the CIA, the [t]ranscript bore the typewritten marking 'Secret' on its interior cover page," and that CIA Legislative Counsel had submitted a declaration stating that "[t]he CIA retains a copy of the [t]ranscript for internal reference purposes only, to be used in conjunction with legislation concerning the Agency and its operations." *Id.* In light of those facts, the D.C. Circuit readily concluded that the transcript remained under the control of Congress and that "the decision to make the transcript public should be made by [Congress], not by the recipient agency." *Id.* Indeed, the D.C. Circuit explained that to hold otherwise would force Congress "either to surrender its constitutional prerogative of maintaining secrecy, or to suffer an impairment of its

---

Cir. 1988), *aff'd on other grounds*, 492 U.S. 136 (1989); *Judicial Watch*, 726 F.3d at 218; *Burka v. United States Dep't. of Health & Human Servs.*, 87 F.3d 508, 515 (D.C. Cir. 1996. But "this test does not apply to documents that an agency has either obtained from, or prepared in response to a request from . . . the United States Congress." *ACLU v. CIA*, 823 F.3d at 662. "This is because 'special policy considerations . . . counsel in favor of according due deference to Congress' affirmatively expressed intent to control its own documents.'" *Id.* (citing *Judicial Watch*, 726 F.3d at 221).

oversight role." *Id.* at 346. The Court "decline[d] to confront Congress with this dilemma absent a more convincing showing of self-abnegating congressional intent." *Id.*

Likewise, in *United We Stand Am., Inc. v. IRS*, the D.C. Circuit held that portions of a document created by and in the possession of the IRS were not an agency record subject to FOIA. *United We Stand,* 359 F.3d at 605. In that case, the requester sought "a document the Internal Revenue Service created in response to" a JCT letter request asking for "specified categories of documents and information." *Id.* at 597. JCT's letter contained a legend stating that "[t]his document is a Congressional record and is entrusted to the Internal Revenue Service for your use only" and "may not be disclosed without the prior approval of the Joint Committee." *Id.* The D.C. Circuit also emphasized that "the IRS Manual, relied on by the Joint Committee," expressly recognized the confidentiality of Joint Committee requests." *Id. at* 605. The D.C. Circuit held that the record sufficiently indicated congressional intent to control not only JCT's letter request, but also "the portions of the [IRS] response that would reveal that request." *Id.* However, the D.C. Circuit also held that the portions of the IRS response that did not reveal JCT's request were agency records and therefore subject to FOIA. *Id. at* 601. The D.C. Circuit based this holding on the fact that JCT's legend at that time (unlike the legend at issue here) stated only that "this document" (*i.e.*, JCT's letter request) was a congressional record. The legend relevant to the time of the FOIA Request in this case states that "any documents created by the [Department of the Treasury/IRS] in connection with a response to this Joint Committee document, including (but not limited to) any replies to the Joint Committee," are congressional records. *Id.* at 601.[10]

---

[10] The legend used by JCT at all relevant times here, by contrast, *does* state that "any documents created by the [Department of the Treasury/IRS] in connection with a response to this Joint Committee document, including (but not limited to) any replies to the Joint Committee, are records of the Joint Committee and shall be segregated from agency records and remain subject to the control of the Joint Committee." (Barthold Dec. ¶ 12). After the *United We Stand* decision,

Finally, in *ACLU v. CIA*, the D.C. Circuit held that a report of the Senate Select Committee on Intelligence ("SSCI") that was in the CIA's possession was not an agency record subject to the FOIA. *ACLU,* 823 F.2d at 667-68. The report itself contained no legend or confidentiality stamp expressly indicating SSCI's intent to retain control over the document, and in fact SSCI transmitted the report to the President in 2014 with a letter stating that it "should be made available within the CIA and other components of the Executive Branch for use as broadly as appropriate to help make sure that this experience is never repeated." *Id.* at 667. At the start of its investigation in 2009, however, SSCI had sent a letter to the CIA stating that "any other notes, documents, draft and final recommendations, reports or other materials generated by Committee staff or Members, are the property of the Committee and will be kept at the Reading Room solely for secure safekeeping and ease of reference," and that "[t]hese documents remain congressional records in their entirety and disposition and control over these records, even after the completion of the Committee's review, lies exclusively with the Committee." *Id.* at 665. The D.C. Circuit explained that the "expansive language" in this letter clearly established SSCI's intent to retain control of the report, and thus the report constituted "a congressional document that is not subject to disclosure under FOIA." *Id.* at 667-68.

## II. The Records in this Case are Congressional Records because Congress Has Manifested Its Intent to Control the Records in Multiple Ways, and the IRS Has Treated the Records as Congressional Records.

### A. JCT has manifested its intent to retain control over the responsive records in multiple ways.

As explained in both Mr. Barthold's and Mr. Landes's declarations, the JCT has clearly expressed its intent to retain control over the records identified in Paragraphs 18 and 19 of the

---

moreover, the IRS modified the Internal Revenue Manual to provide expressly that such documents are congressional records. (Second Landes Dec. ¶ 14).

Second Declaration of Scott Landes. The JCT has manifested that intent by: (1) communicating that all communications relating to JCT oversight inquiries should be treated as congressional records; (2) establishing a policy that the current legend, which indicates JCT's intent to retain control over such communications and all IRS documents created in response to such communications, should be included on every oversight inquiry or other official request to the IRS; (3) training and repeatedly reminding JCT professional staff to include a legend; (4) including the legend on the majority of its oversight inquiries and requests to IRS for information; and (5) and communicating its intent to the IRS in multiple conversations. The IRS has also represented that it will comply with the Committee's repeatedly expressed intent in this regard, and the JCT has relied on those representations. (Barthold Dec. ¶¶ 18–19).

**B. The IRS Has Acknowledged in Multiple Ways the JCT's Intent to Retain Control over the Responsive Records.**

Consistently, the IRS has acknowledged the JCT's intent to control the responsive records, and has taken multiple steps to comply with the JCT's assertion of control and segregate them from IRS agency records. Upon receiving many of the requests, The IRS created a file for the request in E-TRAK and segregated the records by storing them in E-TRAK. (Second Landes Dec. ¶¶ 8, 18). For other requests, especially those that were more informally emailed to IRS employees, the IRS employee forwarded the email to Scott Landes in the Office of Legislative Affairs to be processed just as a letter on the JCT Chief of Staff's letterhead. (*Id.* ¶¶ 5, 16, 19(b)). Mr. Landes then segregated the JCT communications from his regular email and preserved them in separate electronic folders. (*Id.* ¶ 19(a)). Finally, the IRS has memorialized the JCT's intent to control these records in two places: the Internal Revenue Manual, *see* I.R.M. § 11.3.13.5.3 (October 26,

2007); I.R.M. § 11.3.13.5.4 (August 14, 2013)[11]; and the Chief Counsel Directive Manual, *see* C.C.D.M. 35.5.4.9. (*Id.* ¶¶ 14–15). The IRS has also memorialized the requirement to segregate congressional records in the Treasury regulations. *See* 26 C.F.R. § 301.9000-4(e).

In short, consistent with the D.C. Circuit case law discussed above, JCT has done everything that is practically possible to indicate its intent to retain control over the documents at issue. Similarly, the IRS has received the JCT's manifestations of intent to control, formally acknowledged them, put in place its own policies and practices to implement them, and, as evidenced from the responsive records identified, has consistently followed these policies and practices.

**C. The E-TRAK Records are All Congressional Records.**

There is no question that the responsive records found in E-TRAK are congressional records. The responsive records in Paragraph 18(a) of the Second Landes Declaration consist of records in which a legend is included in the original formal correspondence from JCT. (Second Landes Dec. ¶ 18). This legend is the clearest example of Congress's intent to control its correspondence to the IRS and the related records compiled or prepared by the IRS in connection with such communications.

Similarly, the records described in Paragraphs 18(b) and 18(c) of the Second Landes Declaration are also obviously congressional records. While those records do not contain a legend, "the accidental omission of the legend on a communication in no manner negates JCT's intent to maintain control over the communication or the IRS records created in response to that communication." (Barthold Dec. ¶ 15). Indeed, a legend is only one of many ways that Congress can express its intent to control its communications with an agency. *See ACLU*, 823 F.3d at 666

[11] As discussed above on page 8, these wording of these provisions has changed, but the scope has not. They are now located at I.R.M. §§ 11.3.13.3(4)–(6).

("Appellants' argument seems to be premised on an assumption that, when Congress transmits documents to an agency, it must give contemporaneous instructions preserving any previous expressions of intent to control the documents in order to retain control over the documents. This is not the law."); *see also Holy Spirit Ass'n.*, 636 F.2d at 842 ("[W]e do not adopt appellant's position that Congress must give contemporaneous instructions when forwarding congressional records to an agency.").

In the context of this case, the lack of a legend does not render these communications agency records, because the JCT has communicated its longstanding policy to control these records in many other ways. The IRS: (1) has segregated the records in E-TRAK (Second Landes Dec. ¶ 18); (2) has expressed its intent in the JCT policy manual, (3) has communicated its intent in its training of new hires; (4) has communicated its intent through periodic reminders to staff to use the legend; and (5) has communicated its intent through multiple conversations between JCT's Chief of Staff and IRS personnel. (Barthold Dec. ¶¶ 10-20). Additionally, the IRS has acknowledged that it received the JCT's instructions regarding JCT's intent to control the records at issue. The IRS has followed those instructions, and it included them in its Chief Counsel Directives Manual, Internal Revenue Manual, and Treasury Regulations. (*See* Second Landes Dec. ¶¶ 11-15). Together, JCT's numerous and consistent communications, and the IRS's systematized acknowledgment of those communications, demonstrate and confirm JCT's intent that all records transmitted in the course of JCT's official business to the IRS, and all records compiled or prepared by the IRS in connection with such communications, constitute congressional records.

**D. The responsive records identified in Scott Landes' email and electronic folders are congressional records.**

*1. Internal IRS Communications are all congressional records.*

The records described in paragraph 19(a) of the Second Landes Declaration are congressional records not subject to the FOIA. These records consist of 525 pages of emails and attachments of emails that are internal communications between IRS employees. (Second Landes Dec. ¶ 19). All 525 pages consist of communications concerning a JCT general oversight inquiry or communications concerning the IRS's statutory reporting requirements to JCT. *Id.* All of these emails were segregated from Scott Landes' regular email and preserved in separate electronic folders reserved for JCT communications. *Id.*

JCT has manifested a clear and specific intent that "all records compiled or prepared by the IRS and Treasury in connection with [official JCT] communications" constitute congressional records. (Barthold Dec. ¶ 10; *see also id.* ¶ 12 (noting that JCT's legend states that "any documents created by the [Department of the Treasury/IRS] in connection with a response to the Joint Committee, are records of the Joint Committee . . . ."); *Id.* ¶ 20 ("Also consistent with JCT's longstanding position, the Internal Revenue Manual underscores that the protected congressional records created in response to a JCT inquiry include not just the IRS's formal response to JCT, but *any* records created by the IRS in response, including records relating to the documents compiled by the IRS in responding to JCT's inquiry.")).

For 25 of the topics[12] (451 pages of emails and attachments), The IRS identified a legend on either the original JCT request in E-TRAK or on emails between the IRS and JCT about the

[12] Mr. Landes explained that the term "topic" refers to: "(1) for records in E-Trak, collections of emails about a request assigned a specific tracking number in the E-TRAK system; and (2) for records in my email and electronic folders, collections and emails and attachments about a specific JCT request or inquiry." (Third Landes Dec. ¶ 3).

JCT request. (Second Landes Dec. ¶ 19(a)(i)). The legend restricts the use and dissemination of these 451 pages of internal IRS emails and attachments. Thus, there should be no question that these records are congressional records as Congress manifested its intent to control the records directly.

For 10 of the topics (74 pages of emails and attachments), The IRS could not identify a legend restricting the use or dissemination of the internal IRS records. (*Id.* ¶ 19(a)(ii)). In any event, for the reasons described in Section II.C, *supra*, the lack of a legend does not render these communications agency records, because JCT has manifested a clear and specific intent that these records constitute congressional records in many other ways.

2. *External IRS-JCT Communications are also congressional records.*

The records described in paragraph 19(b) of the Second Landes Declaration are congressional records not subject to the FOIA. These records consist of 666 pages of emails and attachments that are communications between the IRS and JCT. (Second Landes Dec. ¶ 19(b)). Of these records, 59 topics (631 pages) consist of communications concerning a JCT general oversight inquiry or communications concerning the IRS's statutory reporting requirements to JCT. (*Id.*). All of these emails were segregated from Scott Landes' regular email and preserved in separate electronic folders reserved for JCT communications. (*Id.*).

For 25 topics (393 pages of emails and attachments), The IRS identified a legend on either the original JCT request in E-TRAK or in related emails between the IRS and JCT about the JCT request. (Second Landes Dec. ¶ 19(b)(i)). The legend restricts the use and dissemination of these internal IRS emails and attachments. Thus, there should be no question that these records are congressional records as congress manifested its intent to control the records directly.

For 34 topics (238 pages of emails and attachments), The IRS could not identify a legend that restricted the use or dissemination of the internal IRS records. (Second Landes Dec. ¶

19(b)(i)). That said, the subjects of these 34 topics (238 pages) all concern specific JCT oversight inquiries, and the process put in place by the IRS for segregating these records and treating them as congressional records was followed. (*See id* at ¶¶ 5, 16, 19(b); 26 C.F.R. § 301.9000-4 (describing how "[a]n IRS officer, employee, or contractor who receives a request or demand in an IRS congressional matter shall notify promptly the IRS Office of Legislative Affairs.")). When the originating email in an email chain did not include Mr. Landes, Mr. Landes was added to the email chain, or the email was forwarded directly to Mr. Landes in the Office of Legislative Affairs. (*Id.*). Then, Mr. Landes segregated the records from his regular email and preserved them in separate electronic folders reserved for JCT communications. (*Id.*). Consequently, for the reasons described in Section II.C, *supra*, the lack of a legend does not render these communications agency records, because JCT manifested a clear and specific intent that these records constitute congressional records, and the records were treated as congressional records by IRS personnel.

There are 28 pages of communications that consist of administrative emails between IRS and JCT, that do not appear to concern a JCT general oversight inquiry. (Second Landes Dec. ¶ 19(b)(iii)). These emails communicate topics such as employees' schedules and availability for calls/meetings, access to a government building, changes in personnel, and explanations of administrative rules. (*Id.*). While these records may not disclose the substantive content of a specific JCT oversight inquiry, they are still congressional records. There is nothing in the relevant case law that suggests that the *content* of a record would make or disqualify it as a congressional record. To the contrary, the two factors that are "effectively dispositive" for purposes of determining whether a document is a congressional record are "the intent of the document's creator to retain or relinquish control over the records," and "the ability of the agency to use and dispose of the record as it sees fit." *ACLU*, 823 F.3d at 662. Here, JCT has repeatedly manifested its intent

to control these records by communicating its "longstanding policy and practice is that all communications from the JCT to the IRS and the Department of the Treasury *sent in the course of JCT's official business*, and all records compiled or prepared by the IRS and Treasury in connection with such communications, constitute congressional records." (Barthold Dec. ¶ 10) (emphasis added). The records here communicate information that was needed by IRS or JCT employees to accomplish their official responsibilities and therefore constitute "official business." Similarly, these records were treated as congressional records by Scott Landes; they were segregated from Mr. Landes' regular email and saved in separate electronic folders. (Second Landes Dec. ¶ 19(b)).

*3. Personal Communications are not agency records.*

There are 7 pages of communications that consist of personal emails between the IRS and JCT, that do not appear to concern a JCT general oversight inquiry or administrative matters. (Second Landes Dec. ¶ 19(b)(iv)). These emails communicate information such as personal congratulations, comments about national sporting events, and news reports unrelated to the IRS or JCT. *Id.* These records are congressional records because they were treated as congressional records by Scott Landes and segregated from Mr. Landes' regular email and saved in separate electronic folders. (Second Landes Dec. ¶ 19(b)). These emails also fostered a friendly working relationship between IRS and JCT personnel, which could have improved the efficiency relationships of the IRS and JCT when working on official business.

Alternatively, these records are personal records not subject to the FOIA. The D.C. Circuit "has adopted a totality of the circumstances test to distinguish 'agency records' from personal records. *Consumer Fed'n of Am.*, 455 F.3d at 287. In determining whether a record is a "personal record," the D.C. Circuit has held that an agency should examine "the totality of the circumstances surrounding the creation, maintenance, and use" of the record. *Bureau of Nat'l Affairs v. U.S. Dep't of Justice*, 742 F.2d 1484, 1490 (D.C. Cir. 1984). Factors relevant to this inquiry include

(1) the purpose for which the document was created; (2) the degree of integration of the record into the agency's filing system; and (3) the extent to which the record's author or other employees used the record to conduct agency business. *Consumer Fed'n of Am.*, 455 F.3d at 287.

Here, the records are personal records because they were created to communicate purely personal information, the subject matters of the communications were personal, and they were not used to conduct any IRS or JCT business. Consequently, they are not "agency" records and should be excluded from the scope of the responsive records.

## III. IRS Reports to JCT under 26 U.S.C. § 6103(p) are, by Statute, Records which Only JCT Has the Authority to Make Public.

Item No. 4 of Cause of Action's June 22, 2016 FOIA request seeks "All records generated or maintained by the IRS in the normal course of its operations that were subsequently provided to the JCT as part of the IRS general oversight responsibilities, but which were not provided in response to a JCT inquiry." The Request notes that IRS reports under 26 U.S.C. §§ 6103(p)(3) are responsive to Item No. 4. Neither reports under 26 U.S.C. § 6103(p)(3)(B) nor under 6103(p)(3)(C) are available under the FOIA. Declaration of Kevin Cummiskey ("Cummiskey Decl.") ¶¶ 11, 29-34.

Section 6103(p)(3) of the Internal Revenue Code requires the IRS to provide two annual reports to JCT about the number and type of requests for disclosures it received for returns and return information, and how many disclosures were made. Under section 6103(p)(3)(B), the Secretary of the Treasury "shall, within 90 days after the close of each calendar year, furnish to the [JCT] a report with respect to, or summary of" its "records or accountings of all requests for inspection or disclosure of returns and return information" under certain provision of Section 6103. 26 U.S.C. § 6103(p)(3)(A)-(B). That report is not public: only JCT may disclose it publicly "by record vote of a majority of [its] members." 26 U.S.C. § 6103(p)(3)(B).

Under section 6103(p)(3)(C), the IRS is required to "furnish to [JCT] for disclosure to the public a report . . . (i) provid[ing] the number of – (I) requests for disclosure of returns and return information, (II) instances in which returns and return information were disclosed pursuant to such requests or otherwise, (III) taxpayers whose returns, or return information with respect to whom, were disclosed pursuant to such requests, and (ii) describes the general purposes for which such requests were made." That report is not public when the IRS sends it to JCT: JCT later publishes it on its website, and the IRS links to the JCT's website in its FOIA electronic reading room. (Cummiskey Dec. ¶ 34).

Under section 6103(p)(3), both reports are congressional records within the exclusive control of JCT. Section 6103(p)(3) authorizes the IRS to do one thing with these reports: "furnish [them] to the Joint Committee on Taxation." Section 6103(p)(3)(B), (C). JCT then has the exclusive authority to make them public. In the case of a report under section 6103(p)(3)(B), the JCT may authorize disclosure only "by record vote of a majority of [its] members." In the case of a report under section 6103(p)(3)(C), JCT will disclose the report as a matter of course. But in both instances, JCT has the authority, not the IRS. Because section 6103(p)(3) confers no "public right to 'request' disclosure," COA's FOIA claim for the reports fails as a matter of law. *See Elec. Priv. Info. Ctr. v. IRS*, 910 F.3d 1232, 1343 (D.C. Cir. 2018) (plaintiff could not state claim under FOIA for President Trump's tax returns under 26 § 6103(k)(1) because an exception to confidentiality of tax returns "affords a FOIA requester no disclosure right.").

## IV. 58 Records Responsive to Plaintiff's Request are Exempt from Disclosure under Exemption 5 (5 U.S.C. § 552(b)(5)) of the FOIA.

There are 58 emails and attachments responsive to Item Nos. 1 and 2 of Cause of Action's June 23, 2021 FOIA request that are exempt from disclosure under 5 U.S.C. § 552(b)(5). (Cummiskey Dec. ¶¶ 2-8; Exhibit A to Cummiskey Decl.). The exempt records are intra-agency

communications between IRS Counsel and other IRS employees, and communications from IRS Counsel to JCT, its counsel, and counsel for the United States House of Representatives. The emails relate to two topics: (1) the processing of Cause of Action's FOIA request up to the agreed search cutoff date of December 1, 2016; and (ii) the IRS's revision of its Chief Counsel Directives Manual ("C.C.D.M.") and Internal Revenue Manual ("IRM") in 2016. All of those records are exempt from disclosure by the work-product privilege, attorney-client privilege, and the deliberative process privilege. (Cummiskey Dec. ¶¶ 14, 17, 19, 27).

Under Exemption 5 of the FOIA, "inter-agency or intra-agency memorandums or letters that would not be available by law to a party . . . in litigation with the agency" are exempt from disclosure. 5 U.S.C. § 552(b)(5). The Exemption "has been interpreted as protecting against disclosure those documents normally privileged in the civil discovery context." *Jud. Watch, Inc. v. U.S. Dep't of Justice*, 365 F.3d 1108, 1113 (D.C. 2004). So, Exemption 5 incorporates the three evidentiary privileges into the FOIA: the attorney-client privilege, the attorney-work-product privilege, and the deliberative process privilege. *Tax Analysts v. IRS*, 294 F.3d 71, 76 (D.C. Cir. 2002).

All of these records are privileged and therefore Exempt under Exemption 5. The emails about Cause of Action's FOIA request are exempt from disclosure under the work product and deliberative process privileges, and one email is attorney-client privileged. The IRS attorneys' emails about the revision of the Chief Counsel Directives Manual and the Internal Revenue Manual are exempt from disclosure under the deliberative process privilege.

### A. Records About the Processing of Cause of Action's FOIA Request Are Protected by the Work-Product Privilege.

The attorney work-product privilege "shields materials prepared in anticipation of litigation or for trial by or for another party or by or for that other party's representative (including

the other party's attorney, consultant, surety, indemnitor, insurer, or agent)." *Leopold v. United States Dep't of Justice*, 487 F. Supp. 3d 1, 10 (D.D.C. 2020) (quoting *McKinley v. Bd. of Governors of the Fed. Reserve Sys.*, 647 F.3d 331, 341 (D.C. Cir. 2011)). The privilege protects "factual materials prepared in anticipation of litigation, as well as mental impressions, conclusions, opinions, and legal theories." *Id.* (quoting *Heggestad v. U.S. Dep't of Justice*, 182 F. Supp. 2d 1, 18 (D.D.C. 2000)). An attorney's "mental impressions, conclusions, opinions or legal theories of an attorney … concerning the litigation are *never* to be disclosed. Hence, the attorney-client privilege may yield to several exceptions, but the work product privilege is, in this sense, inviolate." *Banks v. Office of Senate Sergeant-at-Arms*, 222 F.R.D. 1, 4 (D.D.C. 2004) (emphasis added). And the agency "need not segregate and disclose non-exempt material if a record is 'fully protected' as work product." *Nat'l Ass'n of Crim. Def. Lawyers v. Dep't of Justice Executive Office for United States Attorneys*, 844 F.3d 246, 256 (D.C. Cir. 2016).

The exempt emails are withheld in full. They contain the thoughts, mental impressions, and legal opinions of IRS Counsel Deborah Lambert-Dean about Cause of Action's request, and the content of IRS's August 8, 2016 response letter to Cause of Action (attached as Exhibit 5 to the Complaint). (Cummiskey Dec. ¶ 14(b)-(d)). They also contain the thoughts and mental impressions of IRS Counsel Charles Pillitteri, who communicated with the General Counsel for the U.S. House of Representatives only a week after Cause of Action sent it to the IRS. *Id.* ¶ 14(a). Moreover, at the time of these communications, the filing of this case was reasonably foreseeable, because the IRS was considering (and later did) deny Plaintiff's request for seeking non-agency, congressional records of JCT.

Because those attorneys' pre-litigation mental impressions are "inviolate," The IRS can therefore withhold those emails in full. *See* Banks, 222 F.R.D. at 4, *and Nat'l Ass'n of Crim Def. Lawyers*, 844 F.3d at 256.

**B. Certain Records About the Processing of Cause of Action's FOIA Request Before August 8, 2016 and All the Records about the Revision of the C.C.D.M. and I.R.M. are Protected by the Deliberative Process Privilege.**

The deliberative process privilege protects "documents 'reflecting advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.'" *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 148, 150 (1975). The privilege therefore "protects agency documents that are both predecisional and deliberative." *Jud. Watch, Inc. v. FDA*, 449 F.3d 141, 151 (D.C. Cir. 2006). A record is "predecisional if 'it was generated before the adoption of an agency policy' and deliberative if 'it reflects the give-and-take of the consultative process." *Id.* Because the deliberative process privilege protects the "frank exchange of ideas on legal or policy matters," disclosure of predecisional deliberations would harm agencies by leading to weaker decisions and policies. *Judicial Watch*, 449 F.2d at 151.

Here, the IRS asserts deliberative process privilege over two categories of records: (1) emails and attachments from June 30, 2016, through August 5, 2016, about the IRS's processing of (and response to) Cause of Action's FOIA request; and (2) emails and attachments about the IRS's revision of the Chief Counsel Directives Manual and Internal Revenue Manual provisions about requests from the public for JCT records in the IRS's possession. (Cummiskey Dec. ¶¶ 17, 22). Both categories are exempt.

*1. Records about the processing of Cause of Action's FOIA Request are exempt because they are predecisional and deliberative.*

The first set of records are the initial deliberations within the IRS about how to process and respond to Cause of Action's FOIA request.

The privileged records contain: (i) discussions between IRS Disclosure employees and Legislative Affairs proposing an initial plan for processing Cause of Action's request; (ii) discussions about that initial plan between Legislative Affairs employees and between Legislative Affairs employees and IRS Counsel; and (iii) emails sharing that proposed strategy and seeking the input of JCT on the processing of Cause of Action's request. (Cummiskey Dec. ¶ 17(a)-(f)). All of these deliberations took place before the IRS sent its "final" agency determination—the second response letter denying Cause of Action's request—on August 8, 2016. The IRS's final action—denying Cause of Action's request—did not incorporate those deliberations into the final determination.

*2. Records about the revision of the C.C.D.M. and I.R.M. are also exempt because they are predecisional and deliberative.*

Eighteen records about revising the C.C.D.M. and I.R.M. are also exempt under the deliberative process privilege. The records are deliberative: they share IRS Counsel's thoughts and impressions about the official IRS policies that apply to a request from a member of the public (or a litigant) for JCT records in the IRS's possession. They contain those attorneys' opinions about the scope of the policies. (Cummiskey Dec. ¶ 22). And they contain attorneys' plans for whom to include in their deliberations. *Id.* ¶ 23. The records are also predecisional: they were all sent or created between June 2013and early December 2015, before the final publication of the revisions on December 18, 2015.[13] *Id.* ¶ 22.

The IRS also permissibly involved JCT in this process by sharing its proposed revisions to its internal guidance. IRS Counsel Drita Tonuzi and Richard Goldman invited JCT to share its opinions about the proposed IRS policy statements in the C.C.D.M. and I.R.M.. *Id.* ¶ 23(a). This

[13] As noted above, JCT's responses to these inquiries from the IRS are congressional records. So to the extent that the IRS's emails to JCT contain or disclose JCT's responses, they would disclose congressional records within JCT's control.

is unsurprising since the policies were about how the IRS should treat JCT records in its possession. "Documents exchanged 'between an agency and Congress . . . receive protection as intra-agency memoranda if they were 'part and parcel of the agency's deliberative process,' but not if they were 'created specifically to assist' or for the 'sole purpose of assisting' Congress 'with its deliberations.'" *Cause of Action Inst. v. Exp-Imp. Bank of the United States*, No. CV 19-1915 (JEB), 2021 WL 706612, at *13-14 (D.D.C. Feb. 23, 2021). So even though JCT is not an "agency," the communications are still "intra-agency" in nature because the IRS involved JCT as "part and parcel" of the IRS's own policy-setting deliberations. *See Rockwell Int'l Corp. v. U.S. Dep't of Justice*, 235 F.3d 598, 604 (D.C. Cir. 2001) (agency did not waive Exemption 5 by sharing memorandum with Congress).

The D.C. Circuit's 2024 decision in *American Oversight v. Dep't of Health and Human Servs.*, 101 F.4th 909 (D.C. Cir. 2024), does not alter the analysis. The issue in *American Oversight* was whether letters and memoranda from an agency to Congress about potential healthcare legislation qualified as an "interagency" records that could be withheld under the deliberative process privilege. *Id.* at 914. There, the court held that they were not interagency records because members of congress and their staffs did not, in that context, "function just as an employee would be expected to," and thus the "consultant corollary" did not apply. *Id.* at 920–22. The D.C. Circuit reasoned that, because the communications were about legislation Congress was considering "members of Congress and their staffs brough 'divergent interest to bear' when they engaged with the agencies,' and thus "represented an interest of their own." *Id.* at 916.

Here, the IRS's interests in the withheld records, and Congress's involvement, are very different than in *American Oversight*. The communications do not relate to legislation Congress was considering. Rather, the C.C.D.M. and I.R.M. sections are in agency policy documents

addressing the agency's disclosure obligations. That the JCT has an overlapping interest in ensuring that congressional records are not disclosed is neither here nor there: the IRS was seeking JCT's input as part of its own policy-setting and shared it with Congress; it was not providing deliberations as part of Congress's own deliberations. That difference is critical: where the agency is sharing its own intra-agency deliberations with Congress, the question is not whether the deliberations are intra-agency in the first instance (the issue in *American Oversight*), but whether the privilege is waived by sharing that with Congress. *Rockwell Int'l Corp*., 235 F.3d at 603–04. Under the *Rockwell* line of cases, the privilege was not waived.

### C. Two Emails About Cause of Action's FOIA Request are Exempt Under the Attorney-Client Privilege.

The attorney-client privilege protects from disclosure "confidential communications from clients to their attorneys made for the purpose of securing legal advice or services" and "communications from attorneys to their clients if the communications rest on confidential information obtained from the client." *Tax Analysts v. IRS*, 117 F.3d 607, 618 (D.C. Cir. 1997).

There are two exempt attorney-client privileged emails. On July 26, 2016 and July 27, 2017, Scott Landes of the IRS Office of Legislative Affairs forwarded Cause of Action's FOIA request to IRS Counsel Richard Goldman. (Cummiskey Dec. ¶ 27). The email seeks legal advice about the processing of the FOIA request. *Id.* After those emails, the IRS assigned IRS Counsel Deborah Lambert-Dean to the matter. And, as discussed above, she immediately began working on Cause of Action's request. *Id.* ¶ 14(a)-(d).

### D. Disclosure of the Exempt Records Would Harm the IRS.

Under 5 U.S.C. § 552(a)(8)(A)(i)—added to the FOIA by the FOIA Improvement Act of 2016—an agency may withhold information in response to a FOIA request "only if – (I) the agency reasonably foresees that disclosure would harm an interest protected by an exemption . . . or (II)

dislcosure is prohibited by law." This requirement does not apply to records withheld under Exemption 3. 5 U.S.C. § 552(a)(8)(B). To meet this burden, the agency must "identify specific harms to the relevant protected interests that it can reasonably foresee would actually ensue from disclosure of the withheld materials" and "connect[] the harms in [a] meaningful way to the information withheld." *Ctr. for Investigative Reporting v. U.S. Customs and Border Prot.*, 436 F. Supp. 3d 90, 106 (D.D.C. 2019). Agencies may "take a categorical approach and 'group together like records'" so long as the descriptions of harm meet that standard. *Id.*

The IRS has found that the disclosure of the privileged records would harm the IRS in several ways. Disclosing the IRS's pre-litigation emails about Cause of Action would waive the work-product privilege here, and effectively grant Cause of Action discovery. (Cummiskey Dec. ¶ 15, 18). Disclosing the IRS's deliberations about revising the C.C.D.M. would similarly negate the very policy that the IRS sought to clarify in the C.C.D.M. and I.R.M.: ensuring that JCT retained control over its records in the IRS's possession. *Id.* ¶ 24. Disclosure would therefore impair the IRS's ability to confer confidentially with its own lawyers, or with Congress on matters in which Congress has an important stake.

*1. Disclosure of the IRS's records about the processing of Cause of Action's Request would severely harm the IRS's Attorneys' ability to represent their agency client and communicate confidentially.*

The IRS would suffer several harms if the Court ordered it to disclose the exempt emails and attachments to Cause of Action.

Disclosure of IRS Counsel's communications with other IRS Counsel and with IRS employees about the request here would waive work product protection and attorney-client privilege. (Cummiskey Dec. ¶ 15). A litigant can never—in any case—obtain opposing counsel's "mental impressions, conclusions, opinions or legal theories of an attorney … concerning the

[pending] litigation." *Banks*, 222 F.R.D. at 4. And (unlike in other civil cases) a FOIA plaintiff cannot even obtain any other type of work product by showing need or cause. *Williams & Connolly v. Sec. Exch. Comm'n*, 662 F.3d 1240, 1243 (D.C. Cir. 2011) ("Although work product protection may be overcome for cause in civil cases, any materials disclosed for cause are not 'routinely' or 'normally' discoverable and, for that reason, are exempt under [the] FOIA.") (internal citations omitted). It would be nonsensical if, despite those rules, a FOIA plaintiff could obtain the "inviolate" thoughts, impressions, and legal opinions of an agency counsel working on *that very* FOIA matter. (Cummiskey Dec. ¶ 15). Attorney work product would no longer be "exempt from mandatory disclosure" at all; in fact, the opposite would be true. *See FTC v. Grolier, Inc.*, 462 U.S. 19, 28 (1983); (Cummiskey Dec. ¶ 15). It would also amount to impermissible discovery. *Id.*¶ 18. In sum, disclosure would discourage IRS personnel from conferring with agency counsel on more complicated FOIA requests, like the ones here. *Id.*

The same is true of the attorney-client privileged emails discussed above. An IRS employee emailed IRS Counsel Richard Goldman to seek the advice of IRS Chief Counsel about Cause of Action's requests. (Cummiskey Dec. ¶ 27). That solicitation is privileged and no conceivable exception to the attorney-client privilege (e.g., "crime-fraud") could apply. The IRS provided the requested legal advice and has properly withheld it as work product. *Id.* ¶ 14. Making both the solicitation of legal advice and the advice itself available for public scrutiny would impede if not eviscerate the IRS's ability to candidly confer with its attorneys. *See Cause of Action Inst. v. U.S. Dep't of Justice*, 330 F. Supp. 3d 336, 355 (D.D.C. 2018) (disclosure of attorney-client communications and work product would "stifle 'full and frank' communication between DOJ and its client agencies."); *Id.* ¶ 28.

What is more, disclosure of IRS's pre-litigation work on Cause of Action's request is no different than ordering the IRS to provide discovery. But discovery in a FOIA case is "disfavored," so a party seeking discovery must make a "sufficient showing that the agency acted in bad faith. *Justice v. IRS*, 798 F. Supp. 2d 43, 47 (D.D.C. 2011), *aff'd,* 485 F. App'x 439 (D.C. Cir. 2012).

2. *Disclosure of the IRS's deliberations about the revision of the C.C.D.M. and I.R.M. would undermine the entire purpose of those deliberations and the purpose of the privilege itself.*

Disclosure of the IRS's internal deliberations on the policies contains in the C.C.D.M. and I.R.M. would also the IRS and JCT's overlapping (but separate) interests in maintaining their ability confidentially deliberate with each other.

The purpose of the C.C.D.M. and I.R.M. revisions, and the deliberations that preceded them, was to clarify for IRS employees that Congress retains control over its own records, even if the IRS has a copy of them. (Cummiskey Dec. ¶ 24). Two interests were key to those deliberations: First, the IRS's ability to solicit JCT's views on the language of the policy designed to protect JCT's equities in its own records; and second, the IRS's ability to speak frankly internally about JCT's views. *Id.* ¶ 24, 28. In other words, unlike the typical intra-agency deliberation, it is important that both the consultation with JCT, and the consultation internally *about* that consultation with JCT, be kept from public view.

Were that not the case and these deliberations were open to the public, several harms would follow. First, the content of JCT's responses to the IRS—which are themselves congressional records— would be disclosed without JCT consent. (Cummiskey Dec. ¶ 24). But preserving JCT's control over its records was the very reason for the C.C.D.M. and I.R.M. revisions, and the very reason for the IRS's consultation with JCT. *Id.* If JCT could not count on the fact that it controls its own communications during such a consultation, it could not really participate in it. *Id.* ¶ 25. Instead, JCT would have little choice but to periodically monitor FOIA requests to the

IRS for JCT records and intervening if the IRS does not adequately protect JCT's interests. *Id.* And second, IRS employees would be inhibited from frankly discussing JCT's views internally without fear that their opinions would later become public via a FOIA request. *Id.*¶ 26. This would cause particularly acute harm when the IRS disagrees with JCT's position. *Id.*

## V. The Question of Whether Records are Agency Records or Congressional Records is a Threshold Jurisdictional Issue.

To preserve its objections to the Court's Order dated July 17, 2019, denying the Internal Revenue Service's Motion to Dismiss (Dkt. Nos. 18, 19), The IRS renews its argument that whether records are agency records or congressional records is a threshold jurisdictional issue.

The FOIA provides a limited waiver of sovereign immunity that only authorizes courts to "order the production of any *agency records* improperly withheld." 5 U.S.C. 552(a)(4)(B) (emphasis added).[14] The Supreme Court has held that "[u]nder this provision, 'federal jurisdiction is dependent on a showing that an agency has (1) 'improperly' (2) 'withheld' (3) 'agency records.'" *U.S. Dep't of Justice v. Tax Analysts*, 429 U.S. 136, 142 (1989) (quoting *Kissinger v. Reporters Comm. for Freedom of Press*, 445 U.S. 136, 150 (1980)). Consistent with *Tax Analysis*, the D.C. Circuit has held that the question whether a request seeks "agency records" presents a threshold question of subject matter jurisdiction. *ACLU v. CIA*, 823 F.3d 655 (D.C. Cir. 2016).

It is elementary that in a lawsuit against the federal government, absent a waiver of sovereign immunity, the court lacks subject matter jurisdiction. *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). FOIA establishes a limited waiver of sovereign immunity, granting federal courts

[14] FOIA does not define agency records. *United States Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 (1989). The statute, however, defines an "agency" as "each authority of the Government of the United States," excluding, as relevant here, "the Congress." 5 U.S.C. § 551(1); see 5 U.S.C. § 552(f)(1).

jurisdiction only over suits seeking agency records. *See Porter v. CIA*, 579 F. Supp. 2d 121 (D.D.C. 2008). The grant of jurisdiction to a district court for a FOIA suit states, in relevant part,

> On complaint, the district court of the United States in the district in which the complainant resides, or has his principal place of business, or in which the agency records are situated, or in the District of Columbia, has jurisdiction to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant.

5 U.S.C. § 552(a)(4)(B). By referring only to "agency records," this section limits the scope of the United States' waiver of sovereign immunity. "The federal government is 'immune from suit save as it consents to be sued,' *United States v. Sherwood*, 312 U.S. 584, 586 (1941), and 'waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text,' *Lane v. Pena*, 518 U.S. 187, 192 (1996)." *Kalodner v. Abraham*, 310 F.3d 767 (D.C. Cir. 2002) (citing *Block v. N. Dakota*, 461 U.S. 273 (1983)).

Controlling D.C. Circuit precedent also compels the conclusion that the "agency records" issue is jurisdictional. In *ACLU v. CIA*, the D.C. Circuit reviewed a district court's dismissal of a FOIA lawsuit "under Federal Rule of Civil Procedure Rule 12(b)(1) for lack of subject matter jurisdiction" on the grounds that the requested document was "a congressional record beyond the reach of FOIA." 823 F.3d at 661. Indeed, the Court repeatedly acknowledged the fact that it was reviewing a motion to dismiss for lack of subject matter jurisdiction. *See, e.g.*, *id.* at 661 ("We review *de novo* the District Court's grant of Appellees' motion to dismiss for lack of subject matter jurisdiction."). And the Court affirmed "the eminently well-reasoned judgment of the District Court" dismissing the action for lack of jurisdiction. *Id.* In so holding, the Court emphasized that FOIA only "grants federal district courts jurisdiction 'to order the production of any *agency records* improperly withheld from the complainant.'" *Id.* at 661-62 (quoting 5 U.S.C. §

552(a)(4)(B)) (emphasis added by Court). *ACLU* could not be clearer that the judgment it was reviewing was a jurisdictional holding, and that the Court agreed with that holding.

For these reasons, and the reasons stated in the Internal Revenue Service's Motion to Dismiss and supplemental briefing, the Court should dismiss this case for lack of subject matter jurisdiction.

**Conclusion**

For all these reasons, the Court should grant the IRS's motion for summary judgment.

Dated: September 26, 2025

Respectfully submitted,

*/s/ Ryan O. McMonagle*
RYAN O. MCMONAGLE
Trial Attorney, Tax Division
United States Department of Justice
P.O. Box 227
Washington, D.C. 20044
(202) 307-1355
(202) 514-6866 (facsimile)
Ryan.McMonagle@usdoj.gov

*Attorneys for the Internal Revenue Service*